Case No. 14-3618

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

LuzMaria Arroyo,

Plaintiff-Appellant,

v.

Volvo Group North America, LLC,

Defendant-Appellee.

---

Appeal from a Judgment of the District Court for the
Northern District of Illinois, Eastern Division
Case No. 12 C 06859
Honorable Robert M. Dow, Jr., Judge Presiding

**BRIEF AND SHORT APPENDIX OF**
**PLAINTIFF-APPELLANT**

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com

**Oral Argument Requested**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT (Revised)

**Appellate Court No:**   14-3618

**Short Caption:** LuzMaria Arroyo v. Volvo Group North America, LLC

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing, or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the parties mean brief.

**Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[X] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED. Additional names of law firms that represented LuzMaria Arroyo**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):  LuzMaria Arroyo, Plaintiff-Appellant

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: John P. DeRose & Associates, Ed Fox & Associates, and Donna M. Adler Law, LLC

(3)     If the party or amicus is a corporation:
i) identify all the parent corporations, if any; and
          N/A
ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
          N/A

---

Attorney's Signature: /S/ John P. DeRose                         Date: 01/02/15
Attorney's Printed Name: John P. DeRose

Please indicate if you are Counsel of Record for the above listed parties, pursuant to Circuit Court Rule 3(d).   [X] Yes [ ] No.
Address: John P. DeRose & Associates, 428 Spinning Wheel Rd, Suite 428, Hinsdale, IL 60521
Phone: (630) 920-1111 Fax: (630) 920-1170 Email Address: john@johnderoselaw.com

## TABLE OF CONTENTS

Page No.

Circuit Rule 26.1 Disclosure Statement ……………………………………………i

Table of Contents ……………………………………………………………...ii

Table of Authorities ……………………………………………………….viii

Jurisdictional Statement……………………………………………………1

Statement of the Issues Presented for Review……………………………………3

Statement of the Case……………………………………………………4

A. Volvo Hires Arroyo Knowing She Is an Active Army Reservist…………………5

B. Volvo's Loss of Control over Arroyo's Attendance in the Workplace……………5

    1. Early Attempts to Discipline Arroyo for Failure to Keep
       Volvo Advised of Her Military Orders……………………………......5

    2. Volvo's Resistance to Giving Arroyo Adequate Time to Travel
       Pursuant to Military Orders………………………………………6

    3. Arroyo Involves ESGR to Resolve the Travel Issue…………………………7

    4. Volvo's Repeated Attempts to Investigate and Discipline Arroyo
       For Her Absence from the Workplace in Response to Military Orders….8

    5. Volvo Requires Arroyo to Transfer to a Local Army Reserve Unit……….8

    6. Arroyo Provides Orders to Volvo of Her Military Training and
       Deployment in a Timely Manner Upon Receipt……………………….9

    7. Volvo Attempts to Discipline and Terminate Arroyo for
       Failure to Provide Orders of Military Training and Deployment
       Not Yet Prepared…………………………………………………9

    8. Schroeder and Williams Require Creation of Logs, Spreadsheets and
       Charts Tracking Arroyo's Military Obligations and Work Absences……10

    9. Volvo Looks for "an out" from the Obligations of USERRA……………...11

C. Arroyo Returns from Operation Iraqi Freedom Deployment……………………11

1. Although Allowed a Grace Period upon Completion of Deployment,
   Schroeder Expresses Frustration Because Arroyo Does Not
   Immediately Return to Volvo…………………………………………………11

2. Volvo Offers a "Voluntary Severance Package" and
   Debates the Hope That She Will Accept It……………………………12

D. Schroeder's First Attempt to Discipline Arroyo for Being One Minute Tardy…12

1. Schroeder Reports Arroyo Is Contacting the Department of Labor
   To Question the Volvo Attendance Policy………………………………12

2. Arroyo Advises Volvo of Her Medical Issues
   Since Returning from Active Duty……………………………………13

3. Volvo's HR Director Admits an Outsider Might Have a
   Different View of Disciplining Arroyo for Being One Minute Late………13

E. Volvo subjects Arroyo to a Hostile Work Environment ……………………………13

1. Supervisor Ridicules and Mocks Arroyo's
   Requests for Accommodation……………………………………………13

F. Arroyo Self-Admits to the Hospital with Panic Attacks………………………......14

1. Arroyo Confides in Schroeder about Her Emergency Hospitalization …….14

2. Schroeder Plans to Discipline Arroyo After Self-Admittance To Hospital..14

3. Gossip Is Rampant As Arroyo Is Hospitalized…………………………......15

4. Arroyo Contacts ESGR to Mediate for Her with Schroeder…………………15

G. Arroyo Diagnosed with Posttraumatic Stress Disorder………………………......16

H. Hostility as Arroyo Requests Reasonable Accommodations for PTSD…………..16

1. Arroyo Requests Accommodations Recommended by VA…………………..16

2. Schroeder Strongly Urges Supervisors to Have a Witness
   Whenever Talking with Arroyo………………………………………17

3. Schroeder Questions Whether VA Treatment for PTSD
   Is Elective and Whether Group Therapy Can Be Rescheduled……………17

4. HR Representative Acknowledges That Arroyo Is
Exceptional Case and Volvo Might Be in Violation of ADA....................17

5. When Schroeder Corners and Threatens to Fire Her,
Arroyo Tells Him She Feels Intimidated/Threatened...........................18

I. Unequal Treatment and Heightened Scrutiny of Arroyo................................18

1. Schroeder Gives Arroyo a Three-Day Suspension for Being
1 to 3 Minutes Late in Walking to Her Workstation After
Checking in 30 Minutes Early to Use the Meditation Room...................18

2. Schroeder Revises Local Attendance Policy to Eliminate
Military Leave to Which Arroyo Alone Is Subject When
Calculating 6 Month Rolling Time Period in Assessing Discipline...........19

3. Assessing Arroyo Multiple Disciplinary Steps
For the Same Occurrence Not Uniformly Enforced
By Schroeder for Other Employees...................................................20

4. Rather Than Termination, Other Employees Are Given
"Cumulative Excused Tardies", Verbal Warnings, or
Written Warnings for Tardies and/or Whole Day Absences...................20

J. Arroyo Reports Workplace Harassment........................................................22

1. Arroyo Requests Volvo Give Its Managers and Supervisors
Disability Awareness Training.........................................................22

2. Arroyo Takes Her Claims of Harassment by Schroeder
and Complaint about Williams to Volvo Headquarters.......................23

3. Volvo VP Sholl Tells Schroeder Not to Worry about any Investigation.....23

4. No Investigation of Arroyo's Complaint Is Ever Conducted...................24

K. Arroyo Files EEOC Complaint and Harassment Intensifies in Retaliation........24

1. The Accommodation of the Meditation Room Previously Granted
Is Undercut and Frustrated............................................................24

a. Schroeder Enlarges the Application of the "Safety Shoe Policy".....25

b. Schroeder Creates and Promulgates a New Parking Rule............25

c. Just As Schroeder Fears, Arroyo Perceives
She Is Being Singled out For Policy Enforcement.........................25

2. Request to Use Companywide Flexible Work Arrangements Policy
Is Still "Under Review" at Time of Arroyo's Termination.......................26

3. Schroeder Disciplines Arroyo for Allegedly Walking to Her Workstation
1 to 3 Minutes Late After Using the Meditation Room..........................26

L. Termination of Arroyo by Schroeder and Williams........................................27

1. Schroeder's Proffered Reason for Termination of Arroyo.......................27

2. Upon Review of Time Records by Volvo's Manager of Payroll and
Administration, Volvo's Proffered Reason for Termination Has No Basis
In Fact As Arroyo Was Not Tardy on the Dates Claimed by Volvo..........27

3. On the Date of Her Termination, Schroeder Complains Arroyo
Involves ESGR and Insists on Her Rights under USERRA and ADA.......28

SUMMARY OF THE ARGUMENT.................................................................29

ARGUMENT....................................................................................30

A. Standard of Review...........................................................................30

B. Summary Judgment Is Inappropriate for Deciding Volvo's Motives
and Intent in Dealing with Arroyo ..............................................................31

C. Arroyo's Convincing Mosaic of Circumstantial Evidence ...............................32

D. Arroyo Files EEOC Charge of Discrimination
And Harassment Intensifies in Retaliation....................................................34

1. The Accommodation of the Meditation Room Granted,
But after Use for 2 Months without Incident,
Undercut and Frustrated by Schroeder and Supervisors............................34

E. Termination of Arroyo by Schroeder and Williams......................................35

1. Schroeder's Remarks Just Days Before Arroyo's Termination.................35

2. Remarks by Schroeder on the Day Arroyo Is Terminated......................36

3. Volvo's Proffered Reason Insufficient to Motivate Discharge of Arroyo....37

    a. Arroyo Is Qualified to Perform Functions of the Job........................37

    b. Arroyo's Accommodation Requests of Volvo are Minimal.................38

    c. Arroyo's Compromise Requesting Use Of
       Companywide Flexible Work Schedule.........................................38

    d. Schroeder's Proffered Reason for Discharge Unworthy of Credence.....39

F. Volvo Fails to Follow Its Own Progressive Disciplinary Process
   In Assessing Arroyo Multiple Disciplinary Steps for the Same Occurrence.......40

G. Volvo's Repetitive Discriminatory Behavior
   Between Arroyo's Protected Activity and Her Termination Evince
   The Causal Link of the Two Events............................................................41

H. Arroyo Solicits the Aid of ESGR As She Seeks USERRA Protection
   From Termination While Responding to Military Orders.............................42

I. Arroyo Solicits the Aid of ESGR as She Seeks Protection and Rights
   Afforded Her under USERRA and ADA........................................................46

   1. Ridicule and Mockery of Arroyo................................................................46

   2. Schroeder Plans to Discipline Arroyo after She Confides in Him
     She Self- Admits to the Hospital...........................................................47

   3. Arroyo Contacts ESGR to Mediate for Her with Schroeder........................47

   4. Gossip about Arroyo's Absence Is Rampant Among Supervisors
     and Employees....................................................................................48

J. Arroyo Diagnosed with Posttraumatic Stress Disorder
   and Discrimination and Harassment Follow................................................48

   1. Schroeder Urges All Supervisors
     To Have a Witness When Talking to Arroyo..........................................49

   2. Schroeder Questions Whether VA Treatment for PTSD
     Is Elective and Whether Group Therapy Can Be Rescheduled....................50

    3. Volvo HR Admits Arroyo Is an Exceptional Case

And Volvo Might Be in Violation of ADA................................................50

4. When Schroeder Corners and Threatens to Fire Her,
Arroyo Tells Him She Feels Intimidated/Threatened............................51

5. Schroeder Gives Arroyo a Three-Day Suspension for Being
1 to 3 Minutes Late in Walking to Her Workstation
After Checking in 30 Minutes Early to Use the Meditation Room............51

6. Arroyo Requests Volvo Give Its Managers and Supervisors
Disability Awareness Training........................................................52

K. Arroyo Reports Workplace Harassment.................................................52

1. Arroyo Takes Her Complaints of Harassment by Schroeder
And Claims about Williams to Volvo Headquarters..............................52

2. Volvo VP Sholl Fails to Take Arroyo's Claims Seriously.........................53

L. Volvo's Intentional Infliction of Emotional Distress on Arroyo........................53

M. Taxing of costs on Arroyo.........................................................54

CONCLUSION..........................................................................54

CIRCUIT RULE 30(d) STATEMENT.....................................................56

CERTIFICATE OF COMPLIANCE with F.R.A.P. and C.R. 28.1 and 32(a)(7).......56

CERTIFICATE SERVICE................................................................57

TABLE OF CONTENTS TO SHORT APPENDIX...........................................58

SHORT APPENDIX....................................................SA1 to SA 94

## TABLE OF AUTHORITIES

**Cases Cited**                                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505,
91 L.Ed.2d 202 (1986)...................................................................................30, 31, 54

*Ashman v. Burrows*, 438 F.3d 781, 784 (7th Cir.2006).....................................31

*Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir.2008)............................................46

*Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir.2001).........................30

*Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir.2010).........36

*Gross v. PPG Industries, Inc.*, 636 F.3d 884, 892-3 (7th Cir.2011).......................54

*Hobgood v. Illinois Gaming Board*, 731 F.3d 635, 644 (7th Cir.2013)...................33

*Honaker v. Smith*, 256 F.3d 477, 495-97 (7th Cir. 2001)...................................54

*Ledbetter v. Good Samaritan Ministries*,
--- F.3d ----, 2015 WL 493803, at *5 (7th Cir. 2015)..........................................41

*Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir.2009)..........................37

*Malin v. Hospira, Inc.*, 762 F.3d 552, 559 (7th Cir.2014).........................37, 39, 41

*Martino v. Western & Southern Fin. Grp.*, 715 F.3d 195, 201 (7th Cir.2013).........33

*McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)...........................................53

*Musch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir.2009).........................30

*Naficy v. Illinois Dep't of Human Services*, 697 F.3d 504, 509 (7th Cir.2012).........30

*Paz v. Wauconda Health Care and Rehabilitation Centre, LLC*,
464 F.3d 659, 664 (7th Cir. 2006)...................................................................32

*Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir.2004).....................33

*Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 465 (7th Cir.2014)........................39

## Statutes-Regulations Cited                                    Page(s)

28 U.S.C. A. §§ 1331..................................................................................1

28 U.S.C. A. §1343...................................................................................1

28 U.S.C. A. §1391(b)..............................................................................1

29 U.S.C.A. § 215(a)(3)............................................................................1

29 U.S.C. § 791 *et. seq*............................................................................1

29 U.S.C. A. § 794....................................................................................1

29 U.S.C.A. § 794(a)(1)............................................................................1

29 U.S.C.A. § 2615(a)(1)..........................................................................1

38 U.S.C.A. § 4301 *et seq*.......................................................................1

38 U.S.C.A. § 4301(1) to (3)...................................................................45

38 U.S.C. A. § 4311(b)(1)and (4)...........................................................49

38 U.S.C. A. § 4311(C)(1)(a)..................................................................31

38 U.S.C.A. §4312(e)(1)(D)....................................................................44

38 U.S.C.A. §4323(h)(1).........................................................................54

42 U.S.C.A. § 2000e *et seq*.....................................................................1

42 U.S.C.A § 12101 *et seq*......................................................................1

42 U.S.C.A. §12111(8)............................................................................37

20 C.F.R. §1002.88.................................................................................43

20 C.F.R. §1002.248(a)..........................................................................39

## Jurisdictional Statement

This action was brought pursuant to 29 U.S.C.A. § 794; and the jurisdiction of the District Court was invoked pursuant to 29 U.S.C.A. § 794(a)(1).  Venue lies in the District Court pursuant to 28 U.S.C.A. §§ 1331, 1343, and 1391(b) because the events giving rise to this claim occurred in the District, and Plaintiff and Defendant and its employees reside in the District.

This is an action seeking redress for violations of rights guaranteed to the Plaintiff under the Uniformed Service Members Employment and Reemployment Act (USERRA), 38 U.S.C.A. § 4301 *et seq.*, 29 U.S.C.A. § 215(a)(3), under the Americans with Disabilities Act (ADA) of 1990, § 2 *et seq.*, 42 U.S.C.A. § 12101 *et seq.*, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.A. §§ 2000e *et seq.*, as amended, under the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C.A. § 791 *et. seq.*, and under the Family Medical Leave Act (FMLA), 29 U.S.C.A. § 2615(a)(1) when she was subjected to a hostile work environment and was ultimately terminated because of interference and retaliation by her employer as she sought to exercise her rights under these Acts.

The trial court granted Summary Judgment for Defendant-Appellee Volvo Group North America, LLC (hereinafter "Volvo") on September 30, 2014 and dismissed all of the claims of Plaintiff-Appellant LuzMaria Arroyo (hereinafter "Arroyo"). Arroyo filed a Rule 59 motion to reconsider on October 10, 2014 and the trial court denied the Rule 59 motion to reconsider on November 5, 2014.

The Seventh Circuit Court of Appeals has jurisdiction over this matter pursuant to Rule 4 of the Federal Rules of Appellate Procedure.

The Notice of Appeal was filed on December 1, 2014.  (SA91-92).

This appeal is taken from a final judgment and order that disposes of all claims. (SA93).

## Statement of the Issues Presented for Review

Whether Volvo's proffered reason for termination of Arroyo is a mere pretext claiming that she allegedly reported to her workstation 1 to 3 minutes late after having punched into work 30 minutes early to use the meditation room as agreed.

Whether the many email statements exchanged among Volvo management employees over the several years of Arroyo's deployments to Iraq and interruptions in her employment for military training and service show the true motives of Volvo's termination of her is the oft-stated frustration, ridicule, and hostility toward Arroyo as she sought her rights and protections under USERRA and ADA.

Whether Volvo's policies were universally applied to all of its employees or were used to single out Arroyo for discipline and termination.

Whether subjecting Arroyo who was diagnosed with Post Traumatic Stress Disorder to a hostile work environment exacerbated her condition and intentionally caused severe emotional distress.

Whether all reasonable inferences drawn in favor of Arroyo create a convincing mosaic that Volvo intentionally discriminated against her to preclude summary judgment.

## STATEMENT OF THE CASE

This action is brought by Army Reservist Arroyo who was deployed to Iraq and Kuwait on 3 separate tours of duty. Unbeknownst to Arroyo, from the very commencement of her employment in 2005, Volvo management and supervisors communicate with each other and complain regularly about her absence from work while responding to military orders. They plan and discuss disciplining and/or terminating Arroyo while she complies with military orders. Arroyo solicits the aid of Employer Support of the Guard and Reserve (hereinafter "ESGR") to enforce her rights under USERRA.

Upon return from her latest deployment in 2010 and while under treatment at the Veterans Administration for Posttraumatic Stress Disorder, Volvo management expresses their ridicule of and hostility toward Arroyo as she seeks accommodations.  Knowing of her PTSD, Volvo management intentionally subjects her to mockery, physical intimidation and heightened scrutiny.  Experiencing hostility and harassment in the workplace, Arroyo files complaints at Volvo Headquarters and then with EEOC. Thereafter, Volvo discriminatorily applies its policies singling out Arroyo for discipline.  Volvo terminates Arroyo for allegedly being 1 to 3 minutes late on 3 occasions in walking to her workstation although she had punched into work 30 minutes early to use the meditation room before work as agreed. The proffered reason for termination is insufficient and pretextual.  The true motive of the Volvo management team for the termination is their oft-stated

frustration, ridicule, and hostility toward Arroyo as she insists on her rights under USERRA and ADA.

## A. Volvo Hires Arroyo Knowing
## She Is an Active Army Reservist

Volvo hires Arroyo knowing that she is an active Army Reservist.  Arroyo is the only active duty reservist at the Joliet facility subject to military orders and the protections and benefits of USERRA. (Doc. 82-3, pp. 7-8 [Schroeder Dep. pp. 21:3 to 23:21]; Doc. 82-2, pp. 14, 16 [Temko Dep. pp. 46:7-17 and 54:18-20]).  Volvo always has a sufficient workforce so that it can meet its production needs and customer demands, even if Arroyo is away complying with military orders. (Doc. 82-3, p. 20 [Schroeder Dep. pp. 70:23 to 71:3]; Doc. 82-2, pp. 19, 33 [Temko Dep. pp.69:3-21 and 124:5 to 125:4]).

## B. Volvo's Loss of Control
## Over Arroyo's Attendance in the Workplace

### 1. Early Attempts to Discipline Arroyo for
### Failure to Keep Volvo Advised of Her Military Orders

Unbeknownst to Arroyo, upper management and supervisors communicate with each other regularly about her absence from the workplace while responding to military orders. Shortly over 2 months after having hired her, Plant Manager Schroeder and Material Handling Supervisor Temko contemplate discipline of Arroyo when she is absent from work responding to military orders. In an August 25, 2005 email exchange, Temko advises Schroeder:

> LuzMaria Arroyo had military duty from 8–16 to 8–19. …
> Sunday night, Monday night, Tuesday night LuzMaria
> was a no call, no show…. Wednesday night she shows up

> with a document from her unit saying she worked there
> on Monday.  I questioned her as why she is returning to
> work Wednesday night if she only had to work Monday.
> She said she drove back from her unit which is in
> Georgia….

Schroeder responds:

> ….
>
> If attendance action is in order[,] we must do it
> expeditiously.

(Doc. 78-3 p. 27; Doc. 82-2, pp. 9-10 [Temko Dep p. 28:11 to 33:8]).

## 2. Volvo's Resistance to Giving Arroyo Adequate Time To Travel Pursuant to Military Orders

Schroeder and Temko determine that Arroyo's "military duties were becoming an undue hardship for the company" and question whether they have to give Arroyo travel time to and from Fort Benning, Georgia for training. (Doc. 78-2, pp. 2-3; Arroyo Affidavit, ¶¶ 7-15).

The next time Arroyo travels to Fort Benning, Georgia for training, Temko poses a question:

> … I guess the question is, since she travels out of state for
> drill, are we required to give her the day before and day
> after for travel?....

(Doc. 78-3, p. 28).

Schroeder re-directs the inquiry to HR Director Bruce Olin at Corporate Headquarters in North Carolina:

> …
> Apparently her military reserve unit is in Georgia and she
> needs added time to drive to and from Georgia…. [S]he

> could request a transfer to an Illinois reserve unit[,] but I
> am not sure we can direct her to do that.

(Doc. 78-3, p. 29).

Two days later, Schroeder again emails Olin that Arroyo provides "numerous documents from various websites which appear to be from the US Department of Labor, Title 38 United States Code and from the ESGR (Employer Support of the Guard and Reserve)...".

In response HR Director Bruce Olin incorrectly advises:

> …First, we do not have to grant time off for her travel
> time. Her legal obligation is 2 weeks per year, which we
> do give off, and 1 weekend per month. The drills she
> attended were most likely extra training, which we do not
> have to grant the time. We do not have to give extra time
> for her travel to and from her weekend duty. She does
> have the option to transfer to a closer unit, we cannot
> make her transfer.

(Doc. 78-3, p. 31).

### 3.  Arroyo Involves ESGR to Resolve the Travel Issue

Arroyo files her first inquiry and involves ESGR to assist in resolving the travel issue. HR Representative Celia Jarvis emails Temko, correcting the previous direction and acknowledges that Arroyo must be given adequate travel time and rest time to fulfill her military obligations:

> After our conversation (you, LuzMaria and me), LuzMaria
> filed an inquiry with "Employer Support of the Guard and
> Reserve" to assist in resolving her travel issue. I had two
> somewhat lengthy conversations with a volunteer from
> the organization--Christopher Bernard out of North
> Carolina. Following our first conversation, and much
> reading of the law (revisions/law reviews), it is clearly

written that LuzMaria **be afforded travel time plus an
eight hour rest period following her drill before having to
report to work.**  (I called the Washington DC ESGR just to
ensure I was correct in this interpretation.) (Bold print
and underlining in original).

(Doc. 78-3, p. 36; Doc. 82-2, pp. 19-22 [Temko Dep. pp. 69:22 to 75:6, and 77:15 to
78:12]).

## 4. Volvo's Repeated Attempts to Investigate and Discipline
## Arroyo for Her Absence from the Workplace
## In Response to Military Orders

In early April 2007 Temko complains to Schroeder and Olin that Arroyo

contacted him only one time during her deployment to Iraq and they had only a

brief conversation before they were disconnected. Schroeder and Temko seek advice

as to how to investigate and discipline her:

> Would it [be] appropriate to contact her unit to inquire
> about her deployment status? If not, what are our rights
> and her responsibility in keeping us informed of her
> deployment status?...

(Doc. 78-3, p. 38).

HR Director Olin advises them that under USERRA:

> Unfortunately, there isn't a lot we can do…  All she has to
> do is to inform us within six months of her release.  Per
> the law we have to wait for her.  Sorry it isn't what you
> wanted to hear.

(Doc. 78-3, p. 39).

## 5. Volvo Requires Arroyo to Transfer
## to a Local Army Reserve Unit

Despite having previously decided and been advised that they could not

"make her transfer" to a closer Army Reserve Unit, Schroeder makes it very clear to

Arroyo that "if I wanted to continue to enjoy a career with Volvo, I had better find a
local Army Reserve Unit". Forgoing the camaraderie she had developed with her
"Army Buddies" during her prior deployment, Arroyo transfers to a local Army
Reserve Unit in Darien, Illinois. (Doc. 78-3, pp. 29, 31; Doc. 78-4, p. 1; Doc. 78-2, p.
4, Arroyo Affidavit, ¶¶27-30).

### 6. Arroyo Provides Orders to Volvo of Her
### Military Training and Deployment
### In a Timely Manner Upon Receipt

Arroyo had only been back from deployment to Baghdad, Iraq since May of
2007.  Upon her return to work at Volvo, Arroyo gives Temko the military orders
setting forth her drill schedule for the whole 2007-2008 year in advance.  She also
keeps the Volvo Management Team advised when she is ordered to Annual
Training for three consecutive stretches with her new Darien Reserve Unit in April
2008. (Doc. 78-4, pp. 1-7; Doc. 82-2, pp. 27, 29 [Temko Dep. 98:13 to 100:10 and
106:23 to 108:2]).

### 7. Volvo Attempts to Discipline and Terminate Arroyo for Failure to
### Provide Orders of Military Training and Deployment Not Yet Prepared

When Arroyo's training is extended in 2008, Arroyo is documented by Temko
as "No Call. No Show".  Schroeder expresses his frustration that she has not called
or faxed military orders that were not yet even issued for the extended service.
They consider terminating her at the time.

> LuzMaria has a verbal warning waiting for her when she
> finally comes back. If we were to give her occurrences for
> Thursday, Nov. 13 & Tuesday, Nov. 18 this would put her
> at a 3 Day Suspension for her attendance. If we were to,

9

also, give her an occurrence for Wednesday, Nov. 12 this
would bring her to Termination for her attendance.

LuzMaria was absent from work again tonight (no call/no-
show). We need to contact her and find out what is going
on.
… I received the attached communication from LuzMaria
Arroyo['s] local Army unit which states that she has
orders for No[v] 12 to Nov 26 issued Nov 14th.  One would
have thought that if LuzMaria had received these orders
on Nov 14[,] she would have called or faxed us the orders.
While I have issues with her lack of communications[,] we
likely have no recourse due to her military service.

(Doc. 78-4 p. 11, 10, 15; Doc. 78-2, p. 5, Arroyo Affidavit, ¶¶ 33-38; Doc. 82-3, pp. 33-
34 [Schroeder Dep. pp. 122:5 to 126:16]).

### 8. Schroeder and Williams Require the Creation of Logs, Spreadsheets and Charts Tracking Arroyo's Military Obligations and Work Absences

Starting in November 2008 and continuing throughout the rest of her

employment with Volvo. Schroeder and Regina Williams heighten the scrutiny of

Arroyo.  They order Temko and Maureen Somersett to create logs, spreadsheets,

and charts of Arroyo's military orders, days off work for military drills, and punch

in times when Arroyo returns from VA therapy sessions.  They forward the

spreadsheets, logs, and charts to HR at Volvo Headquarters in North Carolina.

Temko creates a timeline of Arroyo's Annual Drills and checks MapQuest for travel

time and distance to and from Fort McCoy, Wisconsin.  Although Volvo destroys

such spread sheets made for other employees after they return to work, the

spreadsheets made on Arroyo are kept into perpetuity. (Doc. 82-2, pp. 30-32 [Temko

Dep. 110:22 to 113:5 and 117:8 to 118:22 Doc. 82-5, pp. 7-9 [Somersett Dep., pp.

20:24 to 24:3, 26:6 to 27:9]).

### 9. Volvo Looks for "an out" from the Obligations of USERRA

Schroeder, Temko, and Olin discuss in writing Arroyo's termination when she returns to work from her Annual Drills at Fort McCoy.  After scouring USERRA, Olin advises that he has discovered a way to discipline Arroyo for her absence from Volvo in compliance with her military orders:

> Keith, just an FYI. This is part of the law which allows
> her to take the military leave. The last paragraph is our
> "out" to hold her to other policies.

(Doc. 78-4, p. 14; Doc. 82-2, pp. 32-33 [Temko Dep. pp. 118:23 to 122:24 and 123:12-19]).

### C. Arroyo Returns from Operation Iraqi Freedom Deployment

### 1. Although Allowed a Grace Period upon Completion of Deployment, Schroeder Expresses Frustration Because Arroyo Does Not Immediately Return to Volvo

In September 2010 Arroyo returns from yet another 400 day deployment in support of Operation Iraqi Freedom.  Although Arroyo has 6 months thereafter within which to make her decision of whether to return to Volvo, Schroeder again advises upper management of his dissatisfaction and frustration with her failure to immediately return to work:

> After military records review we believe that LuzMaria
> should have returned to work on August 15, 2010. I
> believe she knew this and now has been out an additional
> 6 weeks[;] yet for this case we do not believe any action
> should be taken.

(Doc. 78-4, p. 38).

### 2. Volvo Offers a "Voluntary Severance Package" and Debates the Hope That Arroyo Will Accept It

Schroeder tells VP Sholl:

> Bruce, Mike and I support that we offer the Voluntary Severance Package to LuzMaria pending your approval.

Sholl responds:

> Yes[.] I am okay with offering the package. Do you think she will accept?

Schroeder replies:

> When we met with her several months ago I thought yes[;] yet now not sure as if she were interested I had thought that she would have contacted me before she returned to work.

Temko suggests:

> Depending on [how] much time we give her to make her decision, I think it is possible. …

(Doc. 78-4, pp. 38-39).

### D. Schroeder's First Attempt to Discipline Arroyo for Being One Minute Tardy

### 1. Schroeder Reports Arroyo Is Contacting the Department of Labor To Question the Volvo Attendance Policy

Shortly after Arroyo refused the Voluntary Severance Package, on November 4, 2010, Schroeder writes to Volvo upper management:

> LuzMaria challenged her attendance occurrence for being tardy one minute as she claimed that she was unaware of the Chicago attendance policy change on January 1, 2009. …
> LuzMaria stated to me that she has contacted the HRSC to validate company-local attendance policy. She also stated that she plans to contact the Department of Labor for questions she has on company absenteeism policy.

(Doc. 78-4, p. 60).

## 2.  Arroyo Advises Volvo of Her Medical Issues Since Returning from Active Duty

The following day Schroeder reports to upper management that Arroyo "is having personal issues of depression since her return from active military duty". Schroeder notes that Arroyo wants her absence on October 19, 2010 to be considered excused as "she was seeking support from the military for her medical issues".  (Doc. 78-4, p. 60; Doc. 78-2, pp. 6-8, Arroyo Affidavit, ¶¶ 44-47 and 50-56).

## 3. Volvo's HR Director Admits An Outsider Might Have a Different View of Disciplining Arroyo for Being One Minute Late

Schroeder is stopped by Human Resources Director Bruce Olin from disciplining Arroyo and giving her a CAP for being 1 minute late:

> The only issue I have concern [about] is the last tardy of one minute.…  I understand we enforce the rules completely and non-discriminatorily, but I can see some outsider having a different view of this.

(Doc. 78-4, p. 59; Doc. 82-3, p. 35 [Schroeder Dep. p. 131:6-20]).

## E. Volvo subjects Arroyo to a Hostile Work Environment

## 1.  Supervisor Ridicules and Mocks Arroyo's Requests for Accommodation

Arroyo does research on the ESGR website concerning accommodations recommended by the Department of Labor for employees in the military. Before commencing work each day, she arrives as much as a half hour early for her shift and sits in her car using the meditation/relaxation techniques as suggested in the

materials she is researching online and receiving from the Veterans Administration.

Seeking aid from Volvo to understand her PTSD, Arroyo shares that material with

Volvo management. Sherrie Jankowski, Arroyo's supervisor tells Schroeder:

> She is really becoming a pain with all of this.  She wanted
> me to read this, but I told her I did not have the time
> right now!  Enjoy the reading… it's only 24 pages!!!!!

(Doc. 78-5, p. 17; Doc. 78-2, p. 7-8, 10-11, Arroyo Affidavit, ¶¶ 54, 55, 70-75; Doc. 82-

3, p. 36 [Schroeder Dep. 135:2 to 136:22]).

### F. Arroyo Self-Admits to the Hospital with Panic Attacks

#### 1. Arroyo Confides in Schroeder About Her Emergency Hospitalization

On Christmas Eve 2010, Arroyo confides in Schroeder via email:

> I had to go to the emergency room yesterday…. The doctor
> gave me a note for no work thru 12/30.… Between the
> stress at work and the stress of reliving the events of my
> deployment through writing my story, I have been having
> panic attacks…. I feel scared. And there's no reason to be
> scared. I don't know how to get myself to feel safe again….
> and I am tired of fighting. I nearly fell asleep driving
> home from work every day this week. If I don't get some
> rest and relax, I will wind up killing myself trying to get
> to or from work.

(Doc. 78-5, p. 48).

#### 2. Schroeder Plans to Discipline Arroyo After Self-Admittance to Hospital

Despite having confided in him, Schroeder considers giving Arroyo discipline

for not being in attendance at work from December 23 through December 30, 2010:

> Attached to this email is a communication from LuzMaria
> Arroyo advising us that she will be off a total of 5 days
> beginning 12.23 to 12.30.

> [U]nder our attendance policy on 12.29 LuzMaria would
> be issued Step 2 Formal Written CAP and on 12.30 Step
> 3, 3 Day Suspension.
>
> At this time, I am not aware of any rule or guideline in
> our corporate "Military" policy that would excuse these
> days. Additionally, LuzMaria is awaiting our decision on
> the ESGR - Military federal policy rule.

(Doc. 78-5, p. 48).

Arroyo provides a Doctor's note and hospital discharge paperwork excusing her from work for the period of December 23, 2010 through December 30, 2010. Once again, Schroeder is foiled in his attempts to discipline Arroyo for her absence from work. (Doc. 78-5, p. 48; Doc. 78-2, p. 9, Arroyo Affidavit, ¶¶63-65; Doc. 82-3, pp. 37-39 [Schroeder Dep. pp. 139:15 to 142:24 and 146:6 to 148:24]).

### 3. Gossip Is Rampant As Arroyo Is Hospitalized

While Arroyo self-admits to the hospital, Volvo supervisors and employees gossip that Arroyo is on a vacation in Hawaii:

> … There are several rumors for her not being here:  1. She
> fell and hurt herself and is on A&S.  2.  She's on workers
> comp.  3.  She's on vacation in Hawaii.  (This sounded far
> fetched until I realized that she is on vacation next week
> too!)

(Doc. 78-5, p. 49).

### 4. Arroyo Contacts ESGR to Mediate for Her with Schroeder

On December 30, 2010 Arroyo emails Col. Gorski of ESGR complaining that she believes she is "being targeted and attacked" by Mr. Schroeder, as she seeks the benefits to which she is entitled:

> I want to work. I want to be paid for the work that I do. I do not want to be abused. I do not want to be punished for exercising my rights. And I want the benefits and entitlements provided for me by law/the company. And I have called you, Mr. Gorski, because I am tired of fighting. I do not wish to speak to Mr. Schroeder any more.

(Doc. 78-5, pp. 53-54).

### G. Arroyo Diagnosed with Posttraumatic Stress Disorder

Shortly after Arroyo self-admits to the hospital, Dr. John J. Koehler, the doctor chosen by Volvo to conduct an Independent Medical Examination of Arroyo confirms the diagnosis by Dr. J. Richard Monroe of the Veterans Administration that she is suffering from PTSD. (Doc. 78-5, pp. 58-63; Doc. 78-2, pp. 9-10, Arroyo Affidavit, ¶¶ 66-69).

In light of the Independent Medical Examination by Dr. Koehler, Schroeder and Temko don't believe that Arroyo is malingering or faking her PTSD disability. (Doc. 82-3, pp. 40, 45 [Schroeder Dep. pp. 152:7-20 and 171:13 to 172:6]; Doc. 82-2, p. 40 [Temko Dep. p. 151:17 to 24]).

### H. Hostility As Arroyo Requests<br>Reasonable Accommodations for PTSD

### 1. Arroyo Requests Accommodations Recommended by VA

Arroyo gives Schroeder and Williams documentation she receives from the VA and the Department of Labor entitled *America's Heroes at Work*, a project intended to equip "employers and the workforce development system with the tools they need to help returning Service Members affected by TBI and/or PTSD succeed in the workplace-particularly Service Members returning from Iraq and

Afghanistan". (Doc. 78-4, pp. 46-54; Doc. 78-5, pp. 66-69; Doc. 78-6, pp. 4-9, 41-44; Doc. 78-2 pp. 10-11, Arroyo Affidavit ¶¶ 70 and 73).

## 2. Schroeder Strongly Urges Supervisors to Have a Witness Whenever Talking with Arroyo

By May 2011 Arroyo makes it clear to Schroeder that she thinks he is discriminating against her because of her PTSD disability. Schroeder writes to all his supervisors:

> Due to the ongoing job issues and concerns with LuzMaria
> Arroyo, I strongly urge you to have a witness whenever
> you have a conversation with this employee.

(Doc. 78-5, p. 65; Doc. 78-2, p. 12 ¶¶76-78; Doc. 82-3, pp. 41-42 [Schroeder Dep. pp. 156:18 to 160:20]).

## 3. Schroeder Questions Whether VA Treatment for PTSD Is Elective and Whether Group Therapy Can Be Rescheduled

When the Veterans Administration orders Arroyo to attend therapy sessions in Mindfulness Meditation in Trauma Services on Tuesday evenings from 4:00 PM to 5:30 PM, Schroeder contacts Hines VA Hospital, inquiring whether the therapy sessions are only "elective medical services or military mandated medical treatment" and whether the group therapy sessions could be changed to another time so it would not interfere with her Volvo work schedule. Schroeder is told "no". (Doc. 78-6, pp. 1-2; Doc. 78-2, pp. 10-11, Arroyo Affidavit, ¶71).

## 4. HR Representative Acknowledges That Arroyo Is Exceptional Case and Volvo Might Be in Violation of ADA

When dealing with Arroyo, HR Representative Regina Williams advises Schroeder:

…
We are dealing with an exception in her case. We could be
in violation of ADA.

(Doc. 78-6, p. 3; Doc. 78-2, p. 11, Arroyo Affidavit, ¶ 72).

### 5. When Schroeder Corners and Threatens to Fire Her, Arroyo Tells Him She Feels Intimidated/Threatened

On August 26, 2011 Arroyo writes to Schroeder:

> On 8/24 you requested to speak with me and Mr. Dunn at
> which time you threatened to fire me for my behavior.
> Your demeanor was aggressive and hostile and I felt
> intimidated/threatened…. You also stated that continued
> breaks for managing anxiety will result in termination.
> When I requested this information in writing, you refused
> to provide it to me and still have not provided it to date.
>
> On 8/25 you again requested to speak with me; this time
> cornering me in a small office with 2 other supervisors
> and Ms. Maureen Somersett behind a closed door, in a
> room with no windows and no way to escape. You
> provided me with the workplace violence policy and the
> harassment policy and then allowed me to leave.

(Doc. 78-6, pp. 4-5).

### I. Unequal Treatment and Heightened Scrutiny of Arroyo

### 1. Schroeder Gives Arroyo a Three-Day Suspension for Being 1 to 3 Minutes Late in Walking to Her Workstation After Checking in 30 Minutes Early to Use the Meditation Room

Three days after Arroyo writes Schroeder about her complaint that he is

intimidating her, Schroeder issues a Corrective Action Plan giving Arroyo a three

day suspension for "5 occurrences in a six month period". The time period used to

make the calculation, however, is the 10 months from October 19, 2010 to August

20, 2011 and includes being one (1) minute late on 5 separate occasions, even

though Arroyo is arriving 30 minutes early and sits in her car using relaxation techniques learned in her VA therapy sessions in order to de-stress and de-escalate before starting work.  (Doc. 78-6, pp. 10-13; Doc. 82-3, p. 54 [Schroeder Dep., pp. 207:23 to 208:7]).

### 2. Schroeder Revises Local Attendance Policy To Eliminate Military Leave to Which Arroyo Alone Is Subject When Calculating 6 Month Rolling Time Period in Assessing Discipline

Schroeder revises the attendance policy for the Chicago plant in 2009. With that revision, Arroyo, the only one subject to military orders, accumulates absences for Military Leave, A&S, and FMLA that are not taken into account when measuring the rolling time period to determine if a CAP is warranted. (Doc. 77-5, p. 41).

Schroeder states "each time there is an occurrence, we apply a four week and six-month look-back period from the date of the most recent occurrence to see if an employee has earned enough occurrences to receive a step in the progressive discipline process." (Doc. 77-5, p. 4, Schroeder Affidavit, ¶6).  Because of the modification he makes to the local attendance policy, Schroder reviews almost a full year of Arroyo's time records when determining whether she accumulates an occurrence.  (Doc. 77-6, pp. 79-80).  When Arroyo is given a written warning for her attendance on August 31, 2011, she allegedly accumulates a total of five occurrences in a six-month period. However, the period measured is from October 19th, 2010 through August 19th, 2011. (Doc. 77-6, p. 77).  When assessing her time records, Volvo excludes full months because Arroyo is absent from work because of A&S,

FMLA and Military Leave.  On that same day, Schroeder also gives Arroyo a three-day suspension for attendance for the six month time period October 19th, 2010 through August 20th, 2011 for accumulating five occurrences within a six month period.  (Doc. 77-6, p. 78).

### 3.  Assessing Arroyo Multiple Disciplinary Steps For the Same Occurrence Not Uniformly Enforced By Schroeder for Other Employees

Schroeder states in his Affidavit that "the policy is enforced on a rolling fiscal year basis and depending on how close an employee's occurrences are to one another, an employee may receive more than one disciplinary step at the same time, as the same occurrence can count for purposes of multiple disciplinary steps, given the look-back periods...."  (Doc. 77-5, pp. 4-5, Schroeder Affidavit ¶7).  Of course, Arroyo receives multiple disciplinary steps at the same time in the first week of November 2011 when she is disciplined and ultimately terminated.  (Doc. 78-6, p. 52-57; Doc. 78-2, p. 13, Arroyo Affidavit, ¶ 82; Doc. 82-3, pp. 55, 68-69 [Schroeder Dep., pp. 213:7-14, 262:19 to 266:14; Doc. 77-6, p. 1-2; Doc. 77-6, p. 96-98).

### 4. Rather Than Termination, Other Employees Are Given "Cumulative Excused Tardies", Verbal Warnings, or Written Warnings for Tardies and/or Whole Day Absences

Although employees receive CAPS for tardiness, most receive occurrences for more excessive tardiness.  Most occurrences concern employees who simply call in and do not show up for work at all.  Upon review of all the records submitted by Volvo, only five other employees receive occurrences for being less than three minutes late, however none of them were coping with symptoms of PTSD or had

actually clocked into the plant 30 minutes early.  (Doc. 77-5, pp. 53-231).  Only one

other employee, Victor Jackson receives an occurrence which led to a three-day

suspension for being one minute late.  He is terminated ten days later for calling in

because of weather.  (Doc. 77-5, pp. 135-136).

Upon review of the copies of the time sheets and Corrective Action Plans

("CAPS") for all material handlers who receive any disciplinary action under the

Policy from 2008 through 2012, it is apparent that Volvo is not administering the

Policy consistently among its staff.   (Doc. 77-5, pp. 53-231).  A number of employees

have marks under "excused cumulative days", while Arroyo is not given any excuses

under that category.  Some employees indicate the reason for their absence as "call

in, personal." (E.g., in 2008 Reginald Brown has a "call in, personal" on July 31 and

August 8, one is excused and one is unexcused.) (Doc. 77-5, p. 66). Typically, a

document is required for such an absence, otherwise an occurrence is assessed.

However, some individuals have no mention that a document was provided, but

they still do not acquire an occurrence. (E.g. David Tilghman receives a verbal

warning on December 18, 2008 because he has accumulated a total of 2 occurrences

in a one-month period when he has a "call in, personal with no document" on

December 11th and December 12th of 2008.  (Doc. 77-5, pp. 107-108). However, Ray

Beier accumulates an excused cumulative day on January 22, 2010 when he has a

"call in, sick with no document".) (Doc. 77-5, p. 152).

On January 30, 2008, Victor Jackson is late because of an accident on I-80,

which is excused (Doc. 77-5, p. 74); on March 26, 2008, Will Riley is excused for

traffic on I-55 (Doc. 77-5, p. 94); and on February 1, 2008, Mike Eigenbauer has

"winter snowstorm, 12'+ Schroeder exception excused." (Doc. 77-5, p. 68).  However

other employees accrue an occurrence for the same reasons given. (E.g. Mark Zweig

earns a three-day suspension for accumulating a total of two occurrences in a one-

month period when he was late on June 11, 2008 after there was an accident on I-

80.)  (Doc. 77-5, pp. 113-114).

### J. Arroyo Reports Workplace Harassment

#### 1. Arroyo Requests Volvo Give Its Managers and Supervisors Disability Awareness Training

On September 1, 2011, following her chain of command and Volvo's Conflict

Resolution Policy, Arroyo first requests of Schroeder that Disability Awareness

Training be provided to him, her supervisors, and her coworkers:

> Additionally, I request Human Resources to provide
> reasonable accommodation with providing YOU, the
> supervisors and my coworkers with disability awareness
> training.  Additionally, I request a quiet space be provided
> for me to be able to meditate/utilize relaxation techniques
> (usually done at break and before work begins).  Finally,
> as was the case on 8/23, I request empathy in realizing
> that sometimes I may not use words to request a
> "reasonable accommodation", however I will act with the
> skills and techniques that I am learning in counseling
> [that] will mitigate my anxiety and PTSD symptoms, and
> request a cooperative relationship from you as my
> employer in helping me to do so.

The following day, Arroyo follows up on her request regarding disability awareness

training and asks when her request will be addressed.  Williams advises that

Arroyo's request is received; however no Disability Awareness Training is ever

planned or required for anyone at Volvo. (Doc. 77-6, p. 106; Doc. 78-6, pp. 5, 24, 25;

Doc. 82-3, p. 56 [Schroeder Dep., pp. 214:20 to 215:18]; Doc. 77-7, pp. 36-37).

### 2. Arroyo Takes Her Claims of Harassment by Schroeder and Complaint about Williams to Volvo Headquarters

Less than a week later, Arroyo files a written complaint with Dennis Sholl,

VP at Volvo Headquarters in North Carolina about disability-based harassment and

Schroeder's physically threatening behavior toward her.

> … [I]n my opinion, Mr. Schroeder has targeted me for
> termination and is doing everything within his power to
> achieve such.

(Doc. 78-6, p. 30; Doc. 78-2, p. 12, Arroyo Affidavit, ¶¶ 76-77; Doc. 82-3, pp. 58-61

[Schroeder Dep., pp. 225:3-24; 229:23 to 234:2]; Doc. 82-4, pp. 38-40 [Sholl Dep., pp.

144:4 to 145:17 and 149:16 to 152:21]).

Later that day when Sholl indicates that Regina Williams would be leading

the harassment investigation, Arroyo immediately responds, "I have a problem with

Ms. Williams handling any portion of the investigation." (Doc. 78-6, p. 27-34; Doc.

82-4, pp. 41-42 [Sholl Dep., pp. 157:3 to 159:7 and 160:4 to 161:24]).

### 3. Volvo VP Sholl Tells Schroeder Not to Worry about any Investigation

"About an hour later", Sholl alerts Schroeder concerning the complaint he has

just received from Arroyo and tells him not to worry about any investigation:

> Keith,
> As you read the response to LuzMarie please do not be
> concerned about the investigation Regina will perform. It
> is the only response we could make as we have an
> employee who has filed a complaint so as you know we are

obligated to investigate. If you wish to talk tomorrow call
my cell.

(Doc. 78-6, p. 35; Doc. 78-2, p. 12, Arroyo Affidavit, ¶ 79; Doc. 82-3, pp. 61-62
[Schroeder Dep., pp. 235:5 to 238:5]; Doc. 82-4, p. 43 [Sholl Dep., pp. 163:10 to
164:17).

### 4. No Investigation of Arroyo's Complaint
### Is Ever Conducted

The Volvo management team admits under oath that no investigation of
Arroyo's complaint of harassment by Schroeder and a hostile work environment was
ever undertaken. (Doc. 82-4, pp. 43-44 [Sholl Dep., pp. 164:22 to 166:14]; Doc. 82-3,
p. 62 [Schroeder Dep., pp. 240:3 to 241:24]).

### K. Arroyo Files EEOC Complaint
### And Harassment Intensifies in Retaliation

### 1. The Accommodation of the Meditation Room
### Previously Granted Is Undercut and Frustrated

On September 1, 2011, Schroeder and Williams approve a designated
meditation room for Arroyo's use, a private place to de-stress 20 to 30 minutes
before starting work each day and on breaks. (Doc. 78-6, p. 25-26; Doc. 78-2, pp. 11,
Arroyo Affidavit, ¶¶74-75; Doc. 82-2, p. 42 [Temko Dep., p. 158:18-23]).

On September 13, 2011, Arroyo files her Charge of Discrimination against
Volvo with the EEOC under Charge No. 440–2011–05756. The harassment of
Arroyo in the workplace intensifies and accommodations previously granted are
frustrated.  (Doc. 77-6, pp. 109-110).

### a. Schroeder Enlarges the Application of the "Safety Shoe Policy"

On October 18, 2011 Schroeder selectively enlarges the application of the "safety shoe policy" requiring the wearing of safety shoes not only in the warehouse, but now including "offices adjacent to the warehouse." The meditation room Arroyo has been using since September 1, 2011 is in one of those adjacent offices. (Doc. 78-6, p. 45).

### b. Schroeder Creates and Promulgates a New Parking Rule

Less than a week before terminating Arroyo and just before promulgating a new rule prohibiting parking in the rear of the building, Schroeder sends an email to all his supervisors prominently marked "Do Not Print-Read and Delete":

> …While I have agreement from Sholl, HR, and legal that no employees should be allowed to park in [the] south end of the building, we are well aware that on rare occasions both management and 2nd shift clerical have parked there in the last year.
> …
> So, Miss Arroyo is likely well aware of this and to avoid a charge of retaliation[,] I must first review this with legal. We cannot afford a circumstance where it is perceived that I am singling out Miss Arroyo when others in this facility have on occasion been allowed to do this.

(Doc. 78-6, p. 49; Doc. 82-3 pp. 63-65 [Schroeder Dep., pp. 244:8 to 245:21 and 248:13 to 250:12]).

### c. Just As Schroeder Fears, Arroyo Perceives She Is Being Singled out For Policy Enforcement

Arroyo questions Schroeder's new parking rules:

> Ms. Arroyo['s] response to the meeting was "I hear what you are saying." After the meeting, Ms. Arroyo returned

to the office and made an inquiry. "Are all of the
employees aware of the parking rule or am I singled out
on this?["]. My reply was that management is aware of
this rule yet the hourly group is not yet[.] I plan to
communicate this rule to all. Attached is the statement I
plan to post.

(Doc. 78-6, p. 57; Doc. 82-3, p. 69 [Schroeder Dep., p. 266:15 to 268:4]).

## 2. Request to Use Companywide Flexible Work Arrangements Policy
## Is Still "Under Review" at Time of Arroyo's Termination

Volvo has a companywide Flexible Work Arrangements Policy allowing an

"employee to work with his or her supervisor to set the work day's starting and

ending times that may differ from others in the department". Arroyo requests "a

flexible work schedule to allow 'make up time' in case of tardiness." (Doc. 78-6, p.

25). Arroyo's request made months earlier to use the Companywide Flexible Work

Arrangements Policy is never granted and is still "under review" at the time of her

termination. (Doc. 78-6 pp. 17-24; Doc. 78-6, pp. 39; Doc. 82-3, pp. 56-57 [Schroeder

Dep., pp. 215:19 to 217:20 and 219:13 to 221:10]).

## 3. Schroeder Disciplines Arroyo for Allegedly Walking to Her Workstation
## 1 to 3 Minutes Late After Using the Meditation Room

Schroeder gives Arroyo two different Corrective Action Plans on the same day

for being 1 or 3 minutes late in starting work after leaving the assigned meditation

room to begin her shift on October 31, 2011, November 2, 2011, and November 4,

2011. (Doc. 78-6, pp. 52-55; Doc. 78-2, p. 13, Arroyo Affidavit, ¶ 82; Doc. 82-3, pp.

55, 68-69 [Schroeder Dep. pp. 213:7-14, 262:19 to 266:14]; Doc. 77-6, p. 1-2).

## L. Termination of Arroyo by Schroeder and Williams

### 1. Schroeder's Proffered Reason for Termination of Arroyo

Schroeder seeks and is granted approval from his HR Business Partner, Regina Williams to terminate Arroyo.  (Doc. 78-6, p. 57; Doc. 78-7, pp. 22-23).

Arroyo was not terminated for failure to give Volvo copies of her military orders, for failure to perform her job adequately to the expectations of the company, for insubordination to Schroeder, or for parking in the rear of the building.  Arroyo was only terminated under Volvo's absenteeism attendance policy for violating the Start of Shift Rule. (Doc. 82-3, pp. 28, 55-56 [Schroeder Dep., pp. 104: 3-21 and 213:7 to 214:8]).

### 2. Upon Review of Time Records by Volvo's Manager of Payroll and Administration, Volvo's Proffered Reason for Termination Has No Basis in Fact As Arroyo Was Not Tardy on the Dates Claimed by Volvo

Maureen Somersett, Volvo's Manager of Payroll and Administration admits that she was never asked to make spread sheets for any other employee except Arroyo. (Doc. 82-5, pp. 8-9; p. 36, 45 [Somersett Dep., pp. 24:24 to 29:1, 134:13 to 137:17, 170:14 to 172:8]).

During the 13 years of her employment with Volvo, Somersett admits that she could not recall any other employee who was terminated for being tardy 1 minute.  Upon comparing Arroyo's punch cards to the spreadsheets, Somersett admits that Arroyo actually punched in more than one half hour early and was not tardy on the dates indicated and claimed by Volvo.  (Doc. 78-7, pp. 17-18, 24-26;

Doc. 77-2, p. 248; Doc. 82-5, pp. 50-52 [Somersett Dep., pp. 192:18 to 193:22 and

194:14 to 201:1]).

### 3. On the Date of Her Termination, Schroeder Complains Arroyo Involves ESGR and Insists on Her Rights Under USERRA and ADA

On the very date of Arroyo's termination, Schroeder remarks in an email to

Williams and Sholl:

> ... Also of importance is the fact that never once has Ms. Arroyo cooperated or offered any compromise or leniency to the company in any situation unless we agreed to her terms.  The best example of this is the ESGR case.

(Doc. 82-3, pp. 70-71 [Schroeder Dep., pp. 273:2 to 274:14]).

## SUMMARY OF THE ARGUMENT

The emails, depositions, affidavits, and admissions of record evince Volvo's frustration toward Arroyo as the company loses control over her attendance as she follows her military orders.  Volvo demonstrates hostility toward Arroyo as she seeks outside intervention from ESGR to exercise rights and to secure benefits under USERRA and ADA.  Resolving all inferences in favor of Arroyo, the comments and remarks embedded in the emails exchanged among Volvo management and supervisors over the several years of Arroyo's deployments to Iraq and interruptions in her employment create a convincing mosaic showing the existence of genuine material facts precluding summary judgment. The emails belie any attempt to support Arroyo.

Throughout her employment Volvo management and supervisors complain regularly about Arroyo's absence from work while responding to military orders. They repeatedly plan and discuss disciplining and/or terminating her.

Upon return from her latest deployment in 2010 and while under treatment at the VA for PTSD, the Volvo management team expresses their ridicule and planned discipline of Arroyo as she seeks accommodations. Once Arroyo files her Charge of Discrimination with EEOC, Schroeder promulgates rules negating accommodations already granted and selectively enforces policies against only Arroyo.  Volvo terminates her for allegedly being 1 to 3 minutes late in walking to her workstation although she has punched into work 30 minutes early to meditate before starting work as agreed.

# ARGUMENT

## A. Standard of Review

The appropriate standard of review of the trial court's grant of summary judgment is *de novo. Musch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir.2009). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Naficy v. Illinois Dep't of Human Services,* 697 F.3d 504, 509 (7th Cir.2012); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir.2001).

At the summary judgment stage the trial judge's function is not himself to weigh the evidence and determine the truth of the matter. Upon review, the court does not evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter; rather, the court will determine whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The court below failed to resolve inferences in Arroyo's favor and concluded:

> The emails referenced in the parties' fact statements demonstrate an awareness of Plaintiff's rights as an active service member, as well as discussions about the company's rights and obligations in relation to Arroyo's military leave and PTSD, not discrimination. The emails evince efforts on the part of Volvo to ensure that its employees were aware of Arroyo's rights and sensitive to her military leave requests; to work with Arroyo to make sure that she was providing military orders and that her excused absences were properly considered as such; to allow her to attend her therapy appointments for her PTSD; and also to provide several requested accommodations while Arroyo worked at the Distribution Center. At best, the emails reveal Volvo's interest in

> keeping abreast of Arroyo's military status and not
> running afoul of USERRA and the ADA, while holding
> Arroyo accountable for company policies when she was
> not on leave.

(Memorandum Opinion, SA22; Doc. 88, p. 22).

It is decidedly not the role of the trial judge in ruling on a summary judgment

motion to make credibility determinations and weigh evidence adversely to Arroyo.

*Anderson,* 477 U.S. at 255.

## B. Summary Judgment Is Inappropriate
## For Deciding Volvo's Motives and Intent
## In Dealing with Arroyo

Volvo is considered to have engaged in actions prohibited under USERRA if

Arroyo's obligation for service in the uniformed services is a motivating factor in the

adverse action taken against her. See 38 U.S.C.A. §4311(C)(1)(a). The many emails,

admissions, depositions, and Arroyo's affidavit show that service in the uniformed

services and her attempts to enforce her rights are the motivating factors in Volvo's

actions against Arroyo. "[S]ummary judgment is notoriously inappropriate for

determination of claims in which issues of intent, good faith and other subjective

feelings play dominant roles." See *Ashman v. Burrows*, 438 F.3d 781, 784 (7th

Cir.2006).

Having resolved all inferences in favor of Volvo, the court below mistakenly

opines:

> In short, Plaintiff has not come forward with "near-
> admissions" of discrimination by the employer or a
> convincing mosaic of circumstantial evidence that
> disability discrimination motivated Defendant's decision
> to terminate plaintiff's employment.

(Memorandum Opinion, SA22; Doc. 88, p. 22).

Without any knowledge of the email exchanges among Volvo's management team, Arroyo's own affidavit and deposition testimony describe her perception of the hostile treatment she receives by their discriminatory intentions. "[E]vidence presented in a 'self-serving' affidavit or deposition is enough to thwart a summary judgment motion provided it meets the usual requirements for evidence at summary judgment stage". *Paz v. Wauconda Health Care and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006). "[T]he key consideration is the totality of these 'pieces of evidence[,] none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff.'" *Id.*, at 666.

### C. Arroyo's Convincing Mosaic
### Of Circumstantial Evidence

The comments and remarks embedded in the many emails exchanged among Volvo's Management Team clearly show their repeated lack of cooperation and good faith in dealing with the particular problems of its only employee subject to military orders who is afforded the protections and benefits of USERRA. (Doc. 82-3, pp. 7-8 {Schroeder Dep., pp. 21:3 to 23:21]; Doc. 82-2, pp. 14, 16 [Temko Dep., pp. 46:7-17 and 54:18-20]). Volvo has an ample workforce to meet its business needs and customer orders while she is absent from the workplace fulfilling her military obligations. (Doc. 82-2, p. 19, 33 [Temko Dep., pp. 69:3-21 and 124:5 to 125:4]; Doc. 82-3, p. 20 [Schroeder Dep., pp. 70:23 to 71:3]).

From the very commencement of her employment in 2005, Volvo upper management and supervisors bristle at the loss of authority to control Arroyo's attendance as she responds to military orders and insists on obligations USERRA imposes on the company. Arroyo can "'present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated [her] firing.'" *Martino v. Western & Southern Fin. Grp.*, 715 F.3d 195, 201 (7th Cir.2013).

Arroyo relies upon "a convincing mosaic of circumstantial evidence," that would permit a jury to infer unlawful retaliation in discrimination on the part of Volvo. See *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir.2004). Volvo's discrimination, mockery, and gossip about Arroyo intensifies as she solicits ESGR to secure her rights under USERRA and ADA.

After resolving all reasonable inferences in favor of Arroyo, the individual bits and pieces of evidence put into context and considered as a whole amount to a convincing mosaic sufficient to withstand a motion for summary judgment or judgment as a matter of law. Arroyo's evidence supports a reasonable inference that she was discriminated against as she followed her military orders and insisted on her rights under USERRA. Compare *Hobgood v. Illinois Gaming Board*, 731 F.3d 635, 644 (7th Cir.2013). The ultimate termination of Arroyo for allegedly being 1 to 3 minutes late in walking to her workstation after having checked into work 30 minutes early to use the meditation room could allow a reasonable jury to infer retaliation if placed in relevant context and given the benefit of favorable

inferences. A jury should consider if Arroyo's insistence on her rights under USERRA and ADA is causally connected to discriminatory motives Volvo harbors against her leading to termination.

### D. Arroyo Files EEOC Charge of Discrimination And Harassment Intensifies in Retaliation

On September 1, 2011, Schroeder and Williams approve a designated meditation room for Arroyo's use, a private place to de-stress 20 to 30 minutes before starting work each day and on breaks. (Doc. 78-6, pp. 25-26; Doc. 78-2, p. 11, Arroyo Affidavit ¶¶ 73-75; Doc. 82-3, p. 49 [Schroeder Dep., pp. 188:1-9]; Doc. 82-2, p. 42 [Temko Dep., p. 158:18-23]). After Arroyo files her EEOC complaint on September 13, 2011, heightened scrutiny and retaliation by Volvo management intensifies.

### 1. The Accommodation of the Meditation Room Granted, But after Use for 2 Months without Incident, Undercut and Frustrated by Schroeder and Supervisors

After exactly 2 months of her using the meditation room without problems, Schroeder and his Supervisors take a series of actions that impact Arroyo only and her use of the Meditation Room. Schroeder selectively enlarges the safety shoe policy to include its application to the meditation room at the very back of the warehouse. To avoid walking through the warehouse without safety shoes, Arroyo begins parking in the rear of the building directly in front of the entrance to the meditation room like many other employees. (Doc. 78-6, pp. 45-46, 48, 52; Doc. 82-5, p. 26 [Somersett Dep., p. 94:3-20]). True to form and not yet satisfied, Schroeder finds another way to frustrate Arroyo's use of the meditation room. Within 11 days

before her termination, Schroeder promulgates a new rule prohibiting parking in the rear of the warehouse.

### E. Termination of Arroyo by Schroeder and Williams

#### 1. Schroeder's Remarks Just Days
#### Before Arroyo's Termination

While contemplating his new ban on parking at the rear of the warehouse, Schroeder acknowledges that his actions could be perceived as retaliatory against Arroyo. Schroeder sends to all his supervisors an email prominently marked "Do Not Print-Read and Delete":

> …While I have agreement from Sholl, HR, and legal that no employees should be allowed to park in south end of the building, we are well aware that on rare occasions both management and 2nd shift clerical have parked there in the last year.
> …
> So, Miss Arroyo is likely well aware of this and to avoid a charge of retaliation, I must first review this with legal. We cannot afford a circumstance where it is perceived that I am singling out Miss Arroyo when others in this facility have on occasion been allowed to do this.

(Doc. 78-6, pp. 49, 51, 52-53, 58; Doc. 82-3, pp. 63-65 [Schroeder Dep., pp. 244:8 to 245:21 and 248:13 to 250:12]).

Schroeder's fears that his action would be perceived as retaliatory are well taken. On November 4, 2011, 4 days before her termination, he emails Williams and Sholl that Arroyo questions whether the new parking rule is being made just for her:

> Ms. Arroyo['s] response to the meeting was "I hear what you are saying." After the meeting, Ms. Arroyo returned to the office and made an inquiry. "Are all of the

> employees aware of the parking rule or am I singled out
> on this?["]. My reply was that management is aware of
> this rule yet the hourly group is not yet[.] I plan to
> communicate this rule to all. Attached is the statement I
> plan to post.

(Doc. 78-6, p. 57; Doc. 82-3, p. 69 [Schroeder Dep., p. 266:15 to 268:4]).

Schroeder expresses his fear that Volvo "cannot afford a circumstance where it is perceived that I am singling out Miss Arroyo". She is the first to voice that very perception 3 days later. A reasonable jury could arrive at the same perception.

There is clear evidence that the discriminatory animus of Schroeder and Williams, the decision-makers are causal factors in the decision to terminate Arroyo. Stray remarks can establish discriminatory motivation "where the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir.2010). Schroeder seeks and is granted approval from Williams to terminate Arroyo on November 8, 2013. (Doc. 78-6, pp. 27-30, 33-34, 54, 57; Doc. 78-7, pp. 22-23, Doc.77-6, p. 98).

## 2. Remarks by Schroeder on the
## Day Arroyo Is Terminated

On the very day that he terminates Arroyo, Schroeder is still complaining that she will not compromise with Volvo and has involved ESGR. Among so many emails tendered to the court below for consideration, Arroyo's counsel negligently omitted the email authored by Schroeder on the very day of Arroyo's termination. Perhaps the inclusion of this one more email might have been persuasive. However, the fact remains that at Schroeder's deposition which was tendered in opposition to

Volvo's motion for summary judgment, Schroeder's attention was drawn to the email in which he admits that he authored the statement at the critical time of termination evincing that his true motivation was frustration with Arroyo as she involved ESGR in trying to secure her rights:

> ... Also of importance is the fact that never once has Miss Arroyo cooperated or offered any compromise or leniency to the company in any situation unless we agreed to her terms.  The best example of this is the ESGR case.

(Doc. 82-3, pp. 70-71 [Schroeder Dep., pp. 270:11-22 and 273:2 to 274:14]).

A jury should be allowed to determine whether Arroyo's termination is causally linked to her repeated complaints and insistence upon her rights under USERRA and ADA. See *Malin v. Hospira, Inc.*, 762 F.3d 552, 560-561 (7th Cir.2014).

### 3.  Volvo's Proffered Reason Insufficient To Motivate the Discharge of Arroyo

#### a. Arroyo Is Qualified to Perform Functions of the Job

A qualified individual under the ADA is a person with a disability who is able to perform the essential functions of the job either with or without reasonable accommodation. 42 U.S.C.A. § 12111(8); see also *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir.2009). Even while suffering from PTSD, Volvo management never has a problem with Arroyo's work production. Arroyo is not terminated for failure to perform her job adequately to the expectations of the company. Arroyo is not terminated for failure to give Volvo copies of her military orders, for insubordination to Schroeder, or for parking in the rear of the building. Arroyo is terminated under Volvo's absenteeism attendance policy only for violating the Start

of Shift Rule. (Doc. 82-3, pp. 28, 31, 55-56 [Schroeder Dep., pp.104:3-21, 115:22 to

116:23, and 213:7 to 214:8]).

### b. Arroyo's Accommodation Requests of Volvo are Minimal

Many accommodations sought by Arroyo were only minimal requests of

Volvo's largess. The accommodation of a meditation room, although grudgingly

granted, is infringed upon and frustrated. Heightened scrutiny by supervisors,

newly promulgated parking rules, and seldom and selectively enforced start time

rules easily vitiate the accommodation. Inconsistently, Schroeder insists that an

employee must be at their workstation at the start bell. However, the employee can

finish 5 minutes early to assure that they are not in the middle of an assignment

before the finish bell sounds.  (Doc. 82-3, p. 30 [Schroeder Dep., pp. 110:4 to

111:18]).

### c. Arroyo's Compromise Requesting Use
### Of Companywide Flexible Work Schedule

After meditation, Arroyo is "observed by management" leaving at the sound

of the start bell and arriving at her workstation 1 to 3 minutes later. On 9/1/11

Arroyo requests the use of the Company-wide Flexible Work Schedule reasonable

accommodation whereby she would work longer if she is late in walking to her

workstation from the meditation room. Such a simple compromise would have

resolved the tardiness issue and would have cost Volvo nothing.

Volvo claims that her request was still "under consideration", but in the

meantime they continue to assess Arroyo in order to find a way to ensure her

discipline stands.  Ultimately, Volvo finds their "out" and gives her multiple

disciplinary steps in the first week of November for being 1 to 3 minute tardy before her termination on 11/8/11. (Doc. 78-6, pp. 17-25, 39, 54-57; ; Doc. 77-6, pp. 1-2, 79-80, 96-98, 106; Doc. 78-2, pp. 12-13, Arroyo Affidavit, ¶¶81-82; Doc. 82-3, pp. 55-57, 68-69 [Schroeder Dep., pp. 213:7-14, 215:19 to 217:20), 219:13 to 221:10, 262:19 to 266:14]). The trier of fact should be allowed to review this evidence to determine if the proffered reason given for her termination is convincing. Compare *Malin*, at 554.

The burden is on the employer to prove that the discharge of the employee was reasonable. See 20 C.F.R. §1002.248(a). It strains credulity to believe that such a proffered reason for discharge would be deemed to be significant enough to merit termination -- particularly with this employee who produced the quality of work as expected, who was suffering from PTSD, and who had checked in early to prepare herself for work as allowed by Volvo. (Doc. 82-3, p. 54 [Schroeder Dep., pp. 207:23 to 208:7]).

### d. Schroeder's Proffered Reason for Discharge Unworthy of Credence

Arroyo can demonstrate that Volvo's proffered reason for her termination is not credible as it has no basis in fact. There are "weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Widmar v. Sun Chemical Corp.,* 772 F.3d 457, 465 (7th Cir.2014).

Although Volvo insists that it enforces all of its policy uniformly, there is clear evidence that Arroyo alone is singled out for discipline. Volvo's own time records show other employees get "cumulative excused tardiness" and verbal or written warnings rather than termination. There is evidence that the 1 to 3 minute tardiness in reporting to the workstation has no basis in fact. Volvo's Manager of Payroll and Administration admits that the company records do not support such a claim. (Doc. 78-7, pp. 17-18, 24-26; Doc. 77-2, p. 248; Doc. 82-5, pp. 51-52 [Somersett Dep., pp. 194:14 to 201:1]).

### F. Volvo Fails to Follow Its Own Progressive Disciplinary Process In Assessing Arroyo Multiple Disciplinary Steps for the Same Occurrence

Under Volvo's Progressive Disciplinary Process, Arroyo was to receive a verbal warning, and then a written warning before discipline was to be imposed. Because he revised the Local Attendance Policy, Schroeder's use of the October 2010 incident is more than the 6 months rolling time period. Even if the military leave is removed from the rolling time period, the incident happened well over 6 months earlier. Thus the written warning given on 8/31/11 should have been a verbal warning only. Arroyo should have never been suspended on 8/31/11. Arroyo is given the warning on the same day she is suspended. If Arroyo had been given the warning on 8/19 and then continued to be late on 8/20, the suspension would have been warranted. But that is not what happened. Arroyo was disciplined for past incidents on 8/31, and then disciplined again at the same meeting for the same time period. Even worse, in November 2011, Arroyo should never even have been at 5

occurrences in November 2011. Instead, she is given a written warning, and without

suspension was terminated for the same occurrences on the same day.

### G.  Volvo's Repetitive Discriminatory Behavior Between Arroyo's Protected Activity and Her Termination Evince The Causal Link of the Two Events

Throughout the entire term of her employment with Volvo and the

interruptions in that employment caused by her responding to military orders,

Volvo's management team discusses discipline and seeks to terminate Arroyo. They

mock, ridicule, and complain as she seeks to enforce her rights and benefits under

USERRA and ADA. "The mere passage of time is not legally conclusive proof

against retaliation." *Malin*, at 559.

The time interval of Volvo's discriminatory behavior between Arroyo's first

absence from the workplace in response to military orders and the termination of

her employment is regular and repetitive. Arroyo asserts her rights under USERRA

and ADA first to Volvo management, then to ESGR, next to Volvo Corporate

Headquarters, and finally on September 13, 2011 to the EEOC.

In *Ledbetter v. Good Samaritan Ministries*, --- F.3d ----, 2015 WL 493803, at

\*5 (7th Cir. 2015), Justice Posner recently commented about the inconsistencies and

inferences which required the reversal of a grant of summary judgment:

> There is still more to make us wonder what was really going on.…
>
> There are too many loose ends to have justified the district court in granting summary judgment in favor of the defendants.

Creation of a hostile work environment can be avoided. Being subjected to scrutiny and pretextual termination can be avoided. Taking recommendations from the Department of Labor for both the employer and employees on how to mitigate PTSD symptoms through use of acceptable accommodation would have helped to mitigate the problem. The needless intentional stress caused by Volvo management when its nonessential employee was absent from the workplace responding to military orders and being subjected to ridicule and harassment when she returns to the workplace and seeks rights and accommodations to which she is entitled only worsened the symptoms of Arroyo's PTSD. A jury should be allowed to weigh all this evidence.

### H. Arroyo Solicits the Aid of ESGR
### As She Sees USERRA Protection from Termination
### While Responding to Military Orders

Arroyo's solicitation of Employer Support of the Guard and Reserve to assist in resolving issues with Volvo instills frustration in management when stopped from administering discipline to Arroyo. Just two months after she was hired, Schroeder and Temko contemplate discipline and termination of Arroyo because she is a "no call, no show" after traveling pursuant to military orders. ESGR intervenes and insists that Volvo must give adequate time plus an 8 hour rest period for Arroyo to travel safely to and from her military assignments. (Doc. 78-3, pp. 26-31, 36).

The early involvement of ESGR should have showed Volvo how to effectively resolve issues in accordance with USERRA if management had any questions or

were unclear about Arroyo's rights and its responsibilities. Instead, the various emails authored by Schroeder over the years of Arroyo's employment consider discipline and display an intent and desire to terminate Arroyo's employment as a result of her absence from the workplace for military duties.

In early April 2007 Temko complains that Arroyo contacted him only one time during her deployment to Iraq. They were "trying to run a business" and for their own "planning/scheduling purposes, it would be beneficial" to know her deployment status. (Doc. 78-3, p. 38; Doc. 82-2, pp. 19, 23, 33 [Temko Dep., pp. 69:3-21, 83:2 to 84:16, and 123:12 to124:23). Temko's query to Volvo HR about "our rights and her responsibility" demonstrates Volvo's continued lack of compliance with its obligations and responsibilities under USERRA. It also shows a lack of appreciation for and cooperation with the benefits afforded to Arroyo.

Under USERRA, when Arroyo leaves her employment position to begin a period of military service, she is not even required to tell Volvo if she intends to seek reemployment after completing the uniformed service. See 20 C.F.R. §1002.88. Arroyo has no responsibility to keep Volvo advised of anything. Arroyo is not indispensable to Volvo's operation of its Joliet plant and she has her own responsibilities and worries in Iraq rather than keeping them advised of when she is going to report back to work.

When Arroyo's military training is unexpectedly extended in 2008, Arroyo is documented by Temko as "No Call. No Show". Schroeder expresses his frustration that Arroyo has not called or faxed military orders that were not yet even issued for

the extended service and they again consider terminating her.  "LuzMaria has a verbal warning waiting for her when she finally comes back. …If we were to, also, give her an occurrence for Wednesday, Nov. 12 this would bring her to Termination for her attendance."  (Doc. 78-4, pp. 10-11, 13, 15).  Of course, when the military orders extending her duty are finally cut, Arroyo promptly forwards them to Schroeder.

On April 15, 2009 Arroyo is deployed in support of Operation Iraqi Freedom. Occupied with her military duties, Arroyo does not keep Schroeder and Temko advised. Upon her return to the United States, Arroyo's military obligation is extended through August 2010. She visits the Joliet plant and advises management of the extension. In September 2010, Schroeder again expresses his frustration that this nonessential employee is not immediately returning to work at Volvo. "After military records review we believe that LuzMaria should have returned to work on August 15, 2010."  (Doc. 78-4, pp. 38-39).  That "belief" is completely wrong.

Under USERRA, if Arroyo's period of service in the uniformed services is for more than 180 days, she has 90 days after completing that service to submit her application for reemployment. See 38 U.S.C.A. §4312(e)(1)(D).  Volvo management is still bristling at their lack of control over when this nonessential employee will return to the workplace from active duty status more than 5 years after the commencement of Arroyo's employment.  As Schroeder and Temko express their frustration that Arroyo has not returned to work, HR Director Olin advises them of Volvo's obligation under USERRA and apologizes:

> Unfortunately, there isn't a lot we can do....  All she has to
> do is to inform us within 6 months of her release.  Per the
> law we have to wait for her.  Sorry it isn't what you
> wanted to hear.

(Doc. 78-3, p. 39).

HR Director Olin's statement "unfortunately, there isn't a lot we can do" should indicate to a reasonable jury just how unhappy Volvo is with its responsibilities under USERRA. They are obligated to follow the law.  Apologizing to Schroeder and Temko because "it isn't what you wanted to hear" only highlights Volvo's frustration because management cannot dictate the return of this serviceman after complying with her orders.

Awaiting the return of this nonessential employee was hardly a great inconvenience for Volvo.  Temko admits, "My shift wouldn't shut down for any individual employee. … Depending on the amount of people that were already scheduled on vacation and different situations, we always make do with who is there." (Doc. 82-2, p. 33 [Temko Dep., pp. 124:22 to 125:4]).  Arroyo's absence from the workplace cost Volvo nothing.

The sense of Congress in passing USERRA is "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers in employment, which can result from such service" and "to prohibit discrimination against persons because of their service in the uniformed services". Volvo was not being inconvenienced in any way and able to continue its business without interruption while Arroyo is attending her military duties. See 38 U.S.C.A. § 4301(1) to (3).

## I. Arroyo Solicits the Aid of ESGR
## As She Seeks Protection and Rights
## Afforded Her Under USERRA and ADA

When Arroyo seeks to ensure her rights under USERRA and ADA and to enforce the obligations of Volvo, she is subjected to a hostile work environment. To establish a hostile work environment, Arroyo must submit evidence that: "(1) she is subject to unwelcome harassment; (2) the harassment is based upon a protected characteristic; (3) the harassment is severe and pervasive so as to alter the conditions of her environment and creates a hostile work environment; and (4) a basis for employer liability exists." See *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir.2008). There is evidence that Arroyo's solicitation of ESGR motivates hostility toward her as she seeks to secure her rights and Volvo's obligations under USERRA and accommodations under ADA.

### 1. Ridicule and Mockery of Arroyo

Sensing resistance from her employer, Arroyo researches the ESGR website concerning accommodations recommended by the Department of Labor for employees in the military. When she attempts to share the research with Volvo management, Sherrie Jankowski, her supervisor mockingly writes to Schroeder:

> … It is the LAW posted on the ESGR website pertaining
> to employees of the military. She is really becoming a pain
> with all of this.  She wanted me to read this, but I told her
> I did not have the time right now!  Enjoy the reading…
> it's only 24 pages!!!!!

(Doc. 78-5, p. 17; Doc. 78-2, p. 8, Arroyo Affidavit, ¶¶ 59-60).

46

## 2. Schroeder Plans to Discipline Arroyo
### After She Confides in Him She Self-Admits to the Hospital

On Christmas Eve, 2010 Arroyo confides in Schroeder via email:

> I had to go to the emergency room yesterday…. The doctor
> gave me a note for no work thru 12/30. …Between the
> stress at work and the stress of reliving the events of my
> deployment through writing my story, I have been having
> panic attacks…. I feel scared. And there's no reason to be
> scared. I don't know how to get myself to feel safe again….
> and I am tired of fighting. I nearly fell asleep driving
> home from work every day this week. If I don't get some
> rest and relax, I will wind up killing myself trying to get
> to or from work.

(Doc. 78-5, p. 48; Doc. 78-2, pp. 8-9, Arroyo Affidavit, ¶¶ 61-64).

Despite the doctor excusing Arroyo from work from December 23 through
December 30, 2010, and lacking any concern for compassion, Schroeder considers
giving her a "3 Day Suspension" for not being in attendance because "I am not
aware of any rule or guideline in our corporate "Military" policy that would excuse
these days. Additionally, LuzMaria is awaiting our decision on the ESGR - Military
federal policy ruling." (Doc. 78-5, p. 48).

### 3. Arroyo Contacts ESGR to Mediate for Her with Schroeder

The "stress at work" to which Arroyo is referring in her email is being caused
by harassment from Schroeder. Within the week of self-admitting to the emergency
room, Arroyo emails Col. Gorski of ESGR complaining that she is "being targeted
and attacked" by Mr. Schroeder as she seeks the benefits to which she believes she
is entitled:

> …I want to work.  I want to be paid for the work that I do.
> I do not want to be abused.  I do not want to be punished

for exercising my rights.  And I want the benefits and
entitlements provided for me by law/the company. And I
have called you, Mr. Gorski, because I am tired of
fighting.  I do not wish to speak to Mr. Schroeder any
more.

(Doc. 78-5, pp. 53-54).

### 4. Gossip about Arroyo's Absence Is Rampant
### Among Supervisors and Employees

Gossip is rampant among Volvo supervisors and employees after Arroyo self-

admits to the emergency room. Supervisor Jankowski reports to Schroeder that,

among other possibilities, the reason for her absence from work being discussed:

"She's on vacation in Hawaii. (This sounded far-fetched until I realized that she is

on vacation next week too!)" (Doc. 78-5, p. 49).  Although he knows better, Schroeder

does nothing to correct this false assumption and the idle gossip about Arroyo's

absence from the workplace. (Doc. 82-3, p. 39 [Schroeder Dep., pp. 146:7 to 149:8]).

### J. Arroyo Diagnosed with Posttraumatic Stress Disorder
### and Discrimination and Harassment Follow

Dr. John J. Koehler, the doctor chosen by Volvo to conduct an Independent

Medical Examination of Arroyo confirms the diagnosis by Dr. J. Richard Monroe of

the Veterans Administration that she is suffering from PTSD. (Doc. 78-5, pp. 58-63).

Schroeder and Temko have no doubt that Arroyo is suffering from PTSD related to

military service and do not believe that she is merely malingering or faking her

illness. (Doc. 78-2, pp. 9-10, Arroyo Affidavit, ¶¶ 66-69; Doc. 82-3, pp. 40, 45

[Schroeder Dep. pp. 152:7-20 and 171:13 to 172:6]; Doc. 82-2, p. 40 [Temko Dep. p.

151:17 to 24]).

In a naïve, good-faith attempt to secure their help, Arroyo gives Schroeder and Williams documentation she receives from the VA and the Department of Labor entitled *America's Heroes at Work*, a project intended to equip "employers and the workforce development system with the tools they need to help returning Service Members affected by TBI and/or PTSD succeed in the workplace-particularly Service Members returning from Iraq and Afghanistan".  (Doc. 78-4, pp. 46-54; Doc. 78-5, pp. 66-69; Doc. 78-6, pp. 4-9; Doc. 78-6, pp. 41-44; Doc. 78-2, pp. 10-11, Arroyo Affidavit, ¶¶ 70 and 73).

Volvo is prohibited from discriminating against or taking any adverse employment action against Arroyo because she takes action to enforce a protection afforded her or exercises a right provided for under USERRA.  See 38 U.S.C.A. § 4311(b)(1)and (4).  When Arroyo solicits ESGR to assist her as she seeks to obtain benefits under USERRA and accommodations under ADA, the harassment and hostility toward her by Volvo management only intensifies.

### 1. Schroeder Urges All Supervisors To Have a Witness When Talking to Arroyo

By May 2011 Arroyo makes it clear to Schroeder that she thinks he is discriminating against her because of her disability, and has brought in ESGR and is considering going to EEOC. Armed with that information, Schroeder "strongly urges" his supervisors to have a witness whenever they converse with her.  (Doc. 78-5, p. 65; Doc. 78-2, p. 12, Arroyo Affidavit, ¶¶ 76-78; Doc. 82-3, pp. 41-42 [Schroeder Dep., pp. 156:18 to 160:20]).

### 2. Schroeder Questions Whether VA Treatment for PTSD Is Elective and Whether Group Therapy Can Be Rescheduled

The Veterans Administration orders Arroyo to attend group therapy sessions in Mindfulness Meditation in Trauma Services on Tuesday evenings from 4:00 PM to 5:30 PM.  In a clear attempt to interfere with her military orders, Schroeder contacts Hines VA Hospital, inquiring whether the therapy sessions are really "elective medical services or military mandated medical treatment" and whether the group therapy sessions could be changed to another time so it would not interfere with her Volvo work schedule.  Schroeder is told "no".  (Doc. 78-6, pp. 1-2; Doc. 78-2, pp. 10-11, Arroyo Affidavit, ¶¶ 71-72).  Schroeder's concern about the "inconvenience to Volvo" caused by the temporary loss of this nonessential employee and his inquiry to reschedule and disrupt the therapy sessions for an entire group of military personnel belies his true lack of cooperation required under USERRA.

### 3. Volvo HR Admits Arroyo Is an Exceptional Case And Volvo Might Be in Violation of ADA

The email exchanges among Volvo HR and its management offers no suggestions to help their service member and facilitate her PTSD treatments.  Rather, HR Director Olin scours USERRA and advises Schroeder that he has discovered an "out" to hold Arroyo to other policies and discipline her for absence from Volvo when complying with her military orders. (Doc. 78-4, p. 14).  Even HR Business Partner Williams advises Schroeder and admits, "We are dealing with an exception in her case. We could be in violation of ADA."  (Doc. 78-6, p. 3; Doc. 78-2; Doc. 78-2, p. 11, Arroyo Affidavit, ¶ 72).

Considering the comments made by and the behavior of Volvo management in dealing with Arroyo up to the time of the admission by Williams, a reasonable jury could conclude that Volvo is in violation of the ADA. Still Volvo's illegal and objectionable behavior continues unabated thereafter.

### 4. When Schroeder Corners and Threatens to Fire Her, Arroyo Tells Him She Feels Intimidated/Threatened

In late August, 2011, following Volvo's Employee Conflict Resolution Policy, Arroyo directly complains first to Schroeder himself in writing about their last encounter, "Your demeanor was aggressive and hostile and I felt intimidated/threatened…. You also stated that continued breaks for managing anxiety will result in termination." (Doc. 78-6, p. 4; Doc. 78-2, p. 11, Arroyo Affidavit, ¶73).

### 5. Schroeder Gives Arroyo a Three-Day Suspension for Being 1 to 3 Minutes Late in Walking to Her Workstation After Checking in 30 Minutes Early to Use the Meditation Room

Three days after receiving Arroyo's written complaint about his behavior, Schroeder disregards the Volvo's Progressive Discipline Policy and issues her a three day suspension for "5 occurrences in a six month period". The time period he uses to make the calculation, however, is the 10 months from October 19, 2010 to August 20, 2011 and includes being one (1) minute late on 5 separate occasions, even though Arroyo is arriving 30 minutes early and meditating in her car in order to de-stress before starting work.  (Doc. 78-6, pp. 10-13; Doc. 78-2, pp. 7-8, Arroyo Affidavit, ¶¶ 55-56, 80).

### 6. Arroyo Requests Volvo Give Its Managers and Supervisors Disability Awareness Training

Three days later, because of the hostility she is experiencing in the workplace, Arroyo requests that Volvo give Disability Awareness Training to Schroeder, her supervisors, and coworkers.  Additionally, she requests "a quiet space be provided for me to be able to meditate/utilize relaxation techniques (usually done at break and before work begins)." Arroyo concludes by saying:

> I request empathy in realizing that sometimes I may not use words to request a "reasonable accommodation", however I will act with the skills and techniques that I am learning in counseling [that] will mitigate my anxiety and PTSD symptoms, and request a cooperative relationship from you as my employer in helping me to do so.

(Doc. 78-6, pp. 5, 24-26; Doc. 82-3, p. 56 [Schroeder Dep., pp. 214:20 to 215:18]).

In retaliation of Arroyo's requests and inquiries regarding Disability Awareness Training for supervisors and co-employees, for the next several days scrutiny of Arroyo's attendance records by Temko and Schroeder intensifies.  (Doc. 77-6, pp. 79-80; Doc. 77-7, p. 36).

### K. Arroyo Reports Workplace Harassment

### 1. Arroyo Takes Her Complaints of Harassment by Schroeder and Claims about Williams to Volvo Headquarters

Within the same week, because harassment by Schroeder is intensifying, Arroyo seeks further recourse under Volvo's Employee Conflict Resolution Policy. On September 3, 2011 Arroyo files a written complaint with VP Sholl, at Volvo Headquarters in North Carolina about disability-based harassment and Schroeder's

physically threatening behavior toward her. (Doc. 78-6, pp. 27-30; Doc.78-2, p.12, Arroyo Affidavit, ¶¶ 76-78; Doc. 82-3, pp. 58-61 [Schroeder Dep., pp. 225:3-24; 229:23 to 234:2]; Doc. 82-4,pp. 38-40 [Sholl Dep., pp. 144:4 to 145:17 and 149:16 to 152:21]).

## 2. Volvo VP Sholl Fails to Take Arroyo's Claims Seriously

"About an hour later", Sholl alerts Schroeder that he has just received Arroyo's complaint of verbal threats of Schroeder's physical violence and the creation of a hostile work environment. Without having any knowledge of what such an "investigation" could possibly reveal, VP Sholl downplays Arroyo's complaints when he reassures Schroeder, "please do not be concerned about the investigation Regina will perform." (Doc. 78-6, p. 35; Doc. 78-2, p. 12, Arroyo Affidaivt, ¶79; Doc. 82-3, pp.  61-62 [Schroeder Dep., pp. 235:5 to 238:5]; Doc. 82-4, p. 43 [Sholl Dep., pp. 163:10 to 164:17]).

Of course, Sholl and Schroeder admit that no investigation of Arroyo's serious allegations of threatening and intimidating behavior by Schroeder was ever undertaken. (Doc. 82-3, p.62 [Schroeder Dep., pp. 240:3 to 241:24]; Doc. 82-4, pp. 43-45 [Sholl Dep., pp. 164:22 to 166:14]).

## L. Volvo's Intentional Infliction
## of Emotional Distress of Arroyo

The Court below also dismissed Arroyo's state law claim for Intentional Infliction of Emotional Distress. The behavior of Volvo management about which Arroyo complains goes well beyond "mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." See *McGrath v. Fahey*, 533 N.E.2d 806, 809

(Ill. 1988). Volvo knows that Arroyo suffers from PTSD and is receiving treatment for her injuries at the Veterans Administration. It is reasonable to conclude that the open hostility, intimidation, ridicule, and mockery to which she is subjected in the workplace only exacerbate Arroyo's PTSD. The severity of her emotional distress manifests itself through physical symptoms and the requirement that Arroyo seek medical treatment.  See *Honaker v. Smith*, 256 F.3d 477, 495-97 (7th Cir. 2001). Drawing all reasonable inferences in Arroyo's favor, a jury can infer that her emotional distress from the behavior of Volvo is severe.

## M. Taxing of Costs on Arroyo

USERRA provides that, "[n]o fees or court costs may be charged or taxed against any person claiming rights under this chapter." 38 U.S.C. § 4323(h)(1). The order by the trial court assessing costs against Arroyo should be reversed. Compare *Gross v. PPG Industries, Inc.*, 636 F.3d 884, 892-3 (7th Cir.2011).

## CONCLUSION

Making all inferences in favor of Arroyo, there are genuine factual issues that properly should be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.  The critical question to be answered is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

A reasonable jury can resolve those contested factual issues in favor of Arroyo.  A jury could conclude that Arroyo responds exactly as any other employee

would when confronted with a hostile work environment. Every reasonable juror can appreciate that the reason for termination proffered by Schroeder is insufficient, unconvincing, and pretextual particularly when the employee involved is suffering from PTSD.

The orders entered granting summary judgment to Volvo and assessing costs against Arroyo should be reversed. The matter should be returned to the court below for trial.

February 27, 2015                                    Respectfully submitted,

                                                     /S/John P. DeRose
                                                     Attorney for LuzMaria Arroyo,
                                                     Plaintiff–Appellant

## CIRCUIT RULE 30(d) STATEMENT

In accordance with Circuit Rule 30(d) of the Rules of the Seventh Circuit Court of Appeals, I certify that the foregoing brief contains all the materials required by parts (a) and (b) of this Rule.

/s/John P. DeRose
John P. DeRose
Attorney for LuzMaria Arroyo,
Plaintiff–Appellant

## CERTIFICATE OF COMPLIANCE

In accordance with Rule 28.1(e)(1)-(3) and Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I certify that the foregoing brief complies with the type volume limitation and is proportionately spaced as required by Rule 32(b) of the Circuit Rules. The brief exclusive of tables and cover page contains 13,907 words as recorded by the word count of the word- processing system used to prepare the brief.

/s/John P. DeRose
John P. DeRose
Attorney for LuzMaria Arroyo,
Plaintiff–Appellant

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com

**CERTIFICATE SERVICE**

To:   Mr. William J. McMahon IV          Ms. Falon M. Wrigley
      100 N. Cherry Street              Constangy, Brooks & Smith, LLP
      Suite 300                        Suite 1325
      Winston-Salem, NC 27101          7733 Forsyth Blvd.
      bmcmahon@constangy.com           St. Louis, MO 63105
                                       fwrigley@constangy.com

The undersigned, pursuant to 28 USC 1746, certifies under penalty of perjury under the laws of the United States of America that this BRIEF OF PLAINTIFF-APPELLANT was served by electronically filing the same with the Clerk of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system on February 27, 2015. The participants on this appeal are registered CM/ECF users and will be served by the CM/ECF system. I further certify that I also served the participants by placing two copies of this BRIEF OF PLAINTIFF-APPELLANT in an envelope with sufficient postage affixed and directed to the participants named above, at the addresses indicated, and depositing the envelopes in the United States mail on February 27, 2015.

/s/ John P. DeRose
John P. DeRose
Attorney for LuzMaria Arroyo
Plaintiff-Appellant

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com

## TABLE OF CONTENTS TO SHORT APPENDIX

Table of Contents to Short Appendix……………………………………………………SA1

MEMORANDUM OPINION AND ORDER entered on September 30, 2014….SA2-42

Order denying Motion to Reconsider entered on November 5, 2014………….SA43-48

Plaintiff's Third Amended Complaint filed July 31, 2013………………………SA49-89

Judgment in Favor of Defendant entered September 30, 2014……………………SA90

Minute Entry on Bill of Costs for Defendant entered November 10, 2014………SA91

Notice of Appeal filed December 1, 2014…………………………………………..SA92-93

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-6859 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| VOLVO GROUP NORTH AMERICA, LLC, | ) | |
| d/b/a VOLVO PARTS NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff LuzMaria Arroyo worked at Defendant Volvo Group North America, LLC (d/b/a Volvo Parts North America) from June 2005 until November 2011. In Plaintiff's third amended complaint, she alleges discrimination, retaliation, and failure to provide reasonable accommodations under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, and Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"), along with a state law claim for intentional infliction of emotional distress. Defendant has moved for summary judgment [75] on all counts. For the reasons stated below, the Court grants Defendant's motion for summary judgment [75].

### I.    Background

#### A.    Statement of Facts

The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements. Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles

the movant to judgment as a matter of law. As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue,* 2010 WL 4942161, at \*7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999)). It simply is not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job \* \* \* to make it easy for the court to rule in [her] client's favor \* \* \*." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006).

It is the function of the Court to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g., Sullivan v. Henry Smid Plumbing & Heating Co., Inc.,* 2006 WL 980740, \*2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.,* 2004 WL 2203418, at \*16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor,* 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). Merely including facts in a responsive memorandum is insufficient to put issues before the Court. *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford,* 191 F.R.D. 581, 594 (N.D. Ill. 2000). In addition, Local Rule 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). Where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted.

2

In this case, some of Plaintiff's fact statements and responses to Defendant's fact statements contain legal conclusions or are irrelevant to the issues at hand. For instance, Plaintiff's first fact statement posits:

> Within 2 months of the commencement of her employment and throughout her employment thereafter, Volvo * * * violated the terms of USERRA and the Americans with Disabilities Act, failed to take affirmative action to advance in employment LuzMaria Arroyo who was suffering from posttraumatic stress syndrome (PTSD), subjected plaintiff to a hostile work environment and heightened scrutiny, considered terminating her during and after each deployment, leveled unwarranted discipline against her, and ultimately terminated her.

This one fact statement alone contains numerous legal conclusions and argument. The Court's role is to decide if there is a question of fact as to whether Defendant violated USERRA, the ADA, Title VII, or state law; the parties' role is to present the Court with facts (not legal conclusions) that support their position on the law. To the extent that either party's statements or responses contain legal conclusions or argument, are evasive, are irrelevant, or are not supported by evidence in the record, they will not be considered by the Court in ruling on the summary judgment motion.

**B.    Facts**

Plaintiff LuzMaria Arroyo was employed as a material handler for Volvo at its Chicago Parts Distribution Center (the "Distribution Center") in Joliet, Illinois, from June 13, 2005 until she was fired on November 8, 2011. In Arroyo's employment application, she stated that she was a member of the U.S. Army Reserve, and Volvo hired her as a material handler with that knowledge. Arroyo interviewed with Director of Distribution Keith Schroeder and Material Handling Supervisors Michael Temko and Patrick Dunn. As a material handler, Arroyo was responsible for retrieving ordered vehicle parts with a forklift and then packing those items to

3

ship to the customer on a timely basis. Beginning in January 2009, Arroyo worked the second shift, from 4:30 p.m. to 12:30 a.m.

During Arroyo's employment, no other employees at the Distribution Center were on active duty and subject to military orders. Throughout her employment, Volvo granted Arroyo leave for military activities, including military drills, training, and Yellow Ribbon events, as well as for two extended periods of deployment: April 17, 2006 to May 7, 2007, and April 15, 2009 to August 15, 2010. When Arroyo returned from her latest deployment to Iraq in April 2010, she used some accrued military vacation time and was released from active duty on August 15, 2010. Arroyo then took some additional time off before returning to work on September 27, 2010.[1] Upon her return, Volvo offered Arroyo a voluntary severance package, which Volvo had previously offered to other material handlers while Arroyo was on leave in 2009.[2] Arroyo declined the offer. In sum, Arroyo received more than 900 days of military leave during six and a half years of employment at Volvo.

Arroyo also took leave for weekend drills. Volvo modified Arroyo's work schedule to allow her to arrive to her shift two hours early and leave two hours early on Fridays prior to a weekend drill. Although Arroyo initially agreed to the modified work schedule, she later claimed that the arrangement was unsatisfactory because it did not give her enough time to get ready to drill. Through a mediation conducted by Colonel Tom Gorski of ESGR throughout March and April 2011, Volvo accommodated Arroyo's request by changing her Friday schedule

---

[1] Arroyo nominated Schroeder for a Patriotic Employer Award through the Employer Support of the Guard and Reserve ("ESGR"). Arroyo and ESGR Ombudsman Colonel Tom Gorski presented the award to Schroeder at the Distribution Center in October 2010. Arroyo also arranged for the public affairs officer from her unit to photograph the event. Arroyo had previously nominated Temko and Dunn for a Patriotic Employer Award after returning from an earlier deployment.

[2] The record reflects that in 2009, during Arroyo's second deployment, Volvo terminated six material handlers.

4

to 4:30 to 7:00 and allowed Arroyo to take 5.5 hours of excused military leave. Through the mediation, Volvo also resolved issues concerning Arroyo's health insurance coverage upon her return to work, catch-up 401(k) contributions, and paid military leave for Yellow Ribbon events.

Throughout these multiple tours of duty, weekend drills, and annual training, Keith Schroeder was able to find a replacement for Arroyo when she was otherwise engaged in service for her country. However, both Schroeder and Arroyo's supervisor, Michael Temko, questioned human resources and management about how to handle Arroyo's various leave requests, what rights (such as leave, travel, and rest time) were provided under USERRA, and what information Arroyo was required to provide to Volvo prior to or during requested leave time. Temko kept track of Arroyo's military schedule and her excused and unexcused absences.

All material handlers at the Distribution Center are subject to the Volvo's attendance policy. Pursuant to the policy, employees receive "occurrences"—either whole or fractional—for inexcusable absences or tardiness. For each occurrence, Volvo looks back both four weeks and six months from the date of the most recent occurrence to see if an employee has accrued enough occurrences to warrant a step in the progressive disciplinary process. Corrective action will be taken if an employee has two occurrences within a four week period or five occurrences within a six month period, calculated on a rolling fiscal year. The disciplinary steps under the attendance policy are: verbal warning, formal written warning, three-day suspension, and termination. Depending on how near an employee's occurrences are to one another, an employee may receive more than one disciplinary step at the same time, as the same occurrence can count for purposes of multiple disciplinary steps, given the look-back periods discussed above. If an employee has a six-month period with no occurrences, the employee's disciplinary "level" is reduced by one step.

5

The attendance policy has undergone periodic revision. In January 2008, the unwritten grace period that allowed employees to punch in up to two minutes after the beginning of their shifts was eliminated due to employee abuse. In January 2009, absences other than earned time off ("ETO")/vacation weeks and scheduled holidays no longer counted towards the rolling time period. Arroyo was present for and signed for receipt of an "Employee Infosession" in January 2009 concerning policy changes.

The attendance policy is administered jointly by Temko and Schroeder.[3] Temko is responsible for documenting any occurrences for each employee on an Excel spreadsheet after reviewing the time punch records. Temko and Schroeder are then responsible for administering disciplinary steps under the policy. Arroyo was subject to the policy since the beginning of her employment with Volvo. Although Volvo kept tabs on Arroyo's military leave requests, the record is undisputed that she never received any occurrences under the Volvo's attendance policy for days on which she took military leave. For instance, on November 19, 2008, Schroeder received communication from Arroyo's local army unit stating that she had orders from November 12 to November 26, which were not issued until November 14. Schroeder expressed his frustration that if she had received these orders on November 14, then she should have either called or faxed the orders; however, in an email to Temko, he noted that "[w]hile I have issues with her lack of communication, we likely have no recourse due to her military service."

In 2009, Arroyo received a verbal warning for earning two occurrences as a result of two no call, no shows within a four week period from October 13, 2008 to October 24, 2008. On October 1, 2010, Arroyo punched in 22 minutes after the beginning of her shift and earned a one-

---

[3] According to Schroeder, following Volvo's decision to eliminate the grace period policy, if a person is late, it is documented as late regardless of whether it is one minute or one hour late. Temko believes that being even one minute late could throw an employee's shift off track.

half (0.5) occurrence under the attendance policy.[4]  On October 11, 2010, Arroyo punched in 20 minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the attendance policy.  On October 19, 2010, Arroyo called-in absent for work and earned one (1) occurrence under the attendance policy.  Following Arroyo's October 19, 2010 absence, Schroeder met with Arroyo and told her the absence would be excused if she provided a doctor's note. Arroyo explained that she had an upcoming health assessment on October 25, 2010, and could ask her doctor for a note excusing the October 19th absence then. However, Arroyo never provided such a note.

On October 29, 2010, Schroeder presented Arroyo with a Corrective Action Plan ("CAP") in the form of a verbal warning—the first step in the progressive disciplinary process under the attendance policy—for the two occurrences she earned within a one-month period from October 1, 2010 to October 19, 2010. On October 29, 2010, Arroyo punched in one minute after the beginning of her shift.  Because Arroyo had two occurrences within a one-month period, she received a written warning, which is the second step in the disciplinary process. Arroyo challenged this occurrence and any disciplinary action stemming from October 29, 2010, contending that she was unaware of the change to the attendance policy that eliminated the previous unwritten rule of the two-minute grace period.  Although Schroeder verified that Arroyo was present for the January 2009 "Employee Infosession" mentioned above, Schroeder made an exception and did not give Arroyo an occurrence or the second step in progressive discipline under the attendance policy based on her one-minute transgression on October 29.  On November 4, 2010, Arroyo was provided with copies of various Volvo policies, including the

---

[4] A late punch of one hour or less results in a one-half (0.5) occurrence.

7

attendance policy. On November 23, 2010, Arroyo punched in two minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the policy.

Arroyo was treated for service-related post-traumatic stress disorder ("PTSD") in December 2010 and formally diagnosed in January 2011. Arroyo went to the Adventist LaGrange Memorial Hospital on December 23, 2010. She provided a note and discharge paperwork excusing her from work for the period of December 23, 2010 through December 30, 2010. Arroyo was subsequently approved for and took concurrent FMLA and short-term disability ("STD") leave from December 23, 2010 to March 22, 2011. She returned to work from FMLA/STD leave on March 23, 2011.

In April 2011, Arroyo filled out an indirect report (a document that material handlers use to document any time not spent picking or packing orders) and indicated that she "zoned out" for an unknown period of time during her shift. Arroyo provided these reports on a daily basis to Dunn—her direct supervisor at the time. Based on this comment, Volvo had safety concerns for Arroyo and her co-workers, given that much a material handler's job entails picking items with a forklift up to 20 feet off the ground. Accordingly, and at Volvo's request, John J. Koehler, M.D., conducted an independent medical exam ("IME") of Arroyo on April 14, 2011.[5] Based on his evaluation of Arroyo, Dr. Koehler recommended that Arroyo be removed from all safety sensitive work, including operation of a forklift. Based on that recommendation, Volvo removed Arroyo from forklift duties.

Arroyo began therapy for her PTSD. Volvo, through Regina Williams (Human Resources Business Partner), allowed Arroyo to use partial ETO days (in two hour increments)

---

[5] Also on April 14, 2011, Arroyo punched in ten minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the attendance policy. On both May 10 and 12, 2011, Arroyo punched in one minute after the beginning of her shift and each time earned one-half (0.5) occurrences under the policy. On May 27, 2011, Arroyo punched in five minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the policy.

to leave her shift early on Tuesday nights to attend her first set of VA therapy appointments on Wednesday mornings from 9:00 to 11:00 a.m.; these appointments ran from April through July 2011.

On May 19, 2011, Arroyo attempted to sign up to work overtime for that upcoming Saturday, May 21, 2011. Dunn, Schroeder, and Williams explained that Arroyo was not eligible to work overtime on Saturdays due to her then-existing restrictions from Dr. Koehler, as the Saturday work involved use of a forklift.[6] In response, Arroyo complained via email to Williams on May 20, 2011, that she felt discriminated against under the ADA. Arroyo arrived at the warehouse on Saturday, May 21, 2011, even though she was not scheduled to work, and observed employees packing boxes and strapping containers. Arroyo stayed there "[m]aybe ten minutes max" and testified in her deposition that she does not know how long employees perform packing duties on Saturdays. Arroyo sent a follow-up email to Williams on May 21, 2011, describing her observations and reiterating her perception that she was being discriminated against under the ADA. Following Arroyo's complaints of discrimination, Schroeder sent the following email to his supervisors: "Due to the ongoing job issues and concerns with LuzMaria Arroyo I strongly urge you to have a witness whenever you have a conversation with this employee." Schroeder testified that he made this recommendation due to recent communications with Arroyo and a desire to make sure that supervisors got support before answering her requests.

Arroyo took military leave from May 31, 2011 through July 8, 2011, and returned to work on July 11, 2011. Shortly after her return, Dr. Koehler conducted a follow-up evaluation of Arroyo, and, contingent upon receipt of a letter from Arroyo's counselor, Koehler released

---

[6] While Arroyo was on work restrictions, she worked weekday overtime.

Arroyo back to full-duty without restrictions. After Dr. Koehler released her to full-duty, Arroyo periodically worked overtime, including weekend overtime.

Arroyo's second set of PTSD therapy appointments were on Tuesday evenings from 4:00 to 5:30 p.m. and ran from July 19, 2011 through October 11, 2011. Due to rush hour traffic, Arroyo told Schroeder that she would not be at work before 6:30 p.m. on those days. Although Arroyo punched in after 6:30 p.m. on 11 of those Tuesdays, she did not earn any occurrences under the Attendance Policy with respect to those dates.

On July 29, 2011, Arroyo punched in one minute after the beginning of her shift and earned a one-half (0.5) occurrence under the policy. On August 19, 2011, Arroyo punched in five minutes after the beginning of her shift and earned a one-half (0.5) occurrence under the policy; the following day, she punched in one minute after the beginning of her shift and received a one-half (0.5) occurrence under the policy.

According to Arroyo, on or about Tuesday, August 23, 2011, her co-worker, Brian Accidentale, informed her that another co-worker (who at the time Arroyo believed to be Tracey Adams, but subsequently learned was actually someone else) had called the police on Saturday, August 20, 2011, because Arroyo had parked her motorcycle in a handicap spot at the Distribution Center. Arroyo met with Dunn that same day to complain. Dunn informed Schroeder that Arroyo had commented that Adams is "the enemy" and "her target" and that she could have gone to Adams and punched her in the face or cursed her out. Arroyo denies saying anything violent related to Adams.

Schroeder and Dunn met with Arroyo on August 24, 2011, and informed her that Volvo would not be addressing any rumors related to the motorcycle parking incident and reminded her that threats against a colleague are against company policy and she would be subject to

10

SA11

termination if her behavior continued. The next day, Schroeder spoke with Williams and Arroyo was provided with copies of the Workplace Violence and Harassment policies. In response, on August 26, Arroyo sent Schroeder an email, copying Williams. In her email, Arroyo provided a link to the Department of Labor's ("DOL") "America's Heroes at Work" website that addresses challenges facing service members returning to work with PTSD. Arroyo also requested numerous accommodations. Specifically, Arroyo requested the presence of human resources via phone and either Dunn or Maureen Somersett (Schroeder's administrative assistant) during all discussions with Schroeder; disability awareness training for Schroeder, the Material Handler Supervisors, and her co-workers; and a quiet place to meditate/utilize relaxation techniques during breaks and prior to work.

On August 31, 2011, pursuant to the attendance policy, Schroeder presented Arroyo with CAPs in the form of a formal written warning and three-day suspension—the second and third steps in the progressive disciplinary process under the attendance policy—for earning five occurrences within the six month period from October 19, 2010 to August 19, 2011, and for earning five occurrences within the six month period from October 19, 2010 to August 20, 2011, respectively. Per the revision in 2009 to the rolling period under the attendant policy, the time that Arroyo was out on A&S, FMLA, and Military Leave was excluded in measuring the six month periods for these CAPs.[7]

On September 1, 2011, Schroeder responded to Arroyo's requests for accommodations (copying Williams) and granted Arroyo's request for a quiet space to meditate/utilize relaxation

---

[7] On September 6, 2011, Temko emailed Schroeder to tell him that, in the course of Temko's audit of the time records in connection with the written warning and three-day suspension CAPs, he changed Arroyo's attendance record on her Excel sheet to reflect an excused absence for December 23, 2010. Accordingly, Volvo removed Arroyo's occurrence for that day. Temko explained that the adjustment only impacted the dates of the occurrences making up Arroyo's formal written warning (which, after the adjustment, ran from October 11, 2010 to August 19, 2011 instead of October 19, 2010 to August 19, 2011). Since Arroyo still had five occurrences within a six-month period, the written warning CAP stood.

11

techniques prior to the beginning of her shift and during breaks. Schroeder explained that Volvo was providing Arroyo with a private space in the warehouse operations office. Later that same day, Arroyo emailed Williams with several additional accommodation requests: (1) a flexible work schedule to allow her to "make up time" in case of tardiness; (2) the ability to use noise dampening devices (such as earplugs or headphones); (3) the ability to listen to audio relaxation devices; (4) a place to meditate or relax (which Arroyo noted had already been provided); (5) a mentor (whom Arroyo identified as Patrick Dunn, someone she felt comfortable approaching); (6) time off for counseling (which Arroyo noted had already been provided); (7) day-to-day guidance and feedback; (8) the ability to use the company's wellness program (which Arroyo noted had already been provided); (9) the ability to take breaks during panic/anxiety attacks; (10) disability awareness training (as noted previously); (11) all communications given to Arroyo in writing; and (12) the ability to call a support person during panic/anxiety attacks.

In making her requests, Arroyo relied upon on a document prepared by the DOL, which identified certain potential accommodations for employees with PTSD. Williams responded on September 1, 2011, that Arroyo's requests had been received and that Volvo would be back in touch to discuss her requests after it reviewed them. On September 3, 2011, while Volvo was considering Arroyo's requests for accommodation, Arroyo sent an email to Dennis Sholl, Director of the Central, West, and Mexico Regions for AB Volvo, requesting an investigation of Schroeder for disability-based harassment. Sholl responded by email memorandum on September 13, 2013, explaining that Williams would be in touch with her to begin the harassment investigation. Arroyo filed a charge of discrimination with the EEOC (Charge No. 440-2011-05756) on September 13, 2011, alleging discrimination and retaliation under the ADA.

12

SA13

After Williams and Arroyo discussed Arroyo's accommodation requests, Williams sent Arroyo a memo on September 16, 2011, explaining that Volvo had granted several of Arroyo's requested accommodations and that other accommodations were still under review. Specifically, Volvo granted Arroyo's requests for a place to meditate; a mentor; time off for counseling; access to the company's wellness program; breaks during panic/anxiety attacks; and the ability to call a support person during panic/anxiety attacks. Requests still under review included a flexible schedule to allow make up time in case of tardiness, the ability to use earplugs or headphones in both ears (one ear was allowed), the ability to listen to audio relaxation devices in both ears (one ear was allowed), day-to-day guidance and feedback, disability awareness training, and the request for all communications to be in writing.[8]

On September 19, 2011, Williams notified Arroyo via email that she had been assigned to investigate Arroyo's harassment complaint, that she would be at the Distribution Center on September 20, 2011, and that she would like to meet with Arroyo to begin the investigation. That same day, Arroyo replied back and stated that it was in her "best interest to obtain legal counsel before proceeding any further with the company." Williams responded by email later that day and explained that she had traveled from Atlanta to Chicago to conduct the investigation for three days. She asked Arroyo to let her know once she obtained legal counsel and was prepared to meet. Arroyo replied that she would be willing to answer questions by email in the interim. On September 21, Williams emailed Arroyo some questions "to understand more specifics about your concerns so that I can begin the investigation." In response, Arroyo refused to answer any questions and claimed that she had been "advised to refrain from answering any

---

[8] On September 21, 2011, Williams sent a follow-up email to Arroyo stating which breaks would be paid and unpaid.

13

questions until after * * * my lawyer has been given the opportunity to review my case and advise me of my rights."

On September 20, 2011 and September 21, 2011, Arroyo reported to work with headphones on both ears. Due to safety concerns relating to whether she would be able to hear forklift activity, and consistent with Volvo's Local Music, Radio I-Pod MP3 Policy, Dunn asked Arroyo to remove one of her headphones. When Arroyo refused, she was sent home from work. On September 22, Williams emailed Arroyo regarding her request to wear ear plugs or noise dampening devices in both ears and a flexible work schedule to allow make up time in case of tardiness. Williams explained that Volvo had safety concerns about Arroyo wearing ear plugs in both of her ears and that Volvo needed additional medical information as to whether tardiness and the need for a flexible work schedule was related to Arroyo's condition. Williams requested that Arroyo obtain an IME with Dr. Koehler with respect to her dual ear plug request and provide documentation from her own psychiatrist concerning her request for a flexible work schedule. Williams explained that Arroyo would receive paid time off from work until this medical documentation could be obtained

Arroyo sent Williams an email on September 26, 2011, requesting to return to work, to be provided the accommodations she requested, and to be protected from harassment from her coworkers and management. Arroyo did not provide any documentation from her psychiatrist and did not attend the IME with Dr. Koehler that Volvo had scheduled. On September 27, 2011, Williams emailed Arroyo a memo addressing her three areas of concern. First, Williams explained that she did not have enough information to proceed with a harassment investigation because Arroyo refused to answer the questions she provided. Williams attached a simplified form for Arroyo to fill out. Second, Williams explained that Volvo had not denied any of

14

Arroyo's accommodation requests and sought to continue the interactive process in good faith, reiterating her requests for additional medical information. Finally, Williams stated that Arroyo was allowed to return to work and use one ear plug/head phone in the interim. Later that same day, Arroyo sent Williams an email asserting a claim for harassment against Williams because she requested the aforementioned IME and medical documentation from Arroyo's treating psychiatrist. Arroyo did not complete the questionnaires that Williams provided regarding Arroyo's harassment allegations against Schroeder; however, on October 3, 2011, she returned to work without wearing any headphones.

On October 10, 2011, Arroyo punched in one minute after the beginning of her shift and earned a one-half (0.5) occurrence under the Attendance Policy. Also in October 2011, Arroyo requested time off for her third set of PTSD therapy appointments that were scheduled on Tuesdays from 4:00 to 5:30. Williams emailed Arroyo and explained that Volvo would accommodate her request by allowing her to use ETO in four-hour increments and once that time was exhausted she could attend the remainder of her therapy appointments using unpaid leave.

When Volvo provided Arroyo an accommodation of an office to use as a meditation room prior to the beginning of her shift and during breaks, Arroyo initially parked in the employee lot in the front of the Distribution Center and walked through the warehouse to the office, which was located in the rear of the Distribution Center. On October 18, 2011, Arroyo received a memo from Schroeder reminding her of Volvo's safety shoe policy and how she would need to wear safety shoes when walking through the facility. Thereafter, Arroyo started to park in the rear of the Distribution Center immediately adjacent to the dock area. Rather than put on her safety shoes and walk through the warehouse, Arroyo punched in early in the front of the Distribution Center, exited the building, and then drove her car to park in the rear of the

Distribution Center to use the meditation room prior to the beginning of her shift.  Arroyo then

waited until the shift start bell rang before she exited the warehouse, got back in her car, drove it

around the building to park it in the front employee lot, and then reentered the warehouse.  In

taking this extra time after the shift start bell, Volvo considered Arroyo to be in violation of its

attendance policy (despite the fact that she would punch in approximately 30 minutes prior to her

shift), which required all employees to be "in the building and ready to work at the scheduled

start time and continue to work until the scheduled hours of work are completed."  Arroyo

testified in her deposition that it "never entered [her] mind" to leave the meditation room five

minutes earlier, but admitted that there was no one preventing her from leaving the room earlier.

After Arroyo started her shift late on October 31, 2011, Schroeder met with Arroyo on

November 1, 2011, to discuss her use of the meditation room and failure to begin working at her

shift start time.  During that meeting, Schroeder presented a memo to Arroyo, explaining that the

use of the meditation room does not negate the need for her to be prepared to begin work when

the bell rings.  Schroeder also explained that Arroyo must access the meditation room by walking

inside the warehouse, because parking in the rear of the Distribution Center posed safety

concerns.[9]  Prior to her meeting with Schroeder on November 1, Arroyo did not receive any

occurrences under the attendance policy for her routine of clocking in early, but not being in the

building and ready to work.  On November 2, 2011, Schroeder posted a reminder notice for all

employees.

After her meeting with Schroeder, Arroyo was observed by management starting her shift

late again on November 2, 2011.  Accordingly, on November 3, Schroeder gave Arroyo a CAP

in the form of a verbal warning for this incident.  The CAP also provided that Arroyo would be

---

[9] On October 24, 2011 and October 28, 2011, Schroeder sent emails to the Material Handler Supervisors reminding them that employees should only park in the employee lot and not in the rear of the Distribution Center next to the dock area.

16

charged a one-half (0.5) occurrence for violation of the start rule under the attendance policy. Arroyo did not read the CAP, refused to sign the CAP, and refused to speak to the company without her attorney present.

Arroyo was observed by management starting her shift late again on November 4, 2011, and Schroeder presented Arroyo with a CAP in the form of a formal written warning. The CAP also provided that Arroyo would be charged a one-half occurrence (0.5) for violation of the start rule under the attendance policy. After preparing the November 4, 2011 CAP, Temko and Schroeder audited Arroyo's attendance records and determined that she had incurred five occurrences within a six month period from April 14, 2011 to November 4, 2011. Volvo determined that Arroyo had reached the fourth step in the progressive disciplinary process and terminated her from her employment for violation of the attendance policy. Schroeder testified that Arroyo was not terminated due to her on-the-job work or for insubordination.

**II.    Summary Judgment Standard**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

17

SA18

burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a

scintilla of evidence in support of the [opposing] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S.

at 252.

No heightened standard of summary judgment exists in employment discrimination

cases, nor is there a separate rule of civil procedure governing summary judgment in

employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.,* 263 F.3d 673,

681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir.

1997)). However, intent and credibility frequently are critical issues in employment cases that in

many instances are genuinely contestable and not appropriate for a court to decide on summary

judgment. See *id.* The Court must resolve all evidentiary conflicts in Plaintiff's favor and

accord her the benefit of all reasonable inferences that may be drawn from the record. *O'Leary*

*v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2013). "It is not for the courts at summary

judgment to weigh evidence or determine credibility of [a witness's] testimony." *Id.* (quoting

*Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Nevertheless, summary

judgment in favor of the defendant "is hardly unknown or, for that matter rare, in employment

discrimination cases." *Wallace*, 103 F.3d at 1396.

**III.   Discussion**

In Plaintiff's third amended complaint, she alleges discrimination, retaliation, and failure

to provide reasonable accommodations under Title VII, the ADA, the Rehabilitation Act of 1973,

18

SA19

and USERRA, along with a state law claim for intentional infliction of emotional distress.[10]

However, as pointed out by Defendant in its memorandum in support of summary judgment,

Plaintiff alleged no facts supporting a Title VII discrimination or retaliation claim in her

complaint, nor did Plaintiff pursue a Title VII administrative charge of discrimination before the

EEOC.[11]  Because Title VII requires plaintiffs seeking to pursue claims in federal court to first

file a charge with the EEOC (see *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir.

2000)), any Title VII claim, to the extent actually asserted, is not cognizable.  The Court turns to

Plaintiff's remaining claims.

### A.    Discrimination Claims

#### 1.    Discrimination under the ADA[12]

The Americans with Disabilities Act prohibits employers from taking adverse

employment actions against their employees because of a disability.  *Fleishman v. Cont'l Cas.

Co.*, 698 F.3d 598, 606 (7th Cir. 2012); see 42 U.S.C. § 12112(a).  To establish a violation of the

ADA, an employee must show "1) that she is disabled; 2) that she is otherwise qualified to

perform the essential functions of the job with or without reasonable accommodation; and 3) that

the employer took an adverse job action against her because of her disability or failed to make a

---

[10]   Plaintiff also references the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, in the
jurisdiction section of her third amended complaint, but does not assert a claim for relief under the
FMLA.

[11]   Plaintiff does not respond to Defendant's arguments arguing Title VII and the FMLA. Thus, Plaintiff
has waived any argument that she has cognizable claims under Title VII or the FMLA.  See, *e.g., C & N
Corp. v. Kane,* 756 F.3d 1024, 1027 (7th Cir. 2014) (failure to make argument in response to summary
judgment motion constituted waiver; "we will not find that an argument was adequately preserved solely
because a party's opponent defended against the argument"); *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466
(7th Cir. 2010) ("Failure to respond to an argument * * * results in waiver.").

[12] Complaints alleging employment discrimination under the Rehabilitation Act are governed by the ADA
standard. See 29 U.S.C. § 794(d); *Scott v. Kaneland Community Unit School District # 302,* 898 F. Supp.
2d 1001 (N.D. Ill. 2012).  Accordingly, the analysis with respect to Arroyo's ADA claims applies equally
to her Rehabilitation Act claims.

19

reasonable accommodation." *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009) (quoting

*Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000)). Essentially the same

elements must be proven to establish a violation of the Rehabilitation Act, which additionally

requires plaintiffs to prove that they were "involved in programs receiving federal financial

assistance." *Silk v. City of Chi.*, 194 F.3d 788, 798 nn. 6 & 7 (7th Cir. 1999). Plaintiff has come

forward with sufficient evidence to demonstrate that she was diagnosed with PSTD and suffers

from an ADA-recognized disability.[13]

In an ADA discrimination case, a plaintiff may prove discrimination in one of two ways.

First, a plaintiff can put forth "direct evidence" of discrimination. See *DeLuca v. Winer

Industries, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995). Alternatively, a plaintiff can submit "indirect

evidence" of unlawful ADA discrimination by way of the *McDonnell Douglas* burden-shifting

rubric, originally established for Title VII cases. *Id.*; *Fleishman v. Continental Cas. Co.*, 698

F.3d 598, 604 (7th Cir. 2012) ("[W]e have continued to apply the *McDonnell Douglas* burden-

shifting framework in summary judgment cases that proceed under the indirect method of proof

* * * ."). The burden-shifting test applies only if Arroyo relies on the indirect method of proof in

establishing her discrimination claim. See *id.*; see also *Antonetti v. Abbott Laboratories*, 563

F.3d 587, 591 (7th Cir. 2009) ("Under [the indirect] approach * * * * If Plaintiffs can

demonstrate [a prima facie case of discrimination], the burden shifts to the employer to articulate

---

[13] Plaintiff also contends in one sentence in her response brief that she suffers from depression. See Pl.'s
Resp. at 3. It is not clear from Plaintiff's brief whether she contends that depression is a symptom of her
PTSD or whether she is claiming that depression constitutes a separate disability. To the extent that
Plaintiff is claiming that depression is a symptom or subset of her PSTD, the Court acknowledges that
Plaintiff has demonstrated that she suffers from PTSD. However, Plaintiff has not come forward with
evidence (or even allegations) in her statement of facts that she was diagnosed with depression (apart
from any depression related to her PTSD). Merely including facts in a responsive memorandum is
insufficient to put the issue before the Court. See *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th
Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D.Ill.2000). Thus, while Plaintiff has demonstrated
that she suffered from PTSD, she has not come forward with sufficient evidence to show that she also
suffered from depression apart from her diagnosis of PTSD.

20

some legitimate, nondiscriminatory reason for the adverse action. If [the employer] satisfies this burden of production, Plaintiffs must then establish that there is an issue of material fact as to whether the employer's proffered reasons are merely pretext for unlawful discrimination * * * in order to survive summary judgment.") (internal quotations and citations omitted). But if Arroyo submits direct evidence of discrimination such that a jury could properly find a verdict in her favor—that is, that genuine issues of material fact exist with respect to each element that she will be required to prove at trial—that's the end of the inquiry, and Defendant's summary judgment motion must be denied. See *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683-84 (7th Cir. 2014).

With respect to her direct method argument, Arroyo's one-sentence argument states: "Plaintiff has countless emails sent among Volvo management and staff that illustrate[] a convincing mosaic that they were intentionally discriminating against her because of her disability." See Pl.'s Resp. at 7-8. First, Arroyo does not cite to any specific emails in support of her argument. In response to Defendant's argument that she does not have any direct evidence of discrimination, it is Plaintiff's obligation to come forward with sufficient evidence to support a claim (see *Modrowski v. Pigatto*, 712 F.3d 1166, 1167–68, 1170–71 (7th Cir. 2013) (explaining that district court must grant summary judgment for moving party if, after moving party points to absence of evidence supporting opponent's case, opponent fails to produce evidence from which jury reasonably could find in her favor on material issues for which she bears burden of persuasion)), not the Court's job to sift through the record to find the evidence (see *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006)). Simply referring to countless emails, but not identifying a single one, does not satisfy Plaintiff's obligation.

21

Further, the emails referenced in the parties' fact statements demonstrate an awareness of Plaintiff's rights as an active service member, as well as discussions about the company's rights and obligations in relation to Arroyo's military leave and PSTD, not discrimination. The emails evince efforts on the part of Volvo to ensure that its employees were aware of Arroyo's rights and sensitive to her military leave requests; to work with Arroyo to make sure that she was providing her military orders and that her excused absences were properly considered as such; to allow her to attend her therapy appointments for her PTSD; and also to provide several requested accommodations while Arroyo worked at the Distribution Center. At best, the emails reveal Volvo's interest in keeping abreast of Arroyo's military status and not running afoul of USERRA and the ADA, while holding Arroyo accountable for company policies when she was not on leave. Moreover, these emails affirmatively show that Volvo took no adverse employment action against Arroyo as a result of these discussions. *Cf. Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008) (concluding that a supervisor's comments that expressed frustration with employees' taking medical leave, but that resulted in no loss of job benefits, were not materially adverse). In short, Plaintiff has not come forward with "near-admissions" of discrimination by the employer or a convincing mosaic of circumstantial evidence that disability discrimination motivated Defendant's decision to terminate Plaintiff's employment. See also *Abuelyaman v. Ill. State Univ.*,667 F.3d 800, 809 (7th Cir. 2011).

Turning to the indirect method, Plaintiff preliminarily argues that she was meeting Volvo's legitimate expectations because "the only reason for her termination was because Volvo management had determined that she had violated the Absenteeism Attendance Policy."[14] See

---

[14] The Seventh Circuit has counseled that where a plaintiff has not met her burden of showing that a defendant's explanations are merely a pretext for discrimination, it is not necessary for a court to decide whether the plaintiff also established a prima facie case. See *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990); see also *Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir.

Pl.'s Resp. at 8. But Plaintiff's argument misses the point. Attendance at a job site is a basic requirement of most jobs, and the Seventh Circuit has held that an individual with "erratic, unexplained absences" is not a qualified individual with a disability for purposes of the ADA. See *Waggoner v. Olin Corporation*, 169 F.3d 481, 484-85 (7th Cir. 1999).[15] Not meeting an employer's attendance guidelines equates to not meeting the employer's legitimate expectations. See, *e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001) (holding that an employee failed to meet his employer's legitimate expectations by, among other things, incurring eight attendance violations). Arroyo argues that she was meeting Volvo's legitimate expectations because she "had not punched in late and was not tardy when she was terminated for violating Volvo's attendance policy." See Pl.'s Resp. at 9. Arroyo relies on this distinction without addressing the undisputed evidence that Volvo determined that she started her shift late on November 4, 2011, *despite having punched in timely*. This is because Arroyo would punch in prior to going to the meditation room (provided to her as an accommodation), stay in the mediation room until the shift start bell rang, then leave the room, walk to her car, drive around the side of the building to re-park her car, and then reenter the warehouse. Under any definition of being "in the building and ready to work at the scheduled start time," this would not suffice. It was not unreasonable for Volvo to expect Plaintiff to leave the meditation room in sufficient

---

1985) (moving directly to third step of *McDonnell Douglas* approach where defendant articulated and offered proof of a legitimate, nondiscriminatory reason for adverse employment action).

[15] It is unclear from the operative complaint whether Arroyo is asserting a separate discrimination claim with regard to her request to work overtime on May 21, 2011. She appears to predominantly rely upon this incident as the basis of her protected activity for her retaliation claim. However, to the extent that Plaintiff is asserting a discrimination claim based on this request, her claim fails. The record is clear that Plaintiff was on work restrictions at the time that she requested weekend overtime and could not use a forklift. Thus, she was not a qualified individual with respect to her request to work overtime on May 21, 2011, as using a forklift was a requirement for the weekend position.

time to be ready to work at her start time. In taking advantage of the accommodation provided to her, Plaintiff was not meeting her employer's legitimate expectations.

Arroyo's argument that she was a qualified individual with a disability—pointing out that she had "substantial documentation from doctors, emergency room visits and military orders for her absences"—similarly misses the mark. Arroyo was not disciplined for those excused absences—in fact, she was never disciplined or given an occurrence for any time she missed due to counseling, treatment for her PSTD, or her service in the military; rather, she was disciplined for her unexcused tardies and absences. See *Lewis v. Caterpillar, Inc.*, 367 Fed. Appx. 683, at *2 (7th Cir. Mar. 8, 2010) ("Failure to arrive for work on time—or at all—is not satisfactory performance * * * therefore [plaintiff] was not meeting the employer's legitimate expectations.").

Plaintiff also contends that she "can prove that similarly situated employees without a disability were treated more favorably," but she has not identified any other employees who were not disciplined for tardiness or unexcused absences. While it is undisputed that Volvo management did not have any charts or spreadsheets to keep track of military orders for other employees at the Distribution Center, Arroyo was the only active duty reservist employed at the time. Given that Plaintiff was provided with more than 900 days of military leave during her time at Volvo, it was not unreasonable for Volvo to keep track of her leave requests. Also, it is undisputed that Volvo maintains spreadsheets for all material handlers in monitoring tardiness and absences generally under the attendance policy.[16] Volvo has come forward with undisputed evidence that numerous employees, aside from Arroyo, have received occurrences and steps in the disciplinary process for punching in two minutes or less after the beginning of their shifts.

---

[16] The record also reflects that Volvo terminated six material handlers during Plaintiff's second deployment in 2009.

24

See Schroeder Aff. ¶ 9, Ex. 7 (Corrective Action Plans for all material handlers other than Arroyo who received any disciplinary action under the attendance policy from 2008 through 2012). In short, Plaintiff has not shown that similarly-situated, nondisabled employees were treated more favorably than her.

Volvo has articulated a legitimate non-discriminatory reason for Arroyo's termination (violation of the attendance policy). Additionally, Volvo has come forward with evidence that it would have taken the same action even if Arroyo did not have PSTD or was not in the military. Since Defendant has put forth a non-discriminatory explanation for its termination of Plaintiff, the burden now shifts to Plaintiff to prove that the bias-neutral reason proffered by Defendant was a pretext or an explanation designed to obscure the unlawful discriminatory employment action. *Emmel v. Coca–Cola Bottling Co. of Chicago,* 95 F.3d 627, 629 (7th Cir. 1996). In order to avoid summary judgment, a plaintiff must show that the reason given is unworthy of credence. See *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000). To accomplish this requirement, a plaintiff must provide evidence to prove that the defendant's reasons were either factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action. *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 888–89 (7th Cir. 2001). A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian,* 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). Plaintiff must "*specifically* refute facts which allegedly support the employer's proffered reasons"; conclusory statements about an employer's prejudice are insufficient to establish pretext.

*Alexander v. CIT Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (emphasis in original).

In an attempt to show pretext, Plaintiff points to a number of different incidents. Arroyo first cites to a series of emails exchanged in November 2008 when there was a delay with Arroyo providing her military orders to Volvo. Next, she cites to portions of her affidavit detailing her hospitalization in December 2010, when Schroeder was seeking guidance from HR on how to handle any discipline for her absences, given that Arroyo was going to exceed the cap of five excused days. As Arroyo concedes (but omits from her response brief), no such discipline ever occurred, because once Volvo was aware of the reason for her hospitalization and was given documentation, she was subsequently approved for FMLA and short-term disability leave retroactive to December 23, 2010. And, as noted previously, Plaintiff was never disciplined or given an occurrence for any time she missed due to counseling, treatment for PSTD, or her service in the military. That Volvo required her to provide documentation to support her leave time prior to excusing her leave can hardly be considered a pretext for discrimination.

Next, she claims that when she requested accommodation, "Schroeder and Williams consistently rejected her attempts to discuss what would help minimize her affects from PTSD." As detailed in the fact section, Plaintiff's argument does not find support in the record. Instead, the record is replete with instances in which Volvo provided requested accommodations: (1) use of a meditation room prior to her shift; (2) a mentor; (3) time off for counseling; (4) access to the company's wellness program; (5) breaks during panic/anxiety attacks; and (6) the ability to call a support person during panic/anxiety attacks. They also told her that the following requests were still under review: flexible schedule to allow make up time in case of tardiness, the ability to use earplugs or headphones in both ears (one ear was allowed), the ability to listen to audio

26

relaxation devices in both ears (one ear was allowed), day-to-day guidance and feedback, disability awareness training, and the request for all communications to be in writing. In response to multiple efforts to engage Plaintiff in dialogue about those requests, Plaintiff declined to speak with the company and notified them that she was seeking the assistance of counsel. She also refused to provide medical documentation to support certain of those requests. In light of the record, Plaintiff's contention that her supervisors failed to minimize the effects of her PSTD does not withstand scrutiny.

The record also reflects that, to the extent that Volvo exercised subjective judgment in applying its attendance policy, its discretion in many instances benefitted Arroyo. Specifically, the evidence demonstrates that: (1) Schroeder allowed Arroyo to bring in a doctor's note to excuse her October 19, 2010 absence (although Arroyo never provided such a note); (2) Schroeder deviated from the attendance policy in Arroyo's favor when he excused Arroyo's late punch on October 29, 2010, giving her the benefit of the doubt in response to her argument that she was unaware of the elimination of the two-minute grace period; (3) Arroyo's attendance record was updated in September 2011 to excuse her absence on December 23, 2010; and (4) Arroyo, who already was provided with a revised schedule to account for her counseling sessions, still punched in after 6:30 p.m. on 11 different Tuesday evenings on which she had VA therapy appointments, but earned no occurrences with respect to those days. Further, in November 2011, Schroeder met with Arroyo to discuss the need to begin work at the shift start bell and that her use of the meditation room prior to her shift did not negate her responsibility. It was only after Arroyo ignored his instructions that she earned the final two one-half (0.5) occurrences that ultimately resulted in her termination.

27

In sum, Plaintiff has not come forward with sufficient evidence to establish that Volvo's reason for terminating her was a pretext for disability discrimination. Rather, the facts described above indicate that Volvo had a legitimate business reason—multiple attendance policy violations—to terminate Arroyo's employment, and that it was Arroyo's tardiness, not her military service, that led to her termination.

## 2. Under USERRA

Enacted in 1994, USERRA is the latest in a series of veterans' employment rights laws, replacing its most immediate predecessor, the Veterans' Reemployment Rights Act ("VRRA") of 1974. 20 C.F.R. § 1002.2. The purposes of USERRA are: "(1) to encourage noncareer service in the uniformed services * * *; (2) to minimize the disruption to the lives of persons performing service in the uniformed services * * * by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a). "In enacting USERRA, Congress emphasized USERRA's continuity with the VRRA * * * and that the large body of case law that had developed under [earlier] statutes remained in full force and effect, to the extent it is consistent with USERRA." 20 C.F.R. § 1002.2.

USERRA affords broad protections to service members against employment discrimination, providing that members "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership * * *." 38 U.S.C. 4311(a). A "benefit of employment" means "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes * * * * the opportunity to select work hours or location of

28

SA29

employment." *Id.* § 4303(2). In order to allege a violation of USERRA, a plaintiff must establish that she was subject to an adverse employment action and that her military service was a motivating factor in that action. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 (2011). That Plaintiff in this case was subject to an adverse employment action—termination—is undisputed. Under the burden-shifting framework of § 4311, a plaintiff makes out a prima facie case of discrimination by showing that his service membership was "a motivating factor in the employer's action." *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864-65 (7th Cir. 2009). The employer must then "prove that the action would have been taken in the absence of such membership." *Id.*

Plaintiff's USERRA discrimination theory is that her termination for violation of Volvo's attendance policy in November 2011 was a pretext that Volvo seized upon after spending over six years "looking for a way" to terminate her. In support of her argument, she cites to numerous internal email communications between Volvo management and human resources over the years, which discuss the company's rights and obligations in relation to Arroyo's military leave. Arroyo contends that these emails equate to military animus. She also claims that Volvo selectively enforced certain company rules against her and did not provide her with requested accommodations.

As discussed above, the emails referenced by Arroyo reveal both Volvo's interest in keeping apprised of Arroyo's military status and in holding Arroyo accountable for company policies when not on leave. Had Volvo penalized Plaintiff for taking military leave, these emails may take on a more negative connotation. But they did not. Moreover, these emails affirmatively show that Volvo took no adverse employment action against Arroyo as a result of these discussions. *Cf. Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008)

29

(concluding that a supervisor's comments that expressed frustration with employees' taking medical leave, but that resulted in no loss of job benefits, were not materially adverse). Arroyo does not dispute (i) that Volvo gave her more than 900 days of military leave during her six and a half year period of employment; (ii) that after her return from her second overseas deployment, Volvo accommodated her request for a modified Friday work schedule prior to drill weekends; and (iii) that she did not receive any occurrences under the Attendance Policy for days on which she took military leave. The record also reflects that in 2009, during her second deployment while employed at Volvo, Volvo was forced to terminate six material handlers. What Volvo refused to do was accommodate her recurrent tardiness. Again, if Volvo had penalized Plaintiff and not others for being late, then Volvo's actions might evince a discriminatory animus. But Volvo has come forward with undisputed evidence that it similarly penalized other employees for being minutes late to work. Volvo's decision to hold employees to a strict start time is within its discretion and cannot serve as the basis for Plaintiff's USERRA discrimination claim. For these reasons, as well as reasons stated in analyzing Plaintiff's ADA discrimination claim, Plaintiff's claim of discrimination under USERRA fails.

### B. Retaliation Claims

The ADA prohibits employers from retaliating against employees who assert their right under the Act to be free from discrimination. 42 U.S.C. § 12203(a). Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). As in the discrimination context, a plaintiff can establish a valid case of retaliation using either the direct or indirect method of proof. *Kersting v. Wal–Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001). To establish a case of retaliation under the direct method of proof, a

30

plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) a causal connection between the two exists. *Dickerson v. Board of Trustees of Comm. College Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011). Under the indirect, burden-shifting method for retaliation claims, a plaintiff must demonstrate that she (1) engaged in protected activity; (2) was performing her job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Id.* Once a plaintiff satisfies her initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual. See *id.*; *Jasmantas v. Subaru–Isuzu Auto., Inc.,* 139 F.3d 1155, 1157 (7th Cir. 1998).

As a threshold matter, Defendant points out that Arroyo does not allege that she engaged in any protected activity under USERRA. In her third amended complaint, Arroyo identifies three dates on which she engaged in protected activity: May 20, 2011, August 21, 2011, and September 13, 2011. May 20, 2011, was around the time that Arroyo attempted to sign up to work voluntary Saturday overtime on May 21, 2011. There is no evidence of any protected activity on August 21, 2011; however, Arroyo requested accommodations for her disability on August 26, 2011 and September 1, 2011. Finally, Arroyo filed a charge of discrimination with the EEOC on September 13, 2011, alleging discrimination and retaliation under the ADA. Thus, it appears as if all of her alleged protected activity arises under the ADA rather than USERRA. Arroyo does not rebut Volvo's argument that she did not allege that she engaged in any distinct protected activity under USERRA. Instead, she contends that "Volvo's management was consistently seeking ways to terminate or discipline Arroyo for exercising her military rights and

31

obligations." See Pl.'s Resp. at 10-11. This is essentially Arroyo's USERRA discrimination claim with no further factual explanation. Thus, the same standard as discussed with respect to Arroyo's USERRA discrimination claim applies and the Court's analysis of her USERRA discrimination claim applies to her retaliation claim. There simply is insufficient evidence that Volvo sought to terminate Arroyo for exercising her military rights and obligations.

Turning to her claim under the ADA, for purposes of summary judgment, Volvo does not dispute that Arroyo engaged in protected activity and that she suffered an adverse employment action (her termination). Instead, Volvo contends that her retaliation claim fails because she cannot show a causal link between the two. As previously set forth, the Court has already concluded that (i) Plaintiff's recurrent tardiness prevented her from performing her job satisfactorily and (ii) there is no evidence that she was singled out for an adverse employment action that similarly situated employees did not suffer. Thus, Plaintiff must show a causal connection between her protected activity and her termination in order to proceed with her retaliation claim.

Volvo began to discipline Plaintiff under the attendance policy in October 2010—prior to any allegation of protected activity. That Volvo continued to consistently discipline her for tardiness after her protected activity does not create an inference of a causal link between the protected activity and her discipline; rather, it demonstrates that Volvo continued to implement its attendance policy, which it had the right to do. See, *e.g., Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1st Cir. 1997) (before plaintiff requested disability accommodation, plaintiff had been disciplined and warned of discharge if his performance did not improve; although discharge followed soon after his accommodation request, temporal proximity alone was not enough to sustain inference of retaliation). Additionally, Arroyo's protected activity does not

32

insulate her from continued discipline under the attendance policy. See, *e.g., Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior.") (overruled on other grounds). Again, if Plaintiff had been selectively disciplined for tardiness after engaging in protected activity, this would be a different case. But she was not, and in fact, the record clearly shows that other employees were similarly disciplined for attendance infractions.

In her response brief, Plaintiff contends that her protected activity is both that "she made it clear to Schroeder that she thought she was being discriminated against because of her disability" and that she complained to Sholl that Schroeder was harassing her. See Pl.'s Resp. at 11. Arroyo's complaint to Sholl occurred on September 3, 2011, when Arroyo sent an email to Sholl. The temporal distance between this complaint and her termination more than two months later is likely too remote to sustain any inference of a causal link. See, *e.g., EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2011) (holding that six weeks between filing ADA charge and plaintiff's termination is insufficient to establish retaliation). However, during that time, Arroyo also incurred several more attendance infractions and thus Volvo had a legitimate basis for its termination decision; Arroyo's protected activity does not change that fact.

Arroyo also cites a quote from Williams to Schroeder that "we could be violating the ADA." See Pl.'s Resp. at 11. The content of the quote shows that Williams emailed Schroeder on July 11, 2011, and clarified that Arroyo was allowed to work overtime during the week if there was work for her to do, distinguishing that scenario from when Arroyo was previously ineligible to work Saturday overtime due to no work being available in light of her job

33

restrictions at the time. Arroyo has conceded that she periodically worked overtime after her job restrictions were lifted. Putting Williams's quote in context shows that Williams was advising Schroeder of Plaintiff's rights, not seeking to retaliate against her. Additionally, Schoeder's inquiry into Plaintiff's overtime request is too remote in time to her termination to establish any causal link. See, *e.g.*, *Yellow Freight System, Inc*., 253 F.3d at 952-53.

Finally, Plaintiff alleges that Volvo retaliated against her by "continually refusing" to provide reasonable accommodations and "otherwise harassing" her. See Compl. at ¶ 132. However, as discussed above, the record reflects that Volvo provided various accommodations to Arroyo and attempted to engage in an interactive process with respect to further requests even after Arroyo filed an the EEOC Charge. When Williams attempted to engage Arroyo in the process, Arroyo noted in writing that it was in her "best interest to obtain legal counsel before proceeding any further with the company." Williams then asked Arroyo to let her know once she obtained legal counsel and was prepared to meet. Although Arroyo replied that she would be willing to answer questions by email in the interim, when Williams emailed Arroyo some questions on September 21, 2011, "to understand more specifics about your concerns so that I can begin the investigation," Arroyo refused to answer any questions and claimed that she had been "advised to refrain from answering any questions until after * * * my lawyer has been given the opportunity to review my case and advise me of my rights." Additionally, Arroyo's claim that Schroeder harassed her when he gave her a copy of the Workplace Violence and Harassment policies in response to the Tracey Adams incident occurred before her accommodation requests on August 26, 2011 and September 1, 2011. Thereafter, as set forth above, Volvo requested information from Arroyo to begin its investigation—information that Arroyo refused to provide. In short, the evidence demonstrates that Volvo went through the proper channels upon receiving

34

Plaintiff's EEOC claim and requests for accommodation and did not retaliate against Plaintiff for her complaints.

### C.    Failure to Accommodate[17]

In her third amended complaint, Arroyo identifies four accommodations that she contends were denied:  (1) time-off from work so that she could safety travel to and from military obligations and adequately perform for military duties; (2) allowing her time to attend her PTSD therapy sessions; (3) allowing her to work overtime on a machine other than the forklift; and (4) allowing her time to put on her protective gear prior to starting her shift.[18]  In her response brief, Arroyo does not rebut the fact that numerous accommodations were given to her nor does she address Volvo's arguments with respect to these four accommodations. Instead, she points to other incidents over the course of her employment—including that she provided information about USERRA to Volvo, that she underwent an IME at Volvo's request, that she requested an investigation into Schroeder's alleged disability-based harassment, and that she filed a charge of discrimination with the EEOC—as a basis for her failure-to-accommodate claim.  In the interest of completeness, the Court addresses the initial four accommodations (despite Plaintiff's failure to rebut Defendant's arguments) as well as the contentions in her response brief.

Time off from work to travel to and from military duties is a right protected by USERRA, rather than an accommodation.  See *Sandoval v. City of Chicago*, 560 F.3d 703 (7th Cir. 2009)

---

[17]  The Court has previously discussed aspects of Volvo's alleged failure to accommodate in analyzing Plaintiff's discrimination and retaliation claims and incorporates that analysis here.

[18] Arroyo does not point to Volvo's refusal to allow her to make up time in case of tardiness as part of her claim—nor would the case law support such a claim. See, *e.g., Waggoner*, 169 F.3d at 485 (7th Cir. 1999) (employer is not required to tolerate erratic, unreliable attendance); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (flexible schedule that would allow employee to clock in at whatever time she wanted and make up time at end of shift was not reasonable accommodation).

(noting that 38 U.S.C. § 4311(a) does not require an accommodation but only prohibits discrimination). In any event, the record reflects that Volvo always provided Arroyo the statutorily-required time to report back to work after her military service. See 38 U.S.C. § 4312. After her last deployment, Arroyo and Volvo also discussed the time that she needed off from work prior to her weekend drills. USERRA is silent on this issue and requires an employer to "reasonably accommodate" an employee on a case-by-case basis. The record reflects that Volvo first discussed the issue with Arroyo one-on-one and then mediated with Colonial Gorski of the ESGR. In any event, after the parties mediated the issue, it is undisputed that Plaintiff received the necessary time off to travel to and meet her obligations with respect to her weekend drills.

Second, Arroyo's contention that Volvo did not allow her time to attend her PTSD therapy sessions is belied by the record. Volvo allowed Arroyo to use ETO in two-hour increments on the Tuesdays before her Wednesday morning sessions that ran from April through July 2011; allowed her time off from work to attend another set of therapy appointments that ran from July through October 2011 (and did not credit her with attendance occurrences on numerous evenings that she was late reporting to work); and allowed her to use ETO (or unpaid leave once exhausted) for further therapy appointments that were scheduled for Tuesday evenings starting in October 2011.

Third, Volvo had no obligation to accommodate Arroyo's request to work voluntary Saturday overtime on May 21, 2011, due to her then-existing work restrictions and the unavailability of work that did not involve use of a forklift. See, *e.g., Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000) (noting that there is no duty to manufacture a job that will enable a disabled worker to work despite his disability). It is undisputed that Arroyo worked weekday

36

SA37

overtime while the restrictions were in place and worked weekend overtime after her restrictions were lifted.

Arroyo also contends that Volvo did not allow her time to put on her protective gear prior to starting her shift. She has repeatedly claimed that she was disciplined when she attempted to use the meditation room that Volvo granted her as an accommodation, but in doing so, she ignores both the scope of the accommodation itself and the fact that she was disciplined for starting her shift late in violation of the attendance policy—not for use of the mediation room. Volvo granted Arroyo use of a space in the warehouse operations office for her to meditate prior to the start of her shift and during breaks. When Arroyo refused to put on her safety shoes to access the space by walking through the warehouse, she began to punch in early in the front of the Distribution Center, exit the building, and then drive her car to park in the rear of the Distribution Center to use the mediation room prior to the beginning of her shift. She then waited until the shift start bell rang before she exited the warehouse, got back in her car, drove it around the building to park it in the front employee lot, and then reentered the warehouse. Yet she was not disciplined for this behavior (which caused her to start her shift late) until after she was warned verbally and in writing that such behavior was in violation of company policy. In fact, Schroeder explained that the use of the meditation room did not negate the need to be prepared to work when the bell rang and that parking in the rear of the Distribution Center posed safety concerns. Arroyo—just like any other material hander—had to make time to put on her safety shoes prior to her shift and to arrive at her shift on time. Her failure to do so is not a failure on the part of Volvo to accommodate her. See *Brunker v. Schwan's Home Serv.*, 583 F.3d 1004, 1009 (7th Cir. 2009) (employer did not have to provide plaintiff's "ideal" accommodation).

Plaintiff contends that "Volvo halted all attempts to determine reasonable accommodations for Arroyo's disability." See Pl.'s Resp. at 14. First, as set forth above, Volvo made numerous accommodations for Plaintiff. In regard to accommodation requests that were still under consideration when she was terminated, the record reflects that Plaintiff in fact halted attempts to resolve the outstanding accommodation issues. The evidence includes numerous emails exchanged between Arroyo, Schroeder, and Williams addressing Arroyo's requests and providing updates on which requests were granted and which were still under consideration. Then, when Williams asked Plaintiff to undergo an IME to support her dual ear plug request and requested that Plaintiff provide medical documentation from her treating psychiatrist relating to her request to make up time in case of tardiness, Plaintiff refused to do either and asserted a harassment claim against Williams. While this was going on, Volvo paid Arroyo for seven days that she did not work while Volvo awaited her decision as to whether she would attend an IME for her own requested accommodation. Patricia Dunford, Vice President of Human Resources, also responded to Plaintiff's inquires about why she needed to submit to an IME and provide medical documentation for certain requests and told Plaintiff that she could wear one earphone while the issues were being resolved. After Dunford's response, Plaintiff returned to work without wearing any headphones. Based on the foregoing, the record is clear that Volvo did not halt attempt to determine reasonable accommodations and in fact attempted to engage Plaintiff in an interactive process regarding those requests. See, *e.g.*, *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996) (holding that plaintiff's failure to sign release granting employer ability to investigate her alleged need for accommodation resulted in breakdown of interactive process and precluded her failure to accommodate claim).

38

In sum, Volvo provided numerous accommodations to Plaintiff, including a modified Friday work schedule for those weeks she had weekend drill duty, time off to attend VA therapy appointments using ETO in fractional day increments or having the time excused (including not giving Arroyo any occurrences on evenings she arrived to work late), an office in which to meditate prior to her shift and during breaks, a mentor, access to the company's wellness program, breaks during panic/anxiety attacks, the ability call a support person during panic/anxiety attacks, and use of ear plugs or noise dampening devices in one ear. Volvo also was in the process of reviewing several additional requests when Plaintiff declined to meet with Williams and instead filed a harassment claim against Williams and refused to provide requested documentation and submit to an IME. These facts simply do not give rise to a failure to accommodate claim.

## D. Intentional Infliction of Emotional Distress[19]

Arroyo's final claim is for intentional infliction of emotional distress ("IIED"). To establish a claim for intentional infliction of emotional distress under Illinois state law, a plaintiff must show: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress."

---

[19]    Ordinarily, the Court would relinquish jurisdiction over any remaining state law claims under 28 U.S.C. § 1367(c)(3), having dismissed all of the federal claims short of trial. However, the Seventh Circuit has identified several exceptions to the presumption of the relinquishment of state claims, including where the record has rendered it obvious how those claims should be decided. See *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007); *Sellars v. City of Gary*, 453 F.3d 848, 852 (7th Cir. 2006); see also *Young-Smith v. Holt*, 2014 WL 4699479, at *3 (7th Cir. 2014). Here, the record reflects that disposition of Plaintiff's IIED claim is not a close call. Additionally, considerations of judicial efficiency counsel toward retention of jurisdiction. See *Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722, 731 (7th Cir. 2001). This case has been pending since 2012. To fragment the state law claim off from this case to begin anew in state court would not be an efficient use of resources, given the obvious lack of evidence to support Plaintiff's claim. Therefore, the Court will exercise its discretion to retain jurisdiction over Plaintiff's IIED claim.

*Shamim v. Siemens Industry, Inc.*, 854 F.Supp.2d 496, 511 (N.D. Ill. 2012) (quoting *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 1st Dist. 2000)). "Whether conduct is extreme and outrageous is judged on an objective standard, based on all the facts and circumstances of the particular case." *Shamim*, 854 F.Supp.2d at 511 (citing *Graham*, 742 N.E.2d at 866). "To be considered extreme and outrageous, 'a defendant's conduct must be so extreme as to go beyond all possible bounds of decency' and must be 'regarded as intolerable in a civilized community.'" *Id.* (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (2003)). Courts are particularly reluctant to find extreme and outrageous conduct in the employment context in the absence of "conduct calculated to coerce an employee to do something illegal." *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1st Dist. 1999). "This reluctance seems to be grounded in a fear that, if the anxiety and stress resulting from discipline, job transfers, or even terminations could form the basis of an action for emotional distress, virtually every employee would have a cause of action." *Id.*

Plaintiff's IIED claim consists of many of the same allegations that make up her ADA and USERRA claims. Aside from the reasons discussed above as to why Plaintiff cannot proceed with her ADA and USERRA claims, there are no allegations, nor is there any evidence, that Volvo engaged in extreme and outrageous behavior. Arroyo's evidence consists of internal communications among Volvo employees attempting to determine the company's obligations under USERRA and the ADA. Much more egregious cases have failed to rise to the level of extreme and outrageous. See, *e.g.*, *Stoecklein v. Illinois Tool Works, Inc.*, 589 F.Supp. 139, 146 (N.D. Ill. 1984) (an employer's conduct in demoting and forcing an employee into retirement because of his age, then reneging on a promise of severance pay and job counseling, was not extreme and outrageous); *Balark v. Ethicon, Inc.*, 575 F.Supp. 1227, 1230-32 (N.D. Ill. 1983) (an

40

employer's refusal to reinstate an employee despite an arbitration award in the employee's favor, together with a baseless referral of the employee's name to the FBI for investigation, was not extreme and outrageous); *Witkowski v. St. Anne's Hosp. of Chicago, Inc.*, 447 N.E.2d 1016, 1022-23 (Ill. App. Ct. 1983) (an alleged wrongful discharge to prevent a plaintiff from securing long-term disability benefits was not extreme and outrageous).

In her response brief, Plaintiff merely states that "[t]here is no dispute that Volvo management was aware of Arroyo's PTSD diagnosis and her susceptibility to emotional distress" and Volvo "either intended to inflict severe emotional distress, or knew that there was a high probability that is conduct would do so." Arroyo fails to provide any citations to the record to support her argument, nor does she attempt to rebut the cases cited by Volvo rejecting an IIED claim in the employment context. Arroyo's speculation, which she has not supported with any facts or law, is not sufficient to withstand summary judgment, and her IIED claim, like her other claims, will be dismissed.

## IV.    Conclusion

For the reasons stated above, the Court grants Defendant's motion for summary judgment [75]. Judgment will be entered in favor of Defendant Defendant Volvo Group North America, LLC and against Plaintiff LuzMaria Arroyo on all claims.

Dated: September 30, 2014

_____
Robert M. Dow, Jr.
United States District Judge

41

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| Plaintiff, | ) | Case No. 12-cv-6859 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| VOLVO GROUP NORTH AMERICA, LLC, | ) | |
| d/b/a VOLVO PARTS NORTH AMERICA, | ) | |
| Defendant. | ) | |

## ORDER

For the reasons set forth below, the Court denies Plaintiff LuzMaria Arroyo's motion to reconsider [90]. This case remains closed.

## STATEMENT

Plaintiff LuzMaria Arroyo was employed as a material handler for Defendant Volvo Group North America, LLC, at its Chicago Parts Distribution Center in Joliet, Illinois, from June 13, 2005, until she was fired on November 8, 2011. In Arroyo's employment application, she stated that she was a member of the U.S. Army Reserve, and Volvo hired her as a material handler with that knowledge. Following her termination for repeated violations of Volvo's Absenteeism Attendance Policy, Plaintiff filed a lawsuit against Volvo. In Plaintiff's third amended complaint, she alleged discrimination, retaliation, and failure to provide reasonable accommodations under Title VII, the ADA, the Rehabilitation Act of 1973, and USERRA, along with a state law claim for intentional infliction of emotional distress. Defendant moved for summary judgment on all claims. On September 30, 2014, the Court granted summary judgment in favor of Volvo on all of Plaintiff's claims, and entered judgment in favor of Volvo. Plaintiff now asks the Court to reconsider its summary judgment ruling, arguing that disputed issues of material fact preclude the entry of summary judgment.[1]

Rule 59(e) of Federal Civil Procedure allows a party to direct the court's attention to a "manifest error of law or fact or to newly discovered evidence." *United States v. Resnick*, 594 F.3d 562, 568 (7th Cir. 2010). Essentially, the rule allows "a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995). A motion to reconsider asks a court to "reexamine its decision in light of additional legal arguments, a change of law, or perhaps an argument or aspect of the case which was

---

[1] On October 10, 2014, Plaintiff filed an 11-page motion to reconsider, which included citations to legal authority and a thorough discussion of the errors that Plaintiff perceives in regard to the Court's summary judgment opinion. Plaintiff subsequently filed a motion for leave to file a memorandum of law in support of her original motion to reconsider. In the interest of completeness, the Court gave Plaintiff leave to file the memorandum; however, the Court notes that the 7-page "memorandum of law" attached to her motion for leave to file contains many of the same assertions as her original motion to reconsider.

overlooked." *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004) (internal quotation omitted); see also *Seng–Tiong Ho v. Taflove*, 648 F.3d 489 (7th Cir. 2011) (explaining that a court can amend its judgment only if the petitioner can demonstrate a manifest error of law or present newly discovered evidence) (citing *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008); *U.S. v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008) ("A district court may reconsider a prior decision when there has been a significant change in the law or facts since the parties presented the issue to the court, when the court misunderstands a party's arguments, or when the court overreaches by deciding an issue not properly before it."). However, its purpose is not "to enable a party to complete presenting his case after the court has ruled against him. Were such a procedure to be countenanced, some lawsuits really might never end, rather than just seeming endless." *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995); see also *Oto v. Metropolitan Life Insurance Company*, 224 F.3d 601, 606 (7th Cir. 2000) ("A party may not use a motion for reconsideration to introduce new evidence that could have been presented earlier."); *Divane v. Krull Electric Company*, 194 F.3d 845, 850 (7th Cir. 1999); *LB Credit Corporation v. Resolution Trust Corporation*, 49 F.3d 1263, 1267 (7th Cir. 1995).

Ultimately, a motion for reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Global View Ltd. Venture Capital v. Great Central Basin Exploration*, 288 F. Supp. 2d 482, 483 (S.D.N.Y. 2003). "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (quotation omitted). In regard to the "manifest error" prong, the Seventh Circuit has explained that a motion to reconsider is proper only when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir.1990); see also *Oto*, 224 F.3d at 606 ("A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997))). In view of these exacting standards, it is not surprising that our court of appeals has opined that issues appropriate for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee*, 906 F.2d at 1191.

Plaintiff has not come forward with any new evidence that could not have been presented on summary judgment, nor has she come forward with any law demonstrating that the Court made a manifest error in granting summary judgment to Volvo.[2] Rather, Plaintiff's primary argument on reconsideration can be summed up in one sentence already advanced in her response to Defendant's summary judgment motion: "Plaintiff has countless emails sent among Volvo management and staff that illustrate[] a convincing mosaic that they were intentionally discriminating against her because of her disability." See Pl.'s Resp. to SJ at 7-8. But as set forth in detail in the Court's 41-page summary judgment opinion, the emails referenced by

---

[2]   A few of Plaintiff's arguments rely on events that took place years before her termination. To the extent that Plaintiff's arguments are based on alleged violations of USERRA, such arguments are time-barred with respect to events that occurred before August 27, 2008, as her original complaint was filed on August 27, 2012. See *Middleton v. City of Chicago*, 578 F.3d 655, 658 (7th Cir. 2009) (holding that USERRA claims are subject to the federal four-year statement of limitations set forth in 28 U.S.C. 1658(a)).

Arroyo reveal Volvo's interest in keeping apprised of Arroyo's military status, discussions about the company's rights and obligations in relation to Arroyo's military leave and PSTD, and efforts to hold Arroyo accountable for company policies when not on leave. Had Volvo penalized Plaintiff for taking military leave, these emails may have taken on a more negative connotation. But it did not. Moreover, these emails affirmatively show that Volvo took no adverse employment action against Arroyo as a result of these discussions. *Cf. Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008) (concluding that a supervisor's comments that expressed frustration with employees' taking medical leave, but that resulted in no loss of job benefits, were not materially adverse). What Volvo refused to do was accommodate her recurrent tardiness. Again, if Volvo had penalized Plaintiff and not others for being late, then Volvo's actions might evince a discriminatory animus. But Volvo has come forward with undisputed evidence that it similarly penalized other employees for being minutes late to work. Volvo's decision to hold employees to a strict start time is within its discretion and cannot serve as the basis for Plaintiff's discrimination claims.

Plaintiff's response to summary judgment and motion to reconsider indicate an unwillingness to accept a basic tenant of employment: that attendance at a job site is a basic requirement of most jobs, and the Seventh Circuit has held that an individual with "erratic, unexplained absences" is not a qualified individual with a disability for purposes of the ADA. See *Waggoner v. Olin Corporation*, 169 F.3d 481, 484-85 (7th Cir. 1999). Not meeting an employer's attendance guidelines equates to not meeting the employer's legitimate expectations. See, *e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001) (holding that an employee failed to meet his employer's legitimate expectations by, among other things, incurring eight attendance violations). One of Arroyo's "examples" of alleged discrimination clearly demonstrates that she either does not understand the law or refuses to accept that law as it now stands: Arroyo's practice of punching in early, then going to the meditation room (provided to her as an accommodation), staying in the mediation room until the shift start bell rang, then leaving the room, walking to her car, driving around the side of the building to re-park her car, and then reentering the warehouse violated not only the spirit of Volvo's attendance policy, but also Volvo's accommodation. As the Court stated in granting summary judgment to Volvo, under any definition of being "in the building and ready to work at the scheduled start time," this would not suffice. This example, to which Plaintiff repeatedly refers to as evidence of discrimination, retaliation, and a failure to accommodate, not only shows that Volvo's response was appropriate by Seventh Circuit standards, but also highlights that Plaintiff was taking advantage of an accommodation provided to her. Any way you cut it, Plaintiff was not meeting her employer's legitimate expectations.

In short, Volvo articulated a legitimate non-discriminatory reason for Arroyo's termination (violation of the attendance policy). Additionally, at summary judgment, Volvo came forward with evidence that it would have taken the same action even if Arroyo did not have PSTD or was not in the military. In response to Volvo's motion for summary judgment and now in her motion to reconsider, Plaintiff points to various incidents that she claims evinced a discriminatory animus. But all of those incidents were addressed in the Court's summary judgment opinion, and Plaintiff's disagreement with the Court's analysis does not entitle her to reconsideration. The record is clear that Plaintiff was never disciplined or given an occurrence for any time that she missed due to counseling, treatment for PSTD, or her service in the military. That Volvo management was at times unaware of its obligations (and Plaintiff's) under USERRA, discussed among themselves how to deal with Plaintiff's frequent leave requests, and

3

then required her to provide documentation to support her leave time prior to excusing her leave and also required her to comply with the attendance policy when she was not on leave, does not amount to a pretext for discrimination. This is particularly so in the light of the multiple times that Plaintiff's unexcused tardiness was forgiven. Arroyo's recurrent tardiness, not her military service, led to her termination. See *Lewis v. Caterpillar, Inc.*, 367 Fed. Appx. 683, at *2 (7th Cir. Mar. 8, 2010) ("Failure to arrive for work on time—or at all—is not satisfactory performance * * * therefore [plaintiff] was not meeting the employer's legitimate expectations.").

Only a few additional points, also discussed in detail in the Court's summary judgment opinion, are worth repeating. First, Plaintiff failed to identify any other employees who were not disciplined for tardiness or unexcused absences. Volvo has come forward with undisputed evidence that numerous employees, in addition to Arroyo, received occurrences and steps in the disciplinary process for punching in two or fewer minutes after the beginning of their shifts. See Schroeder Aff. ¶ 9, Ex. 7 (Corrective Action Plans for all material handlers other than Arroyo who received any disciplinary action under the attendance policy from 2008 through 2012). The record also reflects that Volvo terminated six material handlers during Plaintiff's second deployment in 2009. Volvo extended a voluntary severance package to Plaintiff when she returned to work in September 2010, but she declined and resumed her employment as a material handler.

Plaintiff highlights the deposition testimony of Maureen Somersett, a Volvo employee who created a spreadsheet that reflected Plaintiff's leave time. Somersett testified that she did not create any charts or spreadsheets to keep track of military orders for other employees, that did not she recall another employee being terminated for being one-minute late, and that—comparing Arroyo's punch cards to the spreadsheets at her deposition—Plaintiff actually punched in more than one half hour early and was not tardy on the some of the dates indicated and claimed by Volvo. However, it is undisputed that Volvo management did not have any charts or spreadsheets to keep track of military orders for other employees at the Distribution Center because Arroyo was the only active duty reservist employed at the time. Also, although Plaintiff was the only employee whose "military orders" were tracked, it is undisputed that Volvo maintains spreadsheets for all material handlers in monitoring tardiness and absences generally under the attendance policy.

Regarding keeping track of punch times when Arroyo returned from VA therapy sessions, Somersett explained that Arroyo had a small amount of ETO time left that she could use when she arrived late from her therapy appointments and that is how the request from Williams for Somersett to monitor Arroyo's punch times first came up. It is undisputed that although Arroyo punched in after her agreed-upon arrival time of 6:30 p.m. on several (11) Tuesdays, she did not receive an infraction under the attendance policy with respect to those dates. Further, although Somersett testified that she could not recall if any other employees were disciplined or terminated for being one minute late, she explained that the attendance rules are the same for everyone in the facility. Moreover, at summary judgment, Volvo presented undisputed evidence (from sources other than Somersett) that numerous employees, aside from Plaintiff, received occurrences and steps in the disciplinary process for punching in two minutes or less after the beginning of their shirts. See Schroeder Aff. ¶ 9, Ex. 7 (Corrective Action Plans for all material handlers other than Arroyo who received any disciplinary action under the attendance policy from 2008 through 2012). Finally, the November 4, 2011 occurrence that

4

ultimately led to Arroyo's termination was not for punching in untimely (as there is no dispute that Arroyo punched in timely that day), but for starting her shift late in violation of the attendance policy, which required all employees to be "in the building and ready to work at the scheduled start time and continue to work until the scheduled hours of work are completed." It is undisputed that Plaintiff was not at her station and ready to work at the scheduled time.

Plaintiff maintains that Volvo "required her to transfer to a local Army reserve unit just for the convenience of Volvo." At summary judgment, Volvo did not dispute that Plaintiff eventually transferred to a unit Darien, Illinois, in or around December 2007. However, there is no evidence that Volvo required her to transfer or that it penalized her prior to the transfer for traveling to Fort Benning, Georgia for training. In fact, the only evidence cited by Plaintiff that evinces Volvo's involvement with her decision to transfer or not to transfer from Fort Benning is an email between Schroeder and Temko that states, "She does have the option to transfer to a closer unit, we cannot make her transfer." At the end of the day, the decision was Plaintiff's. Furthermore, the nexus between Plaintiff's decision to transfer units in 2007 and her progressive discipline under Volvo's attendance policy, which took place years later, simply does not support an inference of discrimination or retaliation, under Title VII, the ADA, or USERRA.

In her motion to reconsider, Plaintiff suggests that a jury could find in her favor in light of Olin's comments to Schroeder regarding how an outsider could have a different view of Volvo disciplining Plaintiff for being one minute late on October 29, 2010, despite the fact that the evidence shows that Volvo consistently enforced its attendance policy. Plaintiff's argument ignores the fact that Schroeder took Olin's advice and made an exception to the attendance policy, giving Plaintiff the benefit of the doubt that she was unaware of the elimination of the two-minute grace period and deciding not to give her an infraction on October 29.[3]

Plaintiff's claim that she was retaliated against was thoroughly discussed in the Court's summary judgment opinion, and Plaintiff has not come forward with anything new to change the calculus. Volvo began to discipline Plaintiff under the attendance policy in October 2010—prior to any allegation of protected activity. That Volvo continued to consistently discipline her for tardiness after her protected activity does not create an inference of a causal link between the protected activity and her discipline; rather, it demonstrates that Volvo continued to implement its attendance policy, which it had the right to do. See, e.g., Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997) (before plaintiff requested disability accommodation, plaintiff had been disciplined and warned of discharge if his performance did not improve; although discharge followed soon after his accommodation request, temporal proximity alone was not enough to sustain inference of retaliation). Additionally, Arroyo's protected activity does not insulate her from continued discipline under the attendance policy. See, e.g., Hall v. Bodine Elec. Co., 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior.") (overruled on other grounds). Again, if Plaintiff had been selectively disciplined for tardiness after engaging in protected activity, this would be a different case. But she was not, and in fact, the record clearly shows that other employees were similarly disciplined for attendance infractions.

---

[3]   Aside from the exceptions made for Plaintiff at various times during her employment with Volvo (which were pointed out by Defendant), Plaintiff has not come forward with evidence in which Volvo failed to consistently enforce its attendance policy for other employees.

5

In her motion to reconsider, Plaintiff highlights her allegations that Schroeder was harassing her. However, as discussed at length in the Court's summary judgment opinion, the record reflects that Volvo provided various accommodations[4] to Arroyo and attempted to engage in an interactive process with respect to her allegations of harassment as well as requests to accommodate, both before and after Arroyo filed an EEOC Charge. When Williams attempted to engage Arroyo in the process, Arroyo noted in writing that it was in her "best interest to obtain legal counsel before proceeding any further with the company." Williams then asked Arroyo to let her know once she obtained legal counsel and was prepared to meet. Although Arroyo replied that she would be willing to answer questions by email in the interim, Arroyo refused to answer most if not all of the questions and claimed that she had been advised to refrain from answering any questions until she spoke with her lawyer. Volvo requested information, including medical documentation to support certain of accommodations, so that it could begin its investigation and consider her additional requests for accommodations, and Arroyo refused to provide that information. In short, the evidence demonstrates that Volvo went through the proper channels upon receiving Plaintiff's EEOC claim and requests for accommodation and did not retaliate against Plaintiff for her complaints. Additionally, Plaintiff incurred several more attendance infractions after her allegations of harassment and thus Volvo had a legitimate basis for its termination decision; Arroyo's protected activity does not change that fact.

Finally, Arroyo emphasizes a quote from Williams to Schroeder warning Schroeder that "we could be violating the ADA." See Pl.'s Resp. at 11. The content of the quote shows that Williams emailed Schroeder on July 11, 2011, and clarified that Arroyo was allowed to work overtime during the week if there was work for her to do, distinguishing that scenario from when Arroyo was previously ineligible to work Saturday overtime because no work was available in light of her job restrictions at the time. Arroyo has conceded that she periodically worked overtime after her job restrictions were lifted. Putting Williams's quote in context shows that Williams was advising Schroeder of Plaintiff's rights, not seeking to retaliate against her.

In sum, Plaintiff's motion to reconsider, which entirely reasserts arguments made and evidence thoroughly discussed in granting summary judgment, fails to present new evidence (that could not have been presented at summary judgment) that would compel a different result, and falls far short of demonstrating that the Court committed a manifest error of law. Plaintiff's motion to reconsider [90] therefore is denied.

Dated: November 5, 2014

_____
Robert M. Dow, Jr.
United States District Judge

---

[4] Volvo provided several of Plaintiff's requested accommodations: (1) use of a meditation room prior to her shift; (2) a mentor; (3) time off for counseling; (4) access to the company's wellness program; (5) breaks during panic/anxiety attacks; and (6) the ability to call a support person during panic/anxiety attacks. They also were working with her on additional requests: the ability to use earplugs or headphones in both ears (one ear was allowed), the ability to listen to audio relaxation devices in both ears (one ear was allowed), day-to-day guidance and feedback, disability awareness training, and the request for all communications to be in writing.

6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:12-CV-06859 |
| vs. | ) | |
| | ) | Honorable John Z. Lee, |
| VOLVO GROUP NORTH AMERICA, | ) | Judge Presiding |
| LLC, d/b/a VOLVO PARTS NORTH | ) | |
| AMERICA, | ) | Honorable Jeffrey Cole, |
| | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | JURY DEMANDED |

**THIRD AMENDED COMPLAINT**

NOW COMES the Plaintiff, LUZMARIA ARROYO, by and through her attorneys, John

P. DeRose & Associates, and as and for her Third Amended Complaint against Defendant,

VOLVO GROUP NORTH AMERICA, LLC, d/b/a VOLVO PARTS NORTH AMERICA states

as follows:

**JURISDICTION**

1.     This action is brought pursuant to 29 U.S.C. § 794; and the jurisdiction of this court is

invoked pursuant to 29 U.S.C. § 794(a)(1).

2.     This is an action seeking redress for violations of rights guaranteed to the Plaintiff , under

the Uniformed Service Members Employment and Reemployment Act (USERRA), 38 U.S.C.A.

§ 4301 *et seq.*, 29 U.S.C.A. § 215(a)(3), under the Americans with Disabilities Act (ADA) of

1990, § 2 *et seq.*, 42 U.S.C.A. § 12101 *et seq.*, under Title VII of the Civil Rights Act of

1964("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, as amended, under the Rehabilitation Act of 1973

("Rehab Act"), 29 U.S.C. § 791 *et. seq.*, and under the Family Medical Leave Act (FMLA), 29

U.S.C.A. § 2615(a)(1) when she was subjected to a hostile work environment and was ultimately

1

terminated because of interference and retaliation by her employer as she sought to exercise her

rights under these Acts. Plaintiff seeks mandatory injunctive relief and damages to redress

Defendant's discriminatory employment practices.

3.      Venue lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§

1331, 1343, and 1391(b) because the events giving rise to this claim occurred in this judicial

district and Plaintiff and Defendant and its employees reside in this District.

**PARTIES**

4.      At all times herein mentioned, Plaintiff, LuzMaria Arroyo (hereinafter "Ms. Arroyo" or

"Plaintiff"), was employed by the Defendant Volvo Group North America, LLC d/b/a Volvo

Parts North America (hereinafter "Volvo" or "Defendant").

5.      At all times herein mentioned, Defendant Volvo was and is believed and alleged hereon

to be a corporation duly organized, existing, and operating within the jurisdiction of this Court.

6.      Volvo is also an employer subject to suit under the Title VII and the ADA in that

Defendant is in an industry affecting commerce and had 15 or more employees in each of 20 or

more weeks in the current or preceding calendar year.

**FACTUAL ALLEGATIONS**

7.      Defendant is a transportation company in the business of producing, servicing and

distributing heavy-duty truck parts. Defendant is a government contractor and/or subcontractor

with contracts greater than $10,000.

8.      Plaintiff is a disabled veteran of the United States Army Reserve who was deployed on

three separate occasions to combat zones.

9.      Plaintiff has been deployed to Kuwait City, Kuwait and Baghdad, Iraq and Basrah, Iraq--

the last two deployments to Iraq of which were while in the employ of Defendant.

2

SA50

10.     Plaintiff is a qualified person with respect to her employment in that, with or without a reasonable accommodation, she can perform the essential functions of her job.

11.     Within 6 months after her release from active duty with the United States Army in Kuwait, Plaintiff began her employment with Defendant at its plant located in Joliet, Illinois on or about June 13, 2005.

12.     On her application for employment with Defendant, Plaintiff fully disclosed and Defendant was fully aware that she was a member of the United States Army Reserve, subject to call up to active duty and training pursuant to military orders.

13.     At all relevant times described herein, Plaintiff was employed in the position of material handler for Defendant.

14.     At all material times, Plaintiff performed her job according to her employer's legitimate expectations.

15.     Within 10 months after the commencement of her employment with Defendant, on April 15, 2006 Plaintiff was called to active duty in support of Operation Iraqi Freedom, was sent to Baghdad, Iraq, and went on military leave from her employment at the Defendant's Joliet plant.

16.     On or about May 7, 2007, Plaintiff was released from active duty in Baghdad, Iraq and reported back to work for the Defendant at its Joliet plant.

17.     At all times relevant, the Regional Manager at the Defendant's Joliet, Illinois location was Keith Schroeder (hereinafter sometimes referred to as "Schroeder").

18.     At various relevant times, Plaintiff had three immediate supervisors, Michael Temko, Sherrie Jankowski, and Patrick Dunn.

3

SA51

19.     At various relevant times, Defendant's supervisors (who were not even the immediate

supervisor of Plaintiff) interacted with or were involved in the secret discussions and

recommendations concerning the treatment of her, included, but was not limited to, Bill Balsis,

Bernard Bomba, Christopher Humann, David Miller, and Jason Mussatto.

20.     At various of the relevant times, members of the Human Resources Team and the

Management Team of Defendant with which plaintiff interacted or who were involved in the

discussions and recommendations concerning the treatment of her, included, but were not limited

to, Dennis Scholl, Bruce Olin, Regina Williams, Maureen Somerset.

21.     Almost from the inception of her return to work, Defendant's Supervisors, Managers,

Human Resources Representatives, and Upper Management began to consult with each other

concerning the requirements and dictates of the Uniformed Services Employment and

Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §4301 et seq.,  in order to

grudgingly grant only minimal compliance with USERRA and deprive Plaintiff of the rights and

benefits to which she is entitled in order to avoid allegations of discrimination and retaliation.

22.     After Plaintiff's return from Iraq in 2007, Defendant's Supervisors, Managers, Human

Resources Representatives, and Upper Management complained about and agreed among

themselves that Plaintiff's travel to Fort Benning, Georgia for her training imposed too great a

burden on Defendant because Plaintiff needed and had to be granted an extra day of travel to and

from Fort Benning in compliance with her military orders.

23.     Plaintiff was told by Keith Schroeder after he consulted with other of Defendant's

Supervisors, Managers, Human Resources Representatives, and Upper Management to transfer

from Fort Benning, Georgia to a local United States Army Reserve unit.

4

24.     Plaintiff advised Schroeder that as a soldier, she could only request a transfer and did not have the authority to demand a transfer.

25.     In December 2007 at the insistence of Schroeder, Plaintiff requested a transfer from her unit at Fort Benning, Georgia to a local drill site in Darien, Illinois for the convenience of Defendant.

26.     The team of soldiers with which Plaintiff had drilled, trained, and reported for duty at Fort Benning, Georgia were members of the unit with which Plaintiff had been deployed into combat zones in Iraq on the earlier occasion.

27.     The transfer to the unit at the local site in Darien, Illinois at the insistence of Defendant deprived Plaintiff of the camaraderie, society, and confidence she developed in her fellow soldiers, with whom she shared her experiences in harm's way.

28.     That transfer to the unit at the local site in Darien, Illinois also accelerated Plaintiff's Redeployment Schedule since there was normally a two to three-year period between deployments of particular units.

29.     In March, 2008, the United States Army placed Plaintiff on Active Duty for Training ("ADT") and Plaintiff went again on military leave status from her employment with Defendant.

30.     On or about October 1, 2008, Plaintiff returned to work at Defendant's Joliet plant from ADT.

31.     Upon Plaintiff's return to work, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management continued to debate the requirements and dictates of USERRA in order to grudgingly grant only minimal compliance, deprive Plaintiff of the rights and benefits to which she is entitled under USERRA, and avoid allegations of discrimination.

5

SA53

32.     Spreadsheets were created and emails were exchanged among Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management concerning Plaintiff's absence from employment at Defendant's plant for drills and training, her obligation to follow orders, and Defendant's legal obligation to cooperate with those orders.

33.     On or about April 15, 2009, Plaintiff was activated for service in Operation Iraqi Freedom a second time while employed with Defendant.

34.     Although originally scheduled to be released from active duty on April 15, 2010. Plaintiff tour of duty was extended until August 15, 2010.

35.     Questioning the obligation of Plaintiff to remain on extended active duty, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management demanded production of military orders that had not yet been produced in violation of USERRA.

36.     Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management continued to remind each other that they must not appear to be discriminatory of Plaintiff and her rights.

37.     On or about August 15, 2010, Plaintiff was released a third time from active duty with the United States Army in a combat zone.

38.     Pursuant to USERRA Plaintiff was allowed to return to her position at the Defendant up to ninety (90) days after release from active duty on August 15, 2010.

39.     Plaintiff returned to work at the Defendant's Joliet plant on or about September 27, 2010.

40.     Upon her return, Defendant failed to provide the Plaintiff with updated employment policies, failed to provide training and re-training on the essential functions of her job, and failed to provide the appropriate amount of earned time off ("ETO") Plaintiff had accrued.

6

41.     Throughout her employment with Defendant, as Plaintiff was experiencing concerns and
problems in the workplace as a result of her quest to fulfill her military duty and obligations, she
brought her questions, complaints, and problems, both verbally and in writing, to her supervisor
first, then to the local Human Resources Manager, then to the next level of Regional
Management, then to Regional Human Resources personnel, and finally to Defendant's upper
management at the Headquarters level.

42.     As Plaintiff sought rights guaranteed to her under the Uniformed Service Members
Employment and Reemployment Act (USERRA), under the Americans with Disabilities Act
(ADA) of 1990, under Title VII of the Civil Rights Act of 1964 ("Title VII"), under the
Rehabilitation Act of 1973 ("Rehab Act"), and under the Family Medical Leave Act (FMLA),
the company retaliated against her, disciplined her, and ultimately terminated her employment.

43.     On September 28, 2010 the first day after her return to work, Defendant's Supervisors,
Managers, Human Resources Representatives, and Upper Management tendered a Voluntary
Severance Package to Plaintiff with the hopes that she would voluntarily terminate her
employment with Defendant.

44.     Plaintiff did not accept the severance offer and continued to work for Defendant.

45.     On or about October 19, 2010, less than one month after Plaintiff's return to work from
active duty, Schroeder gave Plaintiff a "verbal warning" for two "occurrence" absences between
October 1, 2010 and October 19, 2010, despite the fact that Plaintiff had never been provided
with any protocol promulgated by Defendant concerning absences upon a reemployment and had
been, in fact, excused for one of the absences.

7

46.     On or about October 27, 2010, Plaintiff submitted a request to take military leave on the Friday before a drill and training weekend set to take place on November 5, 2010 in order to properly rest and make preparation for her drills and training.

47.     Schroeder denied the Plaintiff's request for military leave because of what Schroeder alleged, but failed to specify was an "undue hardship".

48.     Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management knew that USERRA required that Plaintiff be afforded travel time plus an eight hour rest period following her drill before having to report to work.

49.     After Schroeder denied Plaintiff's request for military leave, Plaintiff reluctantly agreed to report to work two hours prior to the start of her shift and leave two hours prior to the end of her shift on the Friday before her drill and training weekend.

50.     On or about October 29, 2010, Schroeder gave Plaintiff write-ups for the two absences of October 1, 2010 and October 19, 2010, which were originally "verbal warnings".

51.     This action taken by Schroeder against Plaintiff violated the Defendant's protocols for progressive discipline and corrective disciplinary action.

52.     On or about November 1, 2010, Schroeder disciplined Plaintiff for being one (1) minute late to work.

53.     Plaintiff refused to sign the Disciplinary Notice because the Defendant's policy allowed her to punch in up to two minutes after the start of the shift.

54.     From on or about November 10, 2010 through November 12, 2010, plaintiff's need for a leave day became apparent when she required hospitalization and medical treatment directly following drill weekend.

8

55.     On or about November 27, 2010, Plaintiff requested military leave on December 3, 2010 to allow her to attend a Military Reserve Training Weekend scheduled for December 4 and 5, 2010.

56.     Schroeder denied the Plaintiff's request for military leave from her employment with Defendant in order to attend the Military Reserve Training Weekend and be sufficiently rested before and after that training.

57.     On December 2, 2010, Plaintiff was instructed that a decision concerning any request for military or medical leave would only be made after she provided military or medical documentation in accordance with Defendant's attendance policy in violation of USSERA.

58.     On or about December 7, 2010, Plaintiff requested assistance from Employer Support of the Guard and Reserve (ESGR) in mediating her USERRA rights.

59.     On December 13, 2010, Schroeder offered to adjust the Plaintiff's work schedule on training weekends so that she would begin at 10:00 a.m. and end at 6:00 p.m.

60.     Schroeder's proposed schedule did not allow Plaintiff to meet the eight (8) hours of sleep plus travel time requirement as set forth in USERRA.

61.     When plaintiff did not accept his proposed schedule, Schroeder curtly denied Plaintiff's request to have a military leave day on the Friday before training weekends for the stated reason that it would be an "undue hardship" to Defendant.

62.     On or about December 23, 2010, Plaintiff self-admitted to the emergency room of the Adventist LaGrange Memorial Hospital, as she sought medical treatment for depression and anxiety.

63.     Plaintiff was diagnosed with anxiety and was provided with a note excusing her from work through December 30. 2010 which doctor's note was provided by Plaintiff to Defendant.

9

64.     Plaintiff was examined and treated at the Veterans Administration hospital for depression, anxiety and paranoia on January 8, 2011.

65.     Plaintiff was admitted to the Veterans Administration Hospital between January 10, 2011 and January 14, 2011 for depression, anxiety and paranoia.

66.     On or about January 18, 2011, Dr. Arvind Yekanath diagnosed Plaintiff with service-related Post-Traumatic Stress Disorder ("PTSD").

67.     Plaintiff applied for Short-Term Disability ("STD") with the Defendant, which Defendant approved on January 21, 2011 retroactive to December 27, 2010.

68.     On or about March 19, 2011, after mediation among the Plaintiff, Defendant, and the Employer Support of the Guard and Reserve ("ESGR"), Plaintiff was granted a partial military leave day in advance of drill weekends and pay for military leave for Annual Training attendance in accordance with company policy.

69.     On March 22, 2011 Dr. Arvind Yekanath wrote Defendant that "Arroyo is fit to work without restrictions".

70.     On or about March 23, 2011, Plaintiff returned to work from Short-Term Disability.

71.     On or about April 14, 2011, after the Defendant raised concerns about the impact of her PTSD symptoms on her ability to operate a forklift, Plaintiff saw the Defendant's physician for an Independent Medical Evaluation.

72.     As a result of the Independent Medical Evaluation, Defendant's physician restricted Plaintiff from operating a forklift.

73.     On or about April 26, 2011, Plaintiff requested to use two (2) hours of Earned Time off (ETO) each time she had to attend group therapy sessions required for her PTSD treatment.

10

SA58

74.     Schroeder and HR Representative Maureen Somerset denied Plaintiff's request and indicated that if Plaintiff wished to use ETO she would have to take a whole day off "pursuant to company policy".

75.     On or about May 2, 2011, after Plaintiff called company policy to its attention allowing employees to take ETO in one hour increments if they so desire and have available unused ETO, Defendant's Human Resources Department overruled Schroeder and allowed Plaintiff to use two hours of ETO on her PTSD group therapy session days.

76.     On or about May 20, 2011 Plaintiff requested to work overtime on Saturdays.

77.     After consultation with Schroeder, Local Human Resources Business Partner Regina Williams (hereinafter sometimes referred to simply as "Regina Williams") confirmed in writing that the only Saturday work available at Defendant's Joliet plant entailed operating the forklift.

78.     Plaintiff advised Regina Williams that she had been in the plant on Saturday and observed work being performed by another employee that she was fully able to do while on light-duty.

79.     Defendant was fully aware that the language of its policies contained no prohibition with regard to overtime while on restricted duty nor did it have any documentation placing Plaintiff on restrictive duty.

80.     Plaintiff complained that she was being discriminated against based on her disability when she was prevented from working overtime on Saturdays despite the fact that she had the ability to perform the job for Defendant.

81.     In her email to Regina Williams on May 20, 2013, Plaintiff concludes:

> Perhaps I have been discriminated against his whole time.

11

SA59

82.     On or about May 31, 2011, Plaintiff took military leave from her employment with
Defendant in response to orders from her unit.

83.     Although Arroyo was released from active duty on July 5, 2011, she was required to
report for drill training on July 8, 2011.

84.     Because she had no time off between active duty and her drill training, Plaintiff requested
additional days off (without pay from Defendant) before reporting back to work at Volvo.

85.     Plaintiff's request for additional time off before reporting back to Defendant's plant was
denied by Keith Schroeder and Regina Williams.

86.     As directed by Defendant, Plaintiff returned to work from military leave on July 11,
2011.

87.     In a letter dated the same July 11, 2011, Defendant's physician, Dr. John J. Koehler
reevaluated Plaintiff and indicated that "Arroyo is released back to full duty without restriction",
including the previous limitation on her driving a forklift.

88.     Schroeder had established a new system at the Joliet plant entitled "Volvo LMS Lite" to
allow supervisors and management to monitor the work and gaps in work of employees.

89.     Employees were advised that "supervisors will monitor daily LMS-Lite files", "excessive
gaps of unaccounted for time will be documented and communicated", "upper management will
do random audits of LMS Lite files and audit log", and "an employee will receive a Red Flag
after a supervisor reviews the LMS lite file if there is an accumulation of gaps of unaccounted
for time meeting the listed thresholds each day".

90.     When Supervisor David Miller accused Plaintiff of an LMS Lite policy violation on
August 4, 2011, Plaintiff wrote to HR Representative Regina Williams:

>       Being accused of an LMS Lite policy violation by Mr. Miller, not
>       my supervisor.  The alleged infraction occurred on the Tuesday

12

> when I begin work at a later time. This correlates with time off to
> attend my appointments as an accommodation allowed by the
> company.

> I am requesting intervention before I seek legal assistance.

91.    On or about August 26. I, 2011, Plaintiff wrote an email to Defendant to complain about

harassment relating to her PTSD diagnosis and to request a number of reasonable

accommodations for her PTSD based upon standards published by the Department of Labor

("DOL").

92.    In that email, Plaintiff wrote:

> America's Heroes at Work is a U.S. Department of Labor (DOL)
> project that addresses the employment challenges of returning
> Service Members living with Traumatic Brain Injury (TBI) and/or
> Posttraumatic Stress Disorder (PTSD)-an important focus of the
> President's Veterans agenda.

93.    Plaintiff went on to report harassment she experienced at the hand of Schroeder:

> On 8/23 I experienced an incident which brought about a major
> anxiety episode. I tried various relaxation techniques, but could not
> ignore the event; I have a call to action, for I no longer felt
> safe/protected. After careful consideration of courses of action, I
> decided to speak with my supervisor, Patrick Dunn (who I feel safe
> to approach and confirm with). The anxiety episode lasted
> approximately 20 minutes. After speaking with Mr. Dunn, I felt
> more calm and composed and was able to continue working. Mr.
> Dunn said he would need to speak with you [Keith Schroeder]
> regarding the event brought about the anxiety.

> On 8/24 you requested to speak with me and Mr. Dunn at which
> time you threatened to fire me for my behavior. Your demeanor
> was aggressive and hostile and I felt intimidated/threatened.
> Additionally, you stated that the time that I used in order to reduce
> my anxiety and consider courses of action was not authorized and I
> would be held accountable under the LMS Lite policy. You also
> stated that continued breaks for managing anxiety will result in
> termination. When I requested this information in writing, you
> refused to provide it to me and still have not provided it to date.

13

SA61

> On 8/25 you again requested to speak with me; this time cornering
> me in a small office with 2 other supervisors and Ms. Maureen
> Somerset behind the closed door in a room with no windows and
> no way to escape. You provided me with the workplace violence
> policy and the harassment policy and then allowed me to leave.
> ….

94.    On or about August 31, 2011 Schroeder and Williams suspended Plaintiff for violation of

the company attendance policy.

95.    That suspension was in violation of Defendant's own progressive discipline and

disciplinary protocol since Plaintiff had not received any written warnings for attendance

violations in the previous six (6) months.

96.    On or about September 13, 2011, Plaintiff filed an EEOC Complaint alleging

discrimination in violation of the Americans with Disabilities Act ("ADA").

97.    On or about September 19, 2011, Williams requested to interview the Plaintiff in relation

to her PTSD harassment claims.

98.    Plaintiff indicated that she wanted to obtain legal representation before speaking with

Regina Williams about the harassment.

99.    In the meanwhile, Regina Williams and Plaintiff came to an understanding regarding

some of the accommodations Plaintiff had requested in August, one of which was to allow her

the use of the supervisor's office at the back of the plant so that she could meditate and compose

herself before starting work each morning.

100.    On or about November 1, 2011, Schroeder informed Plaintiff that he could not agree to a

later start time on the dates during which she had her PTSD treatments without a call-in and a

doctor's note.

101.   Schroeder further clarified that Plaintiff was expected to have her personal protective equipment on prior to the start of her shift at 4:30 p.m. and was expected to be walking towards her forklift at the start of the shift.

102.   Plaintiff indicated that she would put on her safety equipment before going to the meditation room, but requested to be paid by Defendant for doing so, which request Schroeder denied.

103.   When Plaintiff asked if this was official policy, Schroeder indicated that he had not communicated these requirements to any other employee and that this was not the policy for any employee other than the Plaintiff.

104.   On or about November 2, 2011, Plaintiff arrived at Defendant's Joliet plant and punched in 20 minutes early in order that she could use the meditation room before starting work as agreed.

105.   On or about November 3, 2011, Schroeder provided Plaintiff with a written Disciplinary Action Form for violation of the Defendant's alleged "Shift Start Rule Policy", contending that Plaintiff had been late 3 minutes on November 2, 2011 because she was not on her forklift when the bell rang.

106.   Plaintiff refused to sign this false write-up and informed Schroeder that Plaintiff's attorney was going to be engaging in mediation with the Defendant at the EEOC on November 18, 2011 to resolve all ADA issues.

107.   Schroeder also advised Plaintiff that there was a parking restriction that prohibited her from parking in the back of the plant at the entrance nearest to the meditation room; and when questioned by Plaintiff about it, Schroeder admitted that the parking restriction was just for her, it was not a parking policy, and he had never before promulgated it.

108.   Only because Plaintiff questioned him on the parking restriction, Schroeder posted a
"parking policy" for all employees 2 days later.

109.   The new parking policy now necessitated that Plaintiff would have to leave the
meditation room and take the approximately 10 minute walk to the front of the plant and put on
her safety equipment and harness in order to be prepared for the start of work.

110.   On or about November 4, 2011, Plaintiff left work early pursuant to her agreement with
the Defendant to use military leave on military drill weekends.

111.   On or about November 8, 2011, Schroeder disciplined the Plaintiff for alleged tardiness
on November 4, 2011 and terminated the Plaintiff for her alleged absences over the past (6)
months.

112.   Defendant's reason for Plaintiff's termination is false and merely pretext for illegal
retaliation against her for reporting Schroeder's harassment and discrimination of her and to
further deprive Plaintiff of the rights and benefits to which she is entitled under USERRA by
Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management.

113.   On or about November 30, 2011, Plaintiff filed an amended charge with the EEOC
adding a claim for retaliation.

114.   Plaintiff was terminated because of her disability, PTSD and in retaliation for her EEOC
complaint for violation of the ADA filed on September 13, 2011 and in retaliation for her
attempt to secure reasonable accommodations and working conditions under USERRA.

115.   As a result of the aforesaid acts of the Defendant, Plaintiff has lost her employment,
income and benefits in an amount to be proven at the time of trial and claims such damages
together with prejudgment interest as permitted by law.

116.    The aforementioned acts of the Defendant were reckless, willful, wanton, malicious, oppressive, and in callous disregard to and indifference to Plaintiff's rights.

## COUNT I
## DISCRIMINATION ON THE BASIS OF PLAINTIFF'S DISABILITY
## VIOLATION OF USERRA, TITLE VII, THE ADA, AND THE REHAB ACT

117.    Plaintiff realleges and incorporates the foregoing paragraphs 1 through paragraph 116 of this Second Amended Complaint as though fully set forth at this place.

118.    Plaintiff is disabled in that she was diagnosed with PTSD and is substantially limited in the major life activity of brain function.

119.    Defendant also treated Plaintiff as a person with a disability by granting some of the accommodations she requested.

120.    Plaintiff was qualified for the job she held with Defendant and performed all job functions to Defendant's legitimate employment expectations.

121.    Despite Plaintiff's qualifications and job performance, Defendant discriminated and retaliated against her because of her disability and active military service.

122.    Defendant's discrimination and retaliation against Plaintiff and denial of her rights under USERRA was intentional.

123.    Defendant discriminated against Plaintiff in the terms and conditions of her employment.

124.    Similarly situated non-disabled employees and employees who were not in the United States military service were not subjected to the same terms and conditions of employment as the Plaintiff.

125.    Defendant's reason for Plaintiff's termination was false and merely pretext for illegal discrimination.

126.    Defendant's actions, as described above, are in violation of USERRA, the ADA and

Rehab Act in that Defendant acted to discriminate and retaliate against Plaintiff in the terms and

conditions of her employment because of her disability and in a studied attempt to deprive her of

rights, benefits and protection under those statutes.

127.    As a direct and proximate result of said unlawful employment practices and in disregard

of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of

discrimination, which has manifested in emotional distress and further has negatively impacted

her future ability to support herself, harmed her earning capacity, disrupted her personal life, and

caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.      That Plaintiff be granted general and compensatory damages in an amount to be

determined at trial;

B.      That Plaintiff be granted punitive or liquidated damages in an amount to be

determined at trial;

C.      That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs,

litigation expenses, and pre-judgment interest; and

D.      That the Court grant such other and further relief as the Court may deem just or

equitable.

**COUNT II**
**RETALIATION IN VIOLATION OF USERRA,**
**TITLE VII, THE REHAB ACT, AND THE ADA**

128.    Plaintiff realleges and incorporates the foregoing paragraphs 1 through 127 of this

Second Amended Complaint as though fully set forth at this place.

129.    Plaintiff met her employer's legitimate employment expectations.

18

SA66

130.   Plaintiff engaged in protected activity when she reported the harassment and violations of USERRA, and the ADA to the Defendant on May 20, 2011 and August 21, 2011.

131.   On September 13, 2011, Plaintiff filed a Charge of Discrimination against Defendant with the EEOC.

132.   After engaging in said protected activity, Defendant has engaged in many acts of retaliatory actions which include, but are not limited to, conspiring among its Supervisors, Managers, Human Resources Representatives, and Upper Management to deprive plaintiff of rights, benefits and protections guaranteed to her under the law, continually refusing to provide Plaintiff with a reasonable accommodation in her working conditions although Plaintiff is a qualified employee, terminating Plaintiff although she was performing to her employer's legitimate expectations and could continue to perform her job, and otherwise harassing Plaintiff in various ways designed to deprive her of those rights, benefits, and protections to which she was entitled and to impede her ability to work for Defendant.

133.   There is a causal connection between Plaintiff's protected activity and Defendant's retaliatory actions.

134.   Similarly situated employees who did not engage in protected activity were treated more favorably than Plaintiff.

135.   Defendant's reason for Plaintiff's termination is false and merely pretext for illegal retaliation.

136.   Defendant's actions, as described above, are in violation of USERRA, the ADA and Title VII as the Defendant has engaged in acts of retaliation because of Plaintiff's engagement in protected activities.

137.     As a direct and proximate result of said unlawful employment practices and in disregard of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of discrimination, which has manifested in emotional distress and further has negatively impacted her future ability to support herself, harmed her earning capacity, disrupted her personal life, and caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.      That Plaintiff be granted general and compensatory damages in an amount to be determined at trial;

B.      That Plaintiff be granted punitive or liquidated damages in an amount to be determined at trial;

C.      That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

D.      That the Court grant such other and further relief as the Court may deem just or equitable.

## COUNT III
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
## IN VIOLATION OF USERRA, THE ADA, AND THE REHAB ACT

138.     Plaintiff realleges and incorporates the foregoing paragraphs 1 through paragraph 137 of this Second Amended Complaint as though fully set forth at this place.

139.     Plaintiff is an active member of the United States Army Reserve and is disabled in that she is substantially limited in major life activity of brain function.

140.     Plaintiff is a qualified person with a disability in that Plaintiff can perform the essential functions of her job, or a job, with a reasonable accommodation.

20

SA68

141.   Defendant was able to provide a reasonable accommodation to Plaintiff in the form of

actions such as allowing plaintiff sufficient time-off from work so that she could safely travel to

and from and adequately perform for military duties, allowing her time to attend her PTSD

therapy sessions, allowing Plaintiff to work overtime on a machine other than the forklift, and

allowing Plaintiff time to put on her protective gear prior to starting her shift.

142.   Such reasonable accommodations would not cause an undue hardship on Defendant.

143.   Defendant refused to provide Plaintiff with these reasonable accommodations.

144.   Defendant failed to engage in the required interactive process to determine what it could

do to provide Plaintiff with a reasonable accommodation.

145.   Defendant's actions, as described above, are in violation of USERRA, the ADA, and

Rehabilitation Act, as Defendant did not offer Plaintiff, a qualified individual with a disability,

an available reasonable accommodation.

146.   As a direct and proximate result of said unlawful employment practices and in disregard

of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of

discrimination, which has manifested in emotional distress and further has negatively impacted

her future ability to support herself, harmed her earning capacity, disrupted her personal life, and

caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.     That Plaintiff be granted general and compensatory damages in an amount to be

determined at trial;

B.     That Plaintiff be granted punitive or liquidated damages in an amount to be

determined at trial;

C.     That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

D.     That the Court grant such other and further relief as the Court may deem just or equitable.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

147.  The Plaintiff repeat and re-allege paragraphs 1 through 146 of this Complaint as paragraphs 1 through 146 of Count IV as though fully set forth herein.

148.  Having been repeatedly advised of the rights of Plaintiff and knowing full well of her PTSD and the need for understanding and accommodation, the actions of Defendant, its supervisors, its Human Resources Department, and its high management employees were extreme and outrageous.

149.  The actions of the Defendant, its supervisors, its Human Resources Department, and its high management employees were done intentionally and maliciously to cause severe emotional distress to Plaintiff.

150.  Defendant, its supervisors, its Human Resources Department, and its high management employees knew or reasonably should have known that their actions had a high probability of causing severe emotional distress to Plaintiff.

151.  The actions of Defendant, its supervisors, its Human Resources Department, and its high management employees were intentional and malicious and demonstrated a willful and wanton disregard for the rights of Plaintiff and had a high probability of causing severe emotional distress to her.

152.  Plaintiff has suffered and continues to suffer from severe emotional distress.

22

153. From the very inception of her employment with Defendant and her absence from the workplace pursuant to military orders and obligations that Plaintiff was required to follow and fulfill, Defendant's management, supervisors, and Human Resources leadership plotted and planned illegal and inappropriate discipline and obstruction of her even though she was not an indispensable employee and her absence was not an undue hardship to Defendant and its business needs.

154. From the very inception of her employment with Defendant, and because of the refusal of Defendant's management, supervisors, and Human Resources personnel to provide Plaintiff with rights guaranteed her under USERRA, Plaintiff furnished Defendant's supervisors and managers with publications setting forth those rights and requested that they be forwarded to upper management and Defendant's Human Resources Department for their review and understanding, all of which requests met with ridicule from Defendant.

155. When Defendant found Plaintiff's absence from work to travel to and from Fort Benning, Georgia for drills and training to be too inconvenient for its work schedule, Plaintiff was compelled by Defendant's management to transfer to a local Army Reserve site in the State of Illinois, an improper order which Plaintiff followed. Counselor redeployment on the Penguin and 25 okay.

156. On August 25, 2005, only 2 months after her commencement of employment with Defendant, supervisor Michael Temko wrote Keith Schroeder:

> Tuesday night LuzMaria was a no call, no show. Wednesday morning I tried to contact her through her Army unit and at home. I was unable to get a hold of her, but left a message to call me back. Wednesday night, she shows up with a document from her unit that said she worked there on Monday. I questioned her as to why she returned to work Wednesday night if she only had to work Monday. She said she drove back from her unit which is Georgia. I informed her that we had no problem with her military service, but

23

SA71

that she still has to keep us informed as to what is going on. She
said next time she will call and let us know.

What do you advise I do in response to her 3 days no call, no
show?

157.    Keith Schroeder responded:

I have numerous questions we must clarify before we take any
disciplinary action.
...
4. Does she have any attendance disciplinary actions in her file? If
so, what level of action?
5. What is her performance, attitude and interaction with peers? I
overheard a conversation this week that indicated that she was a
problem employee. I don't recall discussing this with you.

... If attendance action is in order we must do so expeditiously.

158.    On August 26, 2005, Michael Temko responds to Keith Schroeder's questions:

...
4. She has no disciplinary actions for attendance. ...

5. ... Attitude and interaction with peers-Nothing really negative
or positive to say here. Not a lot of interaction. She, for the most
part, keeps to herself. In my opinion, LuzMaria's biggest problem
is she is "burning the candle on both ends". She works here full-
time, works as a part-time supervisor at UPS, and she is in the
Army Reserves. By the time she gets here, she doesn't appear to
have "much in the tank".

159.    On October 19, 2005, Michael Temko wrote to Keith Schroeder:

I don't know [if] she plans on making it to work from Georgia
when she has to drill on Sunday. I guess the question is, since she
travels out of state for drill, are we required to give her the day
before and the day after for travel? As a probationary employee, is
she entitled to all the same military benefits as a nonprobationary
employee?

160.    Schroeder sought assistance in the answering the questions from Defendant's

Human Resources Department:

24

SA72

...

LuzMaria continued to work for UPS while working for us and it impacted her performance in absenteeism, tardiness. She has since quit UPS in September and her performance has improved.

Now I find myself with a dilemma if I were to discipline a person for taking too much time off for military reserve duty when taking into consideration the current state of our country. Apparently her military reserve unit is in Georgia and she needs added time to drive to and from Georgia. Not sure if our policy addresses that....

I certainly give her credit for serving our country. But of course I am also responsible for our business needs.

161.    Bruce Olin, one of the highest ranking members of the Defendant's Human

Resources hierarchy responded with an answer that is clearly in violation of the law:

In reviewing the dates she has taken off, most were during the week. First, we do not have to grant time off for her travel time. Her legal obligation is 2 weeks per year, [for] which we do give off, and 1 weekend per month. The drills she attended were most likely extra training, [for] which we do not have to grant the time. We do not have to give extra time for her travel to and from her weekend duty.

She does have the option to transfer to a closer unit,....

162.    Thereafter, at the insistence of Keith Schroeder, Plaintiff transferred to a local

Army Reserve unit, severing her ties with the soldiers with whom she had been deployed to Iraq,

had developed camaraderie, and had shared experiences in harm's way.

163.    On December 5, 2005, Michael Temko wrote to Celia Jarvis from Defendant's

Human Resources Department:

LuzMaria has requested to speak with you in regards to her military service. She believes that she is entitled to a travel day to return to work following drill weekends and other training. I explained to her (per our discussion) that she is not entitled to a travel day, just the days that are on her orders or her drill schedule. I explained that any day that she takes for travel outside of this, from here on out, will be under our attendance policy.

25

SA73

164.   Of course, that information "discussed" among Defendant's supervisors,

management, and Human Resources representatives was completely wrong and violative of the

law and Plaintiff's rights.

165.   Because of her transfer to the local Army Reserve unit, Plaintiff's redeployment was

hastened and pursuant to military orders she returned to Iraq in April 2006.

166.   In April 2007, Michael Temko wrote to Bruce Olin and Keith Schroeder:

> LuzMaria Arroyo deployed to Iraq last April and according to her
> orders she is due back. She contacted me one time since her
> deployment (approximately 6 months ago) and I have not heard
> from her since, our conversation was very brief, and we got
> disconnected. For our planning/scheduling purposes, it would be
> beneficial for us to know her status. Would it be appropriate to
> contact her unit to inquire about her deployment status? If not,
> what are our rights and her responsibility in keeping us informed
> of her deployment status?

167. Bruce Olin responded:

> Unfortunately, there isn't a lot we can do. We can contact the unit
> if they have any information. All she has to do is to inform us
> within 6 months of her release. According to the law we have to
> wait for her. Sorry, it isn't what you wanted to hear.

168.   On May 14, 2007, Michael Temko wrote:

> All, LuzMaria called me last night and would like to return to
> work. She will return to work on Tuesday night.

169. In her Post Deployment Health Reassessment in August 2007, Plaintiff answered

among other questions, as follows:

> Health since Most Recent Deployment: Much Worse Now Than
> before I Deployed
>
> …
> I have nightmares
> I am Constantly on Guard, Watchful and Easily Startled
> …

26

SA74

> I am interested in receiving assistance for stress and emotional
> concern.

170. With each deployment and/or extended training of Plaintiff pursuant to military

orders, Defendant's management ordered its supervisory personnel to document and create

spreadsheets of her absence from the workplace in contemplation of her termination from its

employment.

171. On November 7, 2008, Keith Schroeder forwarded to Bruce Olin a spreadsheet

detailing all of Plaintiff's military orders since the commencement of her employment with

Defendant in June 2005.

172. On November 17, 2008, Bruce Olin advised Keith Schroeder:

> … Under the law she is within her rights to volunteer for
> assignments which cause her to use military leave. The only real
> restriction is when she uses five years of leave, not including
> weekends and her annual 2 week required duty. Sorry, but nothing
> we can do.

173. The following day Michael Temko wrote of his plan to discipline and terminate

Plaintiff because of her absence from Defendant's place of employment while she was fulfilling

her military duty:

> This is a follow-up to our previous discussions about LuzMaria
> Arroyo's military leave and her attendance. Since our discussion
> with Bruce Olin last week we have had more issues with
> LuzMaria's attendance. Please review the following timeline:
>
> Sat and Sun, 11/1 and 11/2-- Reserve Drill Weekend (schedule
> attached)
> Mon, 11/3 to Mon, 11/10-- AT Training for 8 duty days (order
> attached)
> Tues. 11/11-- absent from work. Acceptable due to travel from
> Fort McCoy, Wisc. She is allowed her travel time plus an 8 hour
> rest period.
>
> LuzMaria has a verbal warning waiting for her when she finally
> comes back. If we were to give her occurrences for Thursday,

27

SA75

November 13 and Tuesday, November 18 this would put her at a 3
day suspension for attendance. If we were too, also, give her an
occurrence for Wednesday, November 12 this would bring her to
termination for her attendance.

174.  On November 19, 2008, having repeatedly discussed with Defendant's supervisors

and managers at the Joliet facility their desire to terminate LuzMaria Arroyo, Bruce Olin

forwarded to Keith Schroeder a document discussing discrimination under USERRA claiming:

Keith, just an FYI. This is part of the law which allows her to take
the military leave. The last paragraph is our "out" to hold her to
our policies.

175.  The last paragraph of "the law" Bruce Olin had forwarded to Keith Schroeder and

contended gave defendant in an "out" reads:

Employees, including past, present or future service members, are
subject to all employment policies affecting employees'
performance and working conditions as long as these policies do
not penalize a person for service in the uniformed services. All
employees must follow an employer's policies and procedures
established specifically to address non-USERRA related
employment issues and grievances. ***Policies or procedures that
contain provisions infringing on a service member's rights under
USERRA may be a violation of USERRA.*** (Emphasis in bold and
italics not in original).

176.  On November 19, 2008, Keith Schroeder wrote:

To All: I left a voice message at LuzMaria Arroyo's phone, and a
short time ago, I received the attached communication from
LuzMaria Arroyo's local army unit, which states that she has
orders for November 12 to November 26, issued November 14.
One would have thought that if LuzMaria had received these
orders on November 14, she would have either called or faxed us
the orders. While I have issues with her lack of communications,
we likely have no recourse due to her military service.

177.  Once again, Keith Schroeder expressed his frustration because Defendant was

without recourse or reason to terminate Plaintiff's employment as she answered the call to duty

pursuant to military orders.

28

SA76

178.  On April 6, 2009, Plaintiff received orders indicating that she was being mobilized

to support Operation Iraqi Freedom for 400 days, which was later extended until September 2,

2010.

179.  In a Post Deployment Health Assessment completed by Plaintiff on March 17,

2010, among other answers, she indicated she sought a "Referral for: Neurological Problems"

because she experienced the following during her most recent deployment:

> Ringing in Ears, Lost Consciousness and Got Knocked out;
> Dazed, confused, and saw stars; constantly on guard, watchful, and
> easily startled;

180. Although the Separation Date from her most recent deployment was August 15,

2010 and, by law, Plaintiff had up to 90 days thereafter to notify Defendant either orally or in

writing of her desire to return to her former employment and she did return to work well within

the allotted time, Defendant's highest management discussed methods and offers to terminate

Plaintiff's employment.

181.  Keith Schroeder wrote to Bruce Olin:

> Bruce, LuzMaria Arroyo returned to active work on September 27,
> 2010. Mike and I reviewing her military records and we need to
> clarify some things before we speak to her regarding company
> activity during her absence in the military. Additionally, it appears
> we may have misunderstood what the military orders and
> discharge documents tell us regarding her required date to return to
> work.
>
> Questions
> 1) reported to active duty April 15, 2009 for 400 days
> 2) Discharge record indicates separation date of August 15, 2010;
> • assume she had 90 days from above date August 15, 2010 to
> report to work;
> • 400 days from April 15, 2009 is May 20, 2010, so does this
> August 15, 2010 date [mean] the date she should have returned to
> work?
> 3) Need to confirm Volvo policy on ETO [Earned Time off] days.

   4) Need to confirm whether LuzMaria is eligible for the April 2010
   Voluntary Severance package.

 182. Keith Schroeder advised Dennis Scholl, the second highest ranking employee of

Defendant in North America:

   Bruce, Mike and I reviewed the military records and our Volvo
   policy for this case. 1) After military records review we believe
   that LuzMaria should have returned to work on August 15, 2010. I
   believe she knew this and now has been out an additional 6 weeks
   yet. 2) Bruce, Mike and I support that we offer the Voluntary
   Severance package to LuzMaria pending your approval. …

 183. Also desirous of terminating Plaintiff's employment with Defendant and its

obligations under the law to secure reemployment for their only Army Reservist returning from

duty, Dennis Scholl responded:

   Yes I am ok with offering the package. Do you think she will
   accept?

 184. Michael Temko, Plaintiff's supervisor who had previously given Plaintiff the

second highest grades possible, all "VGs", in reviewing performance for Joliet PDC Employee

Evaluation/Updates, answered the question:

   Depending on how much time we give her to make her decision, I
   think it is possible. LuzMaria has always been a below average
   performer. When she sees how she measures up against the LMS, I
   think she will strongly consider it.

 185. Defendant's management and supervisors commenced heightened scrutiny and

discipline of Plaintiff in hopes that "she will strongly consider" their offer to terminate her

employment.

 186. In November 2010, Keith Schroeder advised Bruce Olin of personal issues of

depression that Plaintiff was experiencing and attempted to discipline her for being 1 minute

tardy:

Bruce, LuzMaria is now at step 2 corrective action plan in
accordance with our attendance policy. Below is a summary of
events and communications with LuzMaria since her return from
military duties on September 27, 2010

- October 29, 2010
o   Issued step one of attendance policy, exceeded 2
    occurrences in one month (approved by Bruce Olin HR)
o   Reference attached attendance record
- November 2, 2010
o   I met with LuzMaria at her request to discuss her
    attendance CAP [Corrective Action Plan]

LuzMaria stated to me that she is having personal issues of
depression since her return from active military duty. She stated
that her absence on October 29, 2010 should be considered
excused as she was seeking support from the military for her
medical issues. I stated to LuzMaria that in accordance with our
attendance policy she is required to provide written documentation
to support her absence.

…

187. Bruce Olin responded to Keith Schroeder:

The only issue I have concerns the late tardy of one minute. Yes,
she signed the form, but has been away from work for some time.
Were the policies reviewed with her when she returned? I
understand we enforce the rules completely and non-
discriminatory, but I can see some outsider having a different view
of this.

188. Because of the frustration Plaintiff was experiencing in the workplace, she provided

further documentation to Sherrie Jankowski, her supervisor and requested that it be forwarded to

Defendant's management.

189. On December 2, 2010 Sherrie Jankowski wrote to Keith Schroeder:

LuzMaria just came in and asked me to forward you the following
document. It is the LAW posted on the ESRG website pertaining to
employees of the military. She is really becoming a pain with all
this. She wanted me to read this, but I told her I did not have the
time right now!

Enjoy the reading....it's only 24 pages!!!!!

31

SA79

190.  On Christmas Eve 2010, Plaintiff wrote Keith Schroeder that the doctor had ordered

her not to return to work for the next 7 days, and advised:

> Self-admitted to the emergency room yesterday. Doctor gave me a
> note of no work through December 30, 2010. Between the stress at
> work and the stress of reliving the events of my deployment
> through writing my story, I have been having panic attacks. I have
> been waking up feeling scared. Not able to get more than 4 hours
> of sleep a day.

191.  Notwithstanding the written notice to him within 24 hours of her hospitalization,

Keith Schroeder again plotted and planned discipline leading to termination of Plaintiff's

employment with Defendant:

> HR issues to be resolved before I give formal discipline
>
> Bruce attached to this email is a communication from LuzMaria
> advising she will be off a total of 5 days beginning 12.23 to 12.30.
> In accordance with our corporate "Volvo Salary Continuation and
> Long Term Disability Plan" LuzMaria would need to be off more
> than 5 days to be considered STD so these absences fall under our
> ETO - local attendance policy. Assuming LuzMaria provides a
> medical document when she returns to work 12.23 and 12.27
> would be excused days and is then at our cap of 5 excused days.
> 12.28, 12.29, and 12.30 would be occurrences so under our
> attendance policy on 12.29 LuzMaria would be issued Step 2
> Formal Written CAP and on 12.30 Step 3, 3 day suspension.
>
> At this time I am not aware of any rule or guideline in our
> corporate "military" policy that would excuse these days.
> Additionally, LuzMaria is awaiting our decision on the ESGR -
> military federal policy ruling.
>
> These two outstanding issues with this employee require HR
> review before I administer the attendance CAP disciplinary action
> when she returns on January 3rd 2011.

192.  On December 29, 2010 Sherrie Jankowski advised, Keith Schroeder:

> Last night I was hearing some rumors about LuzMaria, all to which
> I did not comment, but I thought you might like to know about.
> There are several rumors for her not being here. 1. She fell and
> hurt herself and is on A&S 2. She's on workers comp 3. She's on

vacation in Hawaii (this sounded far-fetched until I realized that
she is on vacation next week too!) just thought I'd let you know.

193.  On January 14, 2011, Dr. Wendy Yin wrote to Defendant regarding Arroyo's stay at

the Hines VA Hospital from January 10-14, 2011:

>   Arroyo has a follow-up appointment on January 18, 2011
>   Should not return to work at this time.

194.  On January 18, 2011, Dr. Arvind Yekanath of the Hines Veterans Administration

Hospital wrote to Defendant concerning Plaintiff:

>   Diagnosis: PTSD
>   Prognosis: I expect her to resume full work related activities soon.
>   Ms. Arroyo should continue to see me on an outpatient basis once
>   monthly for medication management. I recommend she continue
>   seeing her therapist Brian Fask at Orland Park Vet Center weekly.
>   She will soon be enrolled in a group psychotherapy program at
>   Hines VA Hospital for PTSD victims.

195.  On April 5, 2011, J. Richard Monroe, PhD completed a U.S. Department of Labor

Certification of Health Care Provider and forwarded it to Defendant indicating:

>   Ms. Arroyo has a diagnosis of posttraumatic stress disorder
>   (PTSD) secondary to military service. The symptoms include, but
>   are not limited to, intrusive memories, emotional distress,
>   interpersonal detachment, hyper vigilance, ease of startle response,
>   and concentration problems. Symptoms may be persistent, but can
>   respond well to ongoing psychological therapies and/or medication
>   management. Clinical outcomes studies support both these
>   treatment options.
>
>   It is possible that symptoms could increase, particularly in
>   response to stress, making it more difficult to fulfill job duties.

196.  On April 21, 2011 Keith Schroeder wrote to Defendant's high management and

Human Resources Personnel:

>   On Thursday, April 21, 2011, Patrick Dunn and I met with
>   LuzMaria Arroyo regarding medical documents she provided to us.
>   LuzMaria presented to us a list of questions regarding Volvo's
>   policies.

33

SA81

> During this conversation, LuzMaria's stated that her case is leading
> to an EEOC complaint. In this case there are 2 pending issues; one
> is the safety concern as documented in the IME report, the other is
> her work and medical treatment for PTSD.

> This military veteran's case is very difficult as at every turn when
> we try to work with her, she rejects all local offers of support,
> resulting in outside mediation, i.e ESGR.

197.  On May 21, 2011, two of Plaintiff's supervisors reported to Keith Schroeder that

she announced that she was considering filing a complaint of discrimination because of the

treatment she was receiving during her employment with Defendant. Michael Temko wrote:

> …
> She told me that she was going to call HRSC and go above Keith
> and Regina Williams….

Sherrie Jankowski wrote:

> Just an FYI, but I heard that Luz is going around the warehouse
> telling people that she is being discriminated against….

198.  Two days later, Keith Schroeder wrote an email to every supervisor in Defendant's

plant, which stated in capital letters across the top "READ AND DELETE—DO NOT PRINT":

> To All: Due to the ongoing job issues and concerns with LuzMaria
> Arroyo, I strongly urge you to have a witness whenever you have a
> conversation with this employee.

199.  In the first week of July 2011, Keith Schroeder and Regina Williams discussed

Defendant's obligation to release Plaintiff to attend Mindfulness Meditation in Trauma Services

group therapy sessions every Tuesday night for 13 weeks from 4:00-5:30 PM as ordered by her

doctors at the Veterans Administration Hospital.

200.  Keith Schroeder inquired of the Veterans Administration whether this was merely

"elective medical services" and whether it could be "rescheduled to another time" because

Plaintiff worked the second shift from 4:30 PM to 12:30 AM.

201.  Because the Veterans Administration had scheduled the mandated group therapy for

the benefit of several veterans, Schroeder was told "no", the group therapy sessions could not be

rescheduled to accommodate Defendant's 2nd shift needs.

202.  On August 26, 2011, Plaintiff wrote to Keith Schroeder and Regina Williams:

> …
> On 8/23 I experienced an incident which brought about a major
> anxiety episode. I tried various relaxation techniques, but could not
> ignore the event; I had a call to action, for I no longer felt
> safe/protected. After careful consideration of courses of action, I
> decided to speak with my supervisor, Patrick Dunn (who I feel safe
> to approach and confer with). The anxiety episode lasted
> approximately 20 minutes.  After speaking with Mr. Dunn, I felt
> more calm and composed and was able to continue working. Mr.
> Dunn said he would need to speak with you regarding the event
> that brought about the anxiety.
>
> On 8/24 you requested to speak with me and Mr. Dunn at which
> time you threatened to fire me for my behavior. Your demeanor
> was aggressive and hostile and I felt intimidated/threatened.
> Additionally, you stated that the time that I used in order to reduce
> my anxiety and consider courses of action was not authorized and I
> would be held accountable under the LMS Lite policy. You also
> stated that continued breaks for managing anxiety will result in
> termination. When I requested this information in writing, you
> refused to provide it to me and still have not provided it to date.
>
> On 8/25 you again requested to speak with me; this time cornering
> me in a small office with 2 other supervisors and Ms. Maureen
> Somerset behind the closed door in a room with no windows and
> no way to escape. You provided me with the workplace violence
> policy and the harassment policy and then allowed me to leave.
>
> Based on the information in the attachment, I feel my actions were
> reasonable.
>
> However I feel that you are making it difficult (hostile) for me to
> deal with my condition, as opposed to being cooperative and
> supportive. Because I feel unsafe when speaking with you, I
> request that human resources on the phone AND ONLY Mr.
> Patrick Dunn OR Ms. Maureen Somerset present during any
> further discussions with you. Additionally, I request human
> resources to provide reasonable accommodation with providing

> YOU, the supervisors and my coworkers with disability awareness
> training. Additionally, I request a quiet space be provided for me to
> be able to meditate/utilize relaxation techniques (usually done at
> breaks and before work begins). Finally, as was the case on 8/23, I
> request empathy in realizing that sometimes I may not use words
> to request a "reasonable accommodation", however, I will act with
> the skills and techniques that I am learning in counseling will
> mitigate my anxiety and PTSD symptoms, and request a
> cooperative relationship from you as my employer in helping me to
> do so.

203.  At the time of writing her report to Keith Schroeder and Regina Williams, Plaintiff's

Human Resources Business Partner at the Joliet facility, the Volvo Human Resources U.S.

Policies & Procedures regarding Harassment, Workplace Violence provided in pertinent part:

> .... Accordingly, harassment of any employee... by any individual
> because of that employee's... disability, veteran status, or for any
> other reason, will not be tolerated on the job, on company property,
> or in any company-sponsored activity.  Therefore, the company
> expects that all relationships among persons in the workplace will
> be business-like and free of bias, prejudice, or harassment.
>
> Procedures for Reporting Harassment:
> Employees who have experienced conduct they believe is contrary
> to this policy have an obligation to take advantage of this
> complaint procedure. An employee's failure to satisfy this
> obligation could affect his or her legal rights in pursuing
> subsequent legal action.
>
> Any employee or business associate who feels he/she has been
> harassed should immediately report such incidents to his/her
> Human Resources Business Partner at the facility in which they are
> employed or to another senior manager/executive within the
> company before the conduct becomes more severe and pervasive.
>
> Employees should not feel hesitant or embarrassed about reporting
> harassment. The company is dedicated to making sure that the
> workplace is productive and free from harassing conduct. The
> company can only achieve this goal if employees report and
> cooperate in investigation of all possible violations of this policy.

204.  On August 28, 2011 Keith Schroeder wrote to Regina Williams and Dennis Scholl:

> I will need HR guidance on the attached to determine what
> accommodations we must comply with for this employee.
> LuzMaria personal physician and our IME released her to work yet
> in my opinion this employee has severe mental issues which must
> be addressed by HR....The case of LuzMaria Arroyo has caused
> significant stress to my staff.

205. Each of the accommodations requested by Plaintiff were set forth in a publication

given by her to Defendant and entitled *America's Heroes at Work*, a US Department of Labor

project that addresses the employment challenges of returning Service Members living with

Traumatic Brain Injury (TBI) and/or Posttraumatic Stress Disorder (PTSD).

206. After providing an office at the back of the plant where Plaintiff could

"meditate/utilize relaxation techniques prior to work start and then break for lunch" as an

accommodation, Defendant's supervisors and management began to document when, in their

opinion, Plaintiff was "late 1 minute" in getting to her workstation.

207. No such hyper vigilance, scrutiny, or record keeping was exercised with respect to

any other of Defendant's employees.

208. On September 3, 2011, Plaintiff wrote for the first time to Dennis Scholl seeking his

assistance:

> Sir,
> My name is LuzMaria Arroyo and I am one of your employees at
> the Joliet PDC. I am writing you based on the instructions in our
> companies, Conflict/Problem Resolution Process, Policy Number
> WP- 04.
>
> My conflict is disability-based harassment. According to our
> companies Equal Employment Opportunity/Affirmative Action
> Policy Number CR-02, our company is aware of this responsibility
> under the Americans with Disabilities Act (ADA). However,
> because I wish to engage the company in a cooperative relationship
> and not seem hostile in nature, I am providing excerpts from the
> US Employment Equal Opportunity Commission EEOC Notice
> Number 915.002 (please read the attached document). My intent is

37

to inform my company of my rights and its responsibilities to me
so that we can engage in a cooperative relationship.

In November 2010, I began to seek medical assistance with mental
health issues as a result of my post deployment activities. As
information regarding my condition was made available to me, I
provided our company (specifically, Keith Schroeder) with it. In
January 2011, I was diagnosed with a qualifying disability (while
on short term disability approved by our company). In March
2011, I returned to full duty at Joliet PDC only to have my duties
restricted by Mr. Schroeder, following a medical evaluation in
January 2011, I requested reevaluation and restrictions were lifted.
Mr. Schroeder has suspended me from work for a period of 3 days,
using the local BA/BU Attendance Policy as justification.

The first and main issue I would like to address to you is
notification of my disability to Mr. Schroeder and his continued
harassment with regards to such. I have worked in conjunction
with our local business partner, Ms. Regina Williams, with no
resolution. According to the guidelines related within the EEOC
notice, "an employer should initiate the reasonable
accommodation, interactive process without being asked if the
employer: (1) knows that the employee has a disability, (2) knows,
or has reason to know, that the employee is experiencing
workplace problems because of the disability, and (3) knows, or
has reason to know that the disability prevents the employee from
requesting a reasonable accommodation....

… Where was the opportunity afforded if both the written warning,
and suspension are delivered on the same day?

Which brings me to my second issue, Mr. Schroeder's blatant
disrespect for our company's policies and the laws of our state and
federal government. Mr. Schroeder has engaged in behavior that is
in violation of company's harassment policy number WP06-03-0,
by creating an intimidating and hostile work environment with
relation to me and my disability. He has violated our company's
Code of Conduct with regard to Equal Employment Opportunity
Harassment, and Accuracy of Books and Records. Ms. Regina
Williams has also violated our company's Code of Conduct with
regard to employee privacy. I am making a formal complaint to
you here and now and requesting an investigation of these actions.

… With regards to violation of Accuracy of Books and Records,
Mr. Schroeder, provided me with a document of attendance
infractions and recorded disciplinary action to justify my

suspension. On this document, Mr. Schroeder indicates a no call,
no show on 23, December 2010. This is a false statement as my
sister-in-law made the phone call to indicate she was driving me to
the hospital and I would not be able to come into work. I can
provide phone records, as well as the hospital discharge paperwork
to prove such. Additionally, 19 August 2011 indicates disciplinary
action had been in taken on that date with regards to my being
given a written warning. However, if you look at the date of the
written warning that I was actually given, it states 31 August 2011.
The same is said of the 3 day suspension with the date of 20
August 2011 on the document he provided, but a date of 31 August
2011 on the actual letter of suspension. I can only guess the reason
for his actions, and in my opinion, Mr. Schroeder has targeted me
for termination and is doing everything within his power to achieve
such.
…

I wish our company will take my complaints seriously, and I
expect feedback regarding my request for accommodation and my
allegations. I will give you until Close of Business 13 September to
respond to my requests. After some time, I will be filing a
complaint with the EEOC and seeking legal assistant. I will let
legal assistance speak with the VP of HR. Thank you for your
time, patience and understanding.

209. In an undated response by Dennis Scholl attached to an email sent to Plaintiff on

September 13, 2011, Defendant's Vice President wrote:

Ms. Arroyo:

I am writing to acknowledge receipt of your September 3 and
September 6, 2011 emails. From your correspondence, I have
identified 3 issues requiring attention. 1st, nor your request for
accommodations. 2nd, you cite to concerns regarding Mr.
Schroeder's behavior. 3rd, state your concerns regarding Ms.
Williams not allowing you to view your personnel records. I want
to address all Volvo parts North America will address each of
these issues you present.

…. Ms. Williams will continue the interactive process and will
respond to your remaining requests in writing as expeditiously as
possible.

Regarding Mr. Schroeder's behavior, Ms. Regina Williams, as a
human resources representative for the Chicago parts distribution

39

SA87

> center, has been assigned to investigate the alleged harassment in
> accordance with Volvo's harassment policy. She will also explore
> your concerns regarding potential code of conduct violations
> regarding equal opportunity and accuracy of records and records
> by Mr. Schroeder....

210.  Within less than an hour after assuring Plaintiff that there would be an investigation

of her allegations which he has admitted under oath are "most serious allegations", Dennis Scholl

wrote to Keith Schroeder:

> Keith, as you read the response to LuzMaria please do not be
> concerned about the investigation Regina will perform. It is the
> only response we could make as we have an employee who has
> filed a complaint so as you know we are obligated to investigate.
>
> If you wish to talk tomorrow call my cell.

211.  No investigation of the "most serious allegations" has ever been undertaken and no

discipline of Keith Schroeder has ever been contemplated.

212.  Instead, on November 8, 2011 Plaintiff's employment was terminated by Keith

Schroeder, with the concurrence of Regina Williams after Defendant's on-site management

and/or supervisors allegedly observed Plaintiff arrive at her workstation 1 to 3 minutes after the

start bell, although they knew that she had arrived at work and had been present 20 to 30 minutes

early each day in order to use the meditation room.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to grant the following

relief:

A.      Compensatory damages against Defendant in the amount of $1,000,000.00;

B.      Punitive damages against Defendant in the amount of $1,000,000.00;

C.      Reasonable attorney's fees and costs of this suit; and

D.      Such other relief as this Honorable Court deems just and appropriate.

Respectfully submitted,


S/ John P. DeRose_____
John P. DeRose
One of Plaintiff's Lawyers


John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois  60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

Luzmaria Arroyo,

Plaintiff(s),

v.

Volvo Parts North America LLC,

Defendant(s).

Case No.  12 cv 6859
Judge Robert M. Dow

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐   in favor of plaintiff(s)
     and against defendant(s)
     in the amount of $          ,

          which ☐ includes      pre–judgment interest.
                ☐ does not include pre–judgment interest.

     Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

     Plaintiff(s) shall recover costs from defendant(s).

---

☒   in favor of defendant(s) Volvo Parts North America LLC
     and against plaintiff(s) Luzmaria Arroyo

     Defendant(s) shall recover costs from plaintiff(s).

---

☐   other:

---

This action was *(check one)*:

☐ tried by a jury with Judge      presiding, and the jury has rendered a verdict.
☐ tried by Judge      without a jury and the above decision was reached.
☒ decided by Judge Robert M. Dow on a motion

Date:  9/30/2014                    Thomas G. Bruton, Clerk of Court

                                    /s/ Theresa Kinney, Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6,1
Eastern Division

Luzmaria Arroyo

Plaintiff,

v.                                                    Case No.: 1:12–cv–06859
                                                      Honorable Robert M. Dow Jr.

Volvo Group North America, LLC

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, November 10, 2014:

    MINUTE entry before the Honorable Robert M. Dow, Jr: Following the entry of judgment in its favor, for Defendant Volvo Group North America, LLC submitted a bill of costs [95] pursuant to Federal Rule of Civil Procedure 54(d). The Court gave Plaintiff until 11/4/14 to file any objections [96]. Plaintiff has not filed an objection. Nevertheless, having scrutinized the amounts sought by Defendant, the Court finds that most of the costs sought–fees for service of summons and subpoena, transcripts, witnesses, and exemplification and costs are reasonable and allowed by rule and statute. However, the Court has reduced the costs sought by $1,950.00 (the amount Defendant seeks to recover for two video depositions) as video recording costs typically are recoverable only where the proponent establishes that they are reasonable and necessary. See Loomis v. Exelon Corp., No. 06 CV 4900, 2010 WL 1005037 at *2 (N.D.Ill. Mar. 11, 2010) (Most decisions that award video recording costs involve a non–party and a chance of his non–appearance at trial.) (citations omitted). Here, Defendant has not justified the need for video service, particularly where Defendant also seeks to recover the cost of the two transcripts. Therefore, the Court has reduced the award by $1,950.00 and awards Defendant $9,476.30, rather than the full amount sought. Mailed notice(tbk, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LUZMARIA ARROYO,           )
                                        )    Notice of Appeal
               Plaintiff,    )
                                        )    Case No. 1:12-CV-06859
vs.                               )
                                        )    Honorable Robert M. Dow, Jr.,
VOLVO GROUP NORTH AMERICA,    )    Judge Presiding.
LLC, d/b/a VOLVO PARTS NORTH     )
AMERICA,                         )
                                        )
               Defendant.   )

**NOTICE OF APPEAL**

To:    Mr. William J. McMahon IV             Ms. Falon M. Wrigley
        100 N. Cherry Street                 Constangy
        Suite 300                           Brooks & Smith, LLP
        Winston-Salem, North Carolina 27101     7733 Forsyth Blvd.
        bmcmahon@constangy.com           Suite 1325
                                        St. Louis, MO 63105
                                        fwrigley@constangy.com

Notice is hereby given that LuzMaria Arroyo, Plaintiff in the above named case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the orders by His Honor, Judge Robert M. Dow, Jr. granting summary judgment to Volvo Group North America, LLC, d/b/a Volvo Parts North America, Defendant entered in this action on the 30th day of September, 2014, denying plaintiffs Rule 59 motion to reconsider on November 5, 2014, and the Bill of Costs awarded to Defendant as prevailing party entered on November 10, 2014.

                                        Respectfully submitted,

                                        /s/John P. DeRose
                                        Attorney for LuzMaria Arroyo
                                        Plaintiff-Appellant

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | Notice of Appeal |
| Plaintiff, | ) | |
| | ) | Case No.  1:12-CV-06859 |
| vs. | ) | |
| | ) | Honorable Robert M. Dow, Jr., |
| VOLVO GROUP NORTH AMERICA, | ) | Judge Presiding. |
| LLC, d/b/a VOLVO PARTS NORTH | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

CERTIFICATE OF SERVICE
NOTICE OF APPEAL

To:    Mr. William J. McMahon IV              Ms. Falon M. Wrigley
       100 N. Cherry Street                   Constangy
       Suite 300                              Brooks & Smith, LLP
       Winston-Salem, North Carolina 27101    7733 Forsyth Blvd.
       bmcmahon@constangy.com                 Suite 1325
                                              St. Louis, MO 63105
                                              fwrigley@constangy.com

The undersigned, pursuant to 28 USC 1746, certifies under penalty of perjury under the laws of the United States of America that this Notice of Appeal was served by electronically filing the same with the Clerk of the United States District Court for the Northern District of Illinois on December 1, 2014, and by depositing a copy of the same in the United States Postal Service, with proper postage affixed.

/S/ John P. DeRose
John P. DeRose
Attorney for LuzMaria Arroyo
Plaintiff-Appellant

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com

2

SA93