In the

# United States Court of Appeals
## For the Seventh Circuit

————————————

No. 14-3618

LUZMARIA ARROYO,

*Plaintiff-Appellant,*

*v.*

VOLVO GROUP NORTH AMERICA, LLC,
d/b/a VOLVO PARTS NORTH AMERICA,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cv-6859 — **Robert M. Dow, Jr.**, *Judge.*

————————————

ARGUED MAY 26, 2015 — DECIDED OCTOBER 6, 2015

————————————

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges*.

KANNE, *Circuit Judge*. LuzMaria Arroyo is an Army Reservist and veteran who suffers from post-traumatic stress disorder ("PTSD"). She worked for Volvo Group North America, LLC, d/b/a Volvo Parts North America ("Volvo") from June 2005 until she was fired in November 2011. Volvo says it fired her for violations of its attendance policy, but

Arroyo claims the real reason was discrimination on the basis of her military service and her disability.

Arroyo sued Volvo in federal district court for discrimination, retaliation, and failure to provide reasonable accommodations in violation the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Arroyo also brought a state-law claim for intentional infliction of emotional distress. The district court granted Volvo's motion for summary judgment on all counts and awarded Volvo, as the prevailing party, its reasonable costs.

We now reverse the district court's order with respect to Arroyo's discrimination claims under USERRA and the ADA because Arroyo has raised genuine, material factual issues that should be resolved at trial. We also vacate the district court's award of Volvo's costs. In all other respects, however, we affirm the judgment of the district court.

## I. BACKGROUND

Because this is an appeal from summary judgment, we summarize the facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor, without necessarily vouching for their accuracy. *Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014). LuzMaria Arroyo worked as a material handler in Volvo's Parts Distribution Center in Joliet, Illinois, from June 13, 2005, to November 8, 2011. Her main job was to retrieve vehicle parts with a

No. 14-3618                                                    3

forklift and pack them for shipment. From 2009 on, she worked the second shift from 4:30 p.m. to 12:30 a.m.

*A. Arroyo's Military Leave; Management's Reaction*

Volvo hired Arroyo with knowledge that she was a member of the U.S. Army Reserve. She was the only active reservist at the Joliet facility. During her employment, she deployed twice to Iraq and Kuwait: from April 2006 to May 2007 and from April 2009 to August 2010. (She had also deployed another time before she came to work at Volvo.) Additionally, Arroyo took regular leave for weekend drills, training, and other military activities. In all, she received more than 900 days of military leave during her six-and-a-half years at Volvo. The company allowed her to modify her work schedule to take leave, and she was never directly disciplined for doing so.

But Arroyo points to evidence, including numerous internal emails obtained in discovery, suggesting that her supervisors were frustrated from the beginning about her schedule and absences. In the fall of 2005, Arroyo traveled several times to Fort Benning, Georgia, where her unit was based, for military drills. In addition to the days of actual training, Arroyo also took off time beforehand and afterward to drive to and from Georgia. That apparently frustrated material handling supervisor Michael Temko, who questioned her about why she needed the additional time. Temko later emailed Keith Schroeder, the director of distribution, to ask, "[A]re we required to give her the day before and day after for travel?" Schroeder forwarded the inquiry to Bruce Olin, the Director of Labor Relations, adding:

> I find myself with a dilemma if I were to discipline
> a person for taking too much time off for military

reserve duty …. I certainly give her credit for serv-
ing our country but of course I am also responsible
for our business needs.

According to Arroyo's affidavit, Schroeder later told her
in a meeting, with Temko present, that her military duties
were becoming an undue hardship for Volvo and that she
needed to transfer to a local unit. Corroborating this account,
an email several weeks later from HR Manager Cecilia Jarvis
to Schroeder referred to "the undue hardship it [*i.e.,* Arroyo's
absences] is causing to our operation."

On October 28, Olin responded to Schroeder's earlier
email. Olin explained:

First, we do not have to grant time off for [Ar-
royo's] travel time. Her legal obligation is 2 weeks
per year, which we do give off, and 1 weekend per
month. The drills she attended were most likely ex-
tra training, which we do not have to grant the
time. We do not have to give extra time for her
travel to and from her weekend duty. She does
have the option to transfer to a closer unit, we can-
not make her transfer.

Schroeder forwarded the email to Temko, predicting "Luz-
Maria will challenge us." Following Olin's advice, Temko
told Arroyo "that she is not entitled to a travel day …. [A]ny
day that she takes for travel … will fall under our attendance
policy." In other words, she would be penalized.

As it turned out, Olin's advice was wrong. After doing
some research, Jarvis clarified that the law "now treats vol-
untary orders and involuntary orders [what Olin called 'ex-
tra training'] the same." And the Employer Support for the
Guard and Reserve ("ESGR"), which got involved at Ar-

royo's request, explained that she was entitled to "travel time plus an eight hour rest period following her drill before having to report to work" (as Jarvis reported to Temko at the end of December).

Arroyo deployed to Baghdad from April 2006 to May 2007. In April 2007, Temko complained to Olin that Arroyo had contacted him only once since she deployed. "For our planning/scheduling purposes," Temko explained, "it would be beneficial for us to know her status." He asked whether he could contact her unit. Olin responded: "Unfortunately, there isn't a lot we can do…. Per the law we have to wait for her. Sorry it isn't what you wanted to hear."

When Arroyo returned to work, according to her affidavit, Temko again suggested that she seriously consider transferring to a local unit, and Schroeder called her into his office and made it "very clear" that her job depended on her doing so. Therefore, in March 2008, she changed her duty station (reluctantly, she says) to Darien, Illinois.

Arroyo received orders to go on active-duty training with her new unit from April to October 2008. When she returned, Arroyo reports, Temko and Schroeder expressed dissatisfaction with the fact that she had been away for so long. The next month, Arroyo was away again for training from November 3 to 10. She had the next day off for travel, but then did not show up for three more days of work. In an internal email, Temko discussed disciplining, suspending, or possibly firing her for her absences. But when Schroeder called Arroyo, he received a copy of new orders extending her training from November 12 to 26. Although Schroeder had "issues with her lack of communications," as he ex-

plained in an email, "we likely have no recourse due to her military service."

From mid-April 2009 to mid-August 2010, Arroyo deployed overseas again in support of Operation Iraqi Freedom. Although USERRA gave her 90 days post-deployment to notify Volvo of her plans, *see* 38 U.S.C. § 4312(e)(1)(D), Schroeder opined in an email that she "should have returned to work on August 15, 2010." Management decided to offer her a voluntary severance package and expressed hope that she would accept it. They presented it to her on the first day after Arroyo returned to work, September 28, 2010. But she declined the package.

*B. Arroyo's PTSD and Requested Accommodations*

After returning from her second deployment, Arroyo received treatment for symptoms of PTSD and was formally diagnosed in January 2011. She checked herself into the emergency room on December 23, 2010; the next day she emailed Schroeder to tell him what was happening and that the doctor ordered her not to work through the 30th. In an internal email, Schroeder considered disciplining her, but she later provided a doctor's note and discharge paperwork excusing the absences.

Around the same time, Arroyo provided documentation about her rights to one of her supervisors, Sherrie Jankowski. Jankowski then wrote to Schroeder on December 2, 2010, that "[Arroyo] is really becoming a pain with all this." Later that month, after Arroyo checked into the ER, Jankowski reported in an email to Schroeder (possibly in jest) "several rumors for [Arroyo's] not being here," including that "[s]he's on vacation in Hawaii."

Arroyo took FMLA and disability leave from December 23, 2010, through March 22, 2011. When she returned, she began therapy for her PTSD. Volvo allowed her to leave her shift early or arrive late once a week to attend therapy sessions from April through October 2011. Arroyo also requested a number of other accommodations. Volvo granted many of them, including: a quiet place to meditate before work and during breaks; a mentor; time off for counseling; and breaks and support during panic or anxiety attacks. Other requested accommodations—a more flexible schedule, use of earplugs or headphones in both ears, day-to-day guidance and feedback, putting all communications in writing, and disability awareness training—were under review.

### C. Volvo's Discipline and Termination of Arroyo

Material handlers at the Joliet facility were subject to a local attendance policy, administered by Temko and Schroeder. Employees receive whole or fractional "occurrences" for unexcused absences or tardiness. Each time there is an occurrence, Volvo looks back at the employee's history. If the employee compiles two occurrences within four weeks or five occurrences within six months, the company takes "corrective action." There are four progressive disciplinary steps: verbal warning, written warning, three-day suspension, and termination. If an employee goes six months without an occurrence, her disciplinary "level" decreases a step. Months spent on military or most other types of leave do not count toward the six-month clock.

In 2009, Arroyo received a verbal warning. In October 2010, after Arroyo returned from her second deployment, she received two half-occurrences for being 22 and 20 minutes late to her work station, plus one full occurrence for

missing a day of work. Therefore, on October 29, she received a verbal warning. That same day, she punched in one minute late, for which she received another half-occurrence. This triggered a formal written warning—the second disciplinary step. But Schroeder retracted that warning because Arroyo said she was unaware that there was no longer a two-minute grace period.

From the fall of 2010 to the fall of 2011, Arroyo continued to receive occurrences for tardiness, often of only a short duration. She was cited four times for being 1 minute late, once for being 2 minutes late, twice for being 5 minutes late, and once for being 10 minutes late. On August 31, 2011, Schroeder issued Arroyo a written warning (step two) for the period preceding August 19 and a suspension (step three) for the period up to August 20.

The next month, Arroyo filed an internal complaint requesting an investigation of Schroeder for disability-based harassment. Volvo assigned an investigator to the case, but Arroyo refused to answer any of her questions. One of Volvo's upper managers emailed Schroeder to reassure him, "[P]lease do not be concerned about the investigation." Arroyo also filed a discrimination charge with the EEOC on September 13, 2011.

On October 10, 2011, Arroyo punched in one minute after her shift started. After another incident on October 31, Schroeder met with Arroyo to explain that her use of the meditation/relaxation room before work did not excuse her arriving late to her work station.

Arroyo started work late again on November 2 and 4 (the record does not reflect how late), so Schroeder issued both a

verbal and a written warning. He and Temko then audited
her attendance record and discovered that she had incurred
five occurrences within six months. That brought Arroyo to
the fourth step in the disciplinary process: termination. Vol-
vo fired her.

Arroyo sued in the Northern District of Illinois. After dis-
covery, Volvo moved for summary judgment, and the district
court granted its motion in full. *Arroyo v. Volvo Grp. N. Am.,
LLC*, No. 12-cv-6859, 2014 U.S. Dist. LEXIS 138696 (N.D. Ill.
Sept. 30, 2014) ("*Arroyo I*"). Arroyo filed a Rule 59 motion to
reconsider, which was denied. Arroyo timely appealed.

## II. ANALYSIS

We review a district court's grant of summary judgment
*de novo*. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938 (7th
Cir. 2003). To obtain summary judgment, the movant must
show that there is no genuine dispute as to any material fact
and that he is entitled to judgment as a matter of law. Fed. R.
Civ. P. 56(a).

### A. USERRA Discrimination Claim

USERRA prohibits employment discrimination against
members of the armed services. It provides:

> A person who is a member of … a uniformed ser-
> vice shall not be denied … retention in employ-
> ment, promotion, or any benefit of employment by
> an employer on the basis of that membership ….

38 U.S.C. § 4311(a). The statute provides further that such
discrimination exists where the employee's service member-
ship was "a motivating factor" in the employer's adverse ac-
tion "unless the employer can prove that the action would
have been taken in the absence of such membership." *Id.*

§ 4311(c)(1). This provision creates a two-step burden-shifting scheme: (1) once a plaintiff makes out a *prima facie* case by showing that his membership was "a motivating factor," (2) the burden shifts to the employer to prove that it would have taken the same action regardless. *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009).

To meet the "motivating factor" standard, a plaintiff does not necessarily need a direct admission from the employer. She may rely instead on circumstantial evidence that creates a "convincing mosaic" from which a reasonable jury could infer discriminatory motive. *See Adams*, 324 F.3d at 939 (discussing the "convincing mosaic" route to proving discrimination); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736–37 (7th Cir. 1994) (same). Such evidence could include, for example, suspicious timing, statements, or behavior. In the aggregate, these individual pieces might be enough to prove—or at least to create a genuine issue about—the employer's ill motive. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013).

Obviously, Arroyo suffered an adverse action—she lost her job. The question is whether her military service was a motivating factor in Volvo's decision to fire her. The district court did not think so. It found that the emails merely "demonstrate an awareness of Plaintiff's rights as an active service member, as well as discussions about the company's rights and obligations." *Arroyo I* at *35. Volvo was, in other words, simply trying to comply with the law.

We think this assessment underestimates the strength of the emails as support for Arroyo's case. Granted, Arroyo did a poor job of presenting her case to the district court. Her statement of undisputed facts under Local Rule 56.1 made

only general, broad-brush statements about Volvo's discrim-
ination, accompanied by bulk citations to the emails, affida-
vits, and other materials. As the district court noted, she
"[did] not cite to any specific emails," and it is "not the
Court's job to sift through the record to find the evidence."
*Arroyo I* at *34. Nevertheless, Arroyo did include the emails
and other materials in the record, so we are free to consider
them.[1] *See* Fed. R. Civ. P. 56(c)(3).

Taking all the evidence as a whole, a reasonable jury
could infer that Volvo was motivated, at least in part, by an-
ti-military animus toward Arroyo. There is evidence that
from the beginning of her employment, her supervisors dis-
liked the burden her frequent military leave placed on the
company. They repeatedly discussed disciplining her and
denied her rights, such as travel time, to which she was enti-
tled. Some of the emails come close to a direct admission of
management's frustration. For example, Schroeder discussed
his "dilemma" of "disciplin[ing] a person for taking too
much time off for military reserve duty." He later reportedly
told Arroyo that accommodating her orders placed an undue
hardship on Volvo; Jarvis repeated the same sentiment.
Temko complained about Arroyo's lack of communication
while she was deployed in Iraq. A jury could understandably
detect in these communications animus toward Arroyo's mil-
itary service.

---

[1] Arroyo also recounted the emails, quoting many of them at length, in
her Third Amended Complaint. Finally, she brought them to the district
court's attention when she moved for reconsideration of the summary
judgment decision.

Animus or frustration alone, however, does not support a claim of discrimination. It must have been linked, as a motivating factor, to an adverse employment action. 38 U.S.C. § 4311(c)(1); *Adams*, 324 F.3d at 939. Again, we think a jury could reasonably conclude that there was such a link here. The emails expressing management's frustration often transitioned directly to a discussion about disciplining Arroyo under the local attendance policy for her tardiness and absences. In the end, she was not disciplined directly for her military leave. But she was disciplined for other instances of tardiness, often of a relatively minor nature—one or only a few minutes late. A jury could infer from the evidence that Arroyo's punishment for such infractions was actually motivated by her supervisors' long-standing frustration about her frequent absences.

These facts distinguish Arroyo's case from cases where the employer demonstrated frustration but took no materially adverse action, *e.g., Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981–82 (7th Cir. 2008), where the employer's negative comments were isolated and unconnected to the termination decision, *e.g., Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 656–57 (7th Cir. 2013), or where there were merely "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process," *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). In contrast to these cases, Arroyo suffered adverse action (termination), the emails were arguably connected to the termination, and the complaining Volvo personnel were supervisors and decision-makers with power over her job.

It is true that Volvo granted Arroyo a considerable amount of military leave during her tenure at the company

and did not directly discipline her for those particular ab-sences. That fact will likely support Volvo's arguments be-fore a jury. But it does not negate an inference of discrimina-tory motive on summary judgment. *See Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 554 (8th Cir. 2005). Here, a jury could reasonably conclude that Volvo "was looking for a reason to discharge [Arroyo] because of the large number of absences from work due to [her] reserve status." *Id.* (revers-ing summary judgment on USERRA claims).

We conclude, then, that Arroyo presented sufficient evi-dence to make a *prima facie* case of USERRA discrimination. The burden therefore shifted to Volvo to show that it would have fired her even in the absence of her military service. 38 U.S.C. § 4311(c)(1). Volvo did not carry that burden; genuine issues of fact remain on this critical issue.

The district court emphasized that "Volvo's decision to hold employees to a strict start time is within its discretion." *Arroyo I* at *48–49. But that is the wrong standard. Even if Arroyo's tardiness was a "fireable offense … that is only the beginning of the analysis." *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 20 (1st Cir. 2007) (reversing summary judgment on USERRA claims). Instead, Volvo must prove that it would have fired Arroyo regardless of her military service. *Id.*

Volvo points out that it disciplined five other employees, and not just Arroyo, for being between one and ten minutes late to work. But Volvo only contends that one of them, Vic-tor Jackson, was disciplined and fired. Arroyo counters that Volvo did not enforce its policy so rigorously against other employees. Volvo has not conclusively established that it necessarily would have terminated Arroyo for her tardiness.

There is sufficient doubt on this issue to make it a jury question.

For these reasons, Volvo is not entitled to summary judgment on Arroyo's discrimination claim under USERRA.

*B. ADA Discrimination Claim*

The ADA prohibits employers from discriminating against their employees "on the basis of disability." 42 U.S.C. § 12112(a). To establish a violation of the ADA, an employee must show "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability…." *Winsley v. Cook Cty.*, 563 F.3d 598, 603 (7th Cir. 2009). An employee can prove discrimination either "directly" through admissions or circumstantial evidence, *Troupe*, 20 F.3d at 736–37, or "indirectly" through the familiar burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Arroyo proceeds under the direct route.[2]

The ADA claim presents a closer call than the USERRA claim for two reasons. First, the ADA standard is more exacting for Arroyo: she must prove that her PTSD was a "but for" cause of her discipline and termination. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010).[3]

---

[2] To the extent Arroyo also attempts to satisfy the indirect method, her claim fails, as the district court correctly concluded. *Arroyo I* at *36–45.

[3] It is an open question whether the 2008 amendments to the ADA, which changed the operative causation language from "because of" to "on the basis of," altered the substantive standard. *See Serwatka*, 591 F.3d at 962 n.1; *Silk v. Bd. of Trustees*, 795 F.3d 698, *12–14 (7th Cir. 2015). The

(continued…)

Second, there is less evidence of animus toward Arroyo's PTSD than there is concerning her military service.

Nevertheless, we think the evidence is sufficient to convince a reasonable jury that Arroyo was the victim of disability discrimination. Internal emails indicate that Volvo management considered disciplining Arroyo for her absences while she was in the hospital in December 2010, even though she emailed Schroeder to tell him about her condition. Another one of her supervisors, Sherrie Jankowski, joked about Arroyo's absence, writing that she heard rumors Arroyo was actually vacationing in Hawaii. A few weeks earlier, Jankowski had complained to Schroeder that Arroyo was "really becoming a pain with all this." This is enough for a jury to find discriminatory motive.

There is also enough to support a finding of "but for" causation. Management's expressions of frustration about Arroyo's military absences goes back to the beginning of her employment in 2005, but it was not until she returned from her second deployment in the fall of 2010 that Volvo began implementing the series of disciplinary steps that led to her termination. That timing coincides with the onset and diagnosis of Arroyo's PTSD. This kind of suspicious timing can support an inference of discrimination. *Hobgood*, 731 F.3d at 643–44.

We therefore conclude that summary judgment was also improper on Arroyo's ADA discrimination claim.

---

(…continued)

issue was not briefed by the parties, and the answer would not affect the outcome here in any case, so we need not resolve this issue.

*C. Remaining Claims*

On Arroyo's remaining claims, however, we agree with the district court's ruling and have little to add to its analysis. To recap briefly: Arroyo's retaliation claim fails because the statutorily protected activity in which she engaged—her internal complaint, EEOC complaint, and accommodation requests in 2011—all came after Volvo began disciplining her for her tardiness. Arroyo has not offered sufficient evidence of a causal link between her protected activity and the adverse employment actions.

Arroyo's failure-to-accommodate claim fails because the undisputed evidence shows that Volvo made numerous accommodations so that she could fulfill her military duties and cope with her PTSD (even if, as she claims, the company did so grudgingly). Volvo was also in the process of considering other requests and investigating Arroyo's complaints through an interactive process. But Arroyo was less than cooperative; for example, she refused to meet with the HR representative assigned to her case. On these facts, we perceive no genuine issue of material fact regarding the adequacy of Volvo's accommodations.

Finally, Volvo's actions, while perhaps discriminatory (that is for a jury to decide), did not rise to the level of "extreme and outrageous" under Illinois law. *See Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999) ("[I]n the absence of conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress."). Arroyo's claim for intentional infliction of emotional distress therefore fails.

*D. Award of Costs*

The district court awarded Volvo its reasonable costs, amounting to $9,476.30, as the prevailing party under Fed. R. Civ. P. 54(d)(1). In light of our decision, that award was at the very least premature and should be vacated. The district court may revisit this issue, however, after a final resolution of the case.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on Arroyo's claims of discrimination under USERRA and the ADA; we VACATE the district court's award of Volvo's costs; and we AFFIRM in all other respects. This case is REMANDED for further proceedings consistent with this opinion.